1

1        IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF WEST VIRGINIA
2              CLARKSBURG
-----
3

4  MARKS CONSTRUCTION CO., INC., et al,

5       Plaintiffs
  VS             CIVIL ACTION NO. 1:05-CV-73
6          (Judge Frederick P. Stamp, Jr.)
  THE HUNTINGTON NATIONAL BANK, et al,

7

      Defendants
8

      ------
9

10        DEPOSITION OF JAMES C. MARKS,

11  a plaintiff herein, called by the Defendants for examination,

12  taken pursuant to Federal Rules of Civil Procedure, by and

13  before Rosalie B. Eanone, Court Reporter, and Notary Public

14  in and for the State of West Virginia, at the offices

15  of Steptoe & Johnson, PLLC, 229 Main Street, Clarksburg,

16  West Virginia, on Friday, October 6, 2006, commencing at

17  10:06 a.m.

18

19

20

21

**EXHIBIT 1**

22

23          ROSALIE B. EANONE, RPR, RMR, NOTARY PUBLIC
                      126 Overlook Drive
24               Clarksburg, West Virginia 26301
                     Tel. (304) 623-4544

**EXHIBIT 1**

2

1  APPEARANCES:

2

3  FOR THE PLAINTIFFS:    MICHAEL J. ROMANO, ESQUIRE
               128 South 2nd Street
4                Clarksburg, West Virginia 26301
               Tel. (304) 624-1100
5

6  FOR THE DEFENDANTS:    JOHN R. CALLCOTT, ESQUIRE
               STEPTOE & JOHNSON, PLLC
7                P. O. Box 1616
               United Center, Suite 400
8                1085 Van Voorhis Road
               Morgantown, West Virginia 26507-1616
9                Tel. (304) 598-8000

10

               KEVIN A. WIGGINS, ESQUIRE
11               STEPTOE & JOHNSON, PLLC
               Chase Tower - Sixth Floor
12               P. O. Box 2190
               Clarksburg, West Virginia 26302-2190
13               Tel. (304) 624-8195

14

15

16

17

18   ALSO PRESENT:        KAREN MARKS
                SHARON LYNN HUGHES
19

20

21

EXHIBIT 1

22

23

24

**EXHIBIT 1**

3

1          * * * * *
             I N D E X

2

3    WITNESS          EXAMINATION REEXAMINATION

4    JAMES C. MARKS

5     By Mr. Callcott:     4
      By Mr. Romano:        92
6     By Mr. Callcott:            102
      By Mr. Romano:              104
7     BY Mr. Callcott:            108

8

9

10

11   EXHIBITS                    MARKED

12    DEPOSITION EXHIBIT NO. 1        21
      DEPOSITION EXHIBIT NO. 2        44
13    DEPOSITION EXHIBIT NO. 3        47
      DEPOSITION EXHIBIT NO. 4        58
14    DEPOSITION EXHIBIT NO. 5        60
      DEPOSITION EXHIBIT NO. 6        65
15    DEPOSITION EXHIBIT NO. 7        65
      DEPOSITION EXHIBIT NO. 8        73
16    DEPOSITION EXHIBIT NO. 9        74
      DEPOSITION EXHIBIT NO. 10       76
17    DEPOSITION EXHIBIT NO. 11       77
      DEPOSITION EXHIBIT NO. 12       99
18
     *Exhibits attached.
19

20

21

**EXHIBIT 1**

22

23

24

**EXHIBIT 1**

4

1              - - -

2         P R O C E E D I N G S

3              - - -

4      JAMES C. MARKS, A PLAINTIFF, SWORN

5              EXAMINATION

6   BY MR. CALLCOTT:

7   Q   Mr. Marks, my name is John Callcott.  We met a few days

8   ago at Mrs. Hughes's deposition.

9      It is my opportunity today to ask you some questions

10   about the lawsuit that you and others have brought.

11      If I ask you a question today that you don't understand,

12   will you tell me?

13   A   Sure.

14   Q   As we sit here today, are you on any medications that

15   would affect your ability to answer my questions completely,

16   fully and truthfully?

17   A   No.  I'm on medications but nothing that will affect

18   that.

19   Q   Okay.  Just for the record, could you state your full

20   name?

21   A   Sure.

EXHIBIT 1

22      My name is James C. Marks, M-A-R-K-S.

23   Q   Where do you currently reside, Mr. Marks?

24   A   We reside at 18 Carriage Lane, Bridgeport, West

**EXHIBIT 1**

5

1   Virginia.

2   Q   What county is that in?

3   A   Harrison.

4   Q   How long have you lived in Harrison County?

5   A   All my life.

6   Q   I have to ask this question of everyone I depose.

7       Have you ever been convicted of any crime?

8   A   No, sir.

9   Q   What I want to start out with today is going over some

10   historical things.

11      Have you ever given a deposition before?

12   A   One time probably in 1978.

13   Q   What was that about?

14   A   Our company had a lawsuit with Union Carbide.

15   Q   You were deposed in connection with that lawsuit?

16   A   Yes.

17   Q   Did you bring the lawsuit or were you a defendant

18   against that lawsuit?

19   A   We were a defendant.

20   Q   Why did they sue you?

21   A   It's really too complicated to answer.  It was a lot of

EXHIBIT 1

22   things involved.

23   Q   Well, was it over a contract?

24   A   Yes.

EXHIBIT 1

6

1   Q    Were they alleging that you breached that contract?

2   A    No, not really.  They were alleging that there was

3   some work done at some of the Union Carbide employees' homes

4   that was charged to Union Carbide and somebody got to their

5   main corporate office, so they brought a lawsuit concerning

6   that.

7   Q    Saying you shouldn't have been doing that work?

8   A    Right.

9   Q    Any other lawsuits you have been involved in that your

10   company -- Let's separate this out.

11       Have you personally ever brought any other lawsuits

12   against anyone else?

13   A    No, sir, not that I can remember.

14   Q    Have you personally ever been sued by anyone else?

15   A    Not that I can remember, no.

16   Q    Has Marks Construction other than the Union Carbide

17   lawsuit that you mentioned ever been sued?

18   A    No, sir, not that I remember.

19   Q    Has Marks Construction ever brought a lawsuit?

20   A    I can't remember of any right now.

21   Q    Okay.

**EXHIBIT 1**

22   A   There may have been but I can't remember.  I can't think

23   of any.

24   Q   When and where did you graduate from high school?

EXHIBIT 1

7

1    A    I graduated from Victory High School in 1956.

2    Q    And after you graduated from high school did you go on

3    to any other formal education?

4    A    No, sir.

5    Q    When you went to work who did you start working with?

6    A    I started working for Clyde M. Shrum Construction

7    Company, a local contractor.

8    Q    And what were you doing for them?

9    A    I started out as a truck driver and ended up when I

10    started my own business.  I was a foreman for them.

11    Q    When did you start your own business?

12    A    1969, March of 1969.

13    Q    And when you were a foreman, what types of work were you

14    handling as a foreman?

15    A    We were doing a lot of work at Union Carbide at the time

16    and I was foreman for a crew of people at Union Carbide.

17    Q    What were they installing or working on?

18    A    We were just doing -- We had a maintenance contract with

19    them, just doing all kinds of work, just maintenance type

20    work.

21    Q    So you started your own business of Marks Construction

**EXHIBIT 1**

22   in 1969 and it has been in operation since then?

23   A    Well, we started out as M&M Contractors in 1969 and then

24   my brother came with me in 1972 and we formed Marks

**EXHIBIT 1**

8

1    Construction in 1972, October of 1972, and it has been Marks

2    Construction since then.

3    Q    Now, has your wife been working with you in the

4    construction business since that time?

5    A    Yes, sir, almost full-time.

6    Q    Is Marks Construction still in operation?

7    A    Barely.  Yes, sir, we are.

8    Q    Still taking contracts to build buildings and that sort

9    of thing?

10   A    Yes, sir.

11   Q    When you started the company up in you said 1969 and

12   then in '72 it became Marks Construction, what kind of work

13   were you working on?

14   A    We were still doing work at Union Carbide and we were

15   also building buildings.

16   Q    Did you operate principally in this region, throughout

17   the whole state, outside the state?

18   A    We tried to stay within a hundred mile radius of

19   Clarksburg.

20   Q    Can you tell me over the years some of the projects that

21   Marks Construction has worked on?

**EXHIBIT 1**

22   A   It has been a lot.

23   Q   Would you say thousands of projects?

24   A   Oh, yes.

**EXHIBIT 1**

9

1      We built Long John Silvers in Charleston, West Virginia.

2      We built a school in Parkersburg, West Virginia.

3   Q    Which school?

4   A    It was an elementary school on Camden Avenue.  I can't

5   remember the name of it but it was a four million dollar

6   project.

7      We built the City Building in Clarksburg.

8      We built the Septa Bus Station in Clarksburg.

9      We built Rish Equipment Company in Bridgeport.

10      Do you want more?

11   Q   All multimillion dollar contracts?

12   A   No, no.  Our biggest job was probably five million.

13   Q   Okay.  And which job would that have been?

14   A   Clarksburg City, the City Building.

15   Q   Any guess on how many subcontractors you would have used

16   for a job like that?

17   A   Probably at least a half a dozen would be my guess.

18      I can't tell without looking at the paperwork.

19   Q   Just taking the Clarksburg City Building as an example,

20   what would your role be in the construction of a building

21   like that?

**EXHIBIT 1**

22   A   I was the manager.  I looked after the job every day.

23       I had a superintendent on the job but he reported to

24   me.

EXHIBIT 1

10

1    Q    And so would you have handled the deal from beginning to

2    end, from the initial negotiation to the final walk-through

3    and punchlist?

4    A    What do you mean handled the deal?

5    Q    Well, when a deal like that, a proposal like that,

6    becomes available, say we will just use the City Building as

7    an example, how did Marks Construction became aware that that

8    job was going to come up for a bid?

9    A    It was advertised in the paper or word of mouth.  I

10   don't remember right now.

11   Q    Would you have submitted a bid on that building?

12   A    Oh, yes.

13   Q    Would you have put that together?

14   A    No.

15   Q    Who would have put that bid together?

16   A    We had an estimator working for us by the name of

17   Richard Straight.

18   Q    Now, I take it that you wouldn't just take what he

19   prepared and submit it to the city; you would have looked at

20   it and worked with it?

21   A    I would have probably looked it over a little bit, and

**EXHIBIT 1**

22   he was a very reputable estimator and we used his judgment.

23   He was a good estimator.

24   Q   Was it your name though on the bid proposal that went

**EXHIBIT 1**

11

1   in?

2   A   I signed the contract, yes.

3       MR. ROMANO:  Objection.

4       Go ahead.  It's a corporation.

5   BY MR. CALLCOTT:

6   Q   Now, did you sign off on behalf of the corporation?

7   A   Yes, sir, correct.

8   Q   Now, did you employ legal counsel to review that

9   particular contract or generally when you had contracts for

10   jobs for Marks Construction or did you review those contracts

11   yourself?

12   A   As near as I can recall, we normally did it ourselves.

13   Q   And you would have been involved in that process?

14   A   Reviewing the contract?

15   Q   Yes, sir.

16   A   Very seldom.  Richard Straight usually took care of

17   that.

18   Q   But you are saying you just signed the contract without

19   reviewing it then?

20   A   I might have glanced through it but I never paid much

21   attention to it.

**EXHIBIT 1**

22      He usually read it.  If he had any objections or

23   anything, he would tell me.

24   Q   So you would essentially -- If he didn't say anything to

EXHIBIT 1

12

1   you, you would essentially after glancing at it just go ahead

2   and sign it?

3   A   If he told me it looked fine, I would probably go ahead

4   and sign it.

5   Q   And that was your typical course of business over the

6   past three decades this company has been in business?

7        MR. ROMANO:  Objection to form.

8        THE WITNESS:  Well, as near as I can remember,

9   yes.

10   BY MR. CALLCOTT:

11   Q   Now, during the course of the job you had various

12   subcontractors reporting to what they were doing.

13      Did you have a superintendent report to you what they

14   were doing on a site?

15   A   Yes.

16   Q   If problems arose, you would deal with those problems?

17   A   Yes, or a lot of times the superintendent would deal

18   with them himself.

19   Q   But if there was a problem though at the end of the day,

20   it would be your responsibility to fix it?

21   A   Not necessarily, no.  The superintendent could take care

EXHIBIT 1

22   of it.

23        I had several jobs going at one time, so I would be

24   travelling from one job to another.

**EXHIBIT 1**

13

1    Q    So you would be essentially working with and dealing

2    with problems from a number of different jobs?

3    A    Yeah, I would be attending all of the jobs.  If there

4    was any questions, I would be glad to help them answer them.

5    Q    What has been your position with the company over the

6    years in terms of whether you have been an officer or a

7    director?

8    A    I was an officer in the corporation.

9    Q    All right.  What position -- I noticed that Mrs. Marks

10   has signed some documents as president and I'm trying to

11   figure out, and I know it is a long time period, so if you

12   could just tell me kind of from 1973 on if you recollect

13   generally what officer positions or other positions you have

14   held?

15   A    Well, right now I'm the treasurer.

16   Q    Okay.

17   A    And the reason being I semi-retired when I turned

18   sixty-five and I gave up the position of president.

19   Q    When would that have been when you turned sixty-five,

20   sir?

21   A    Sixty-five years after 1938.  That would be probably

EXHIBIT 1

22   2003.

23        MR. ROMANO:  5.  Seventy-five after 1938?

24        THE WITNESS:  Sixty-five.

**EXHIBIT 1**

14

1         MR. ROMANO:  Oh, sixty-five?

2         THE WITNESS:  Yeah.

3      No, I'm sorry, when I turned sixty-two --

4         MR. ROMANO:  Sixty-two.

5         THE WITNESS:  -- because I semi-retired when I

6   turned sixty-two.

7   BY MR. CALLCOTT:

8   Q   So that would be 2000?

9   A   Um-hum, okay.

10        MR. ROMANO:  Yeah.

11      Let me just stop and break in here real quick.  I see

12   him squirming around.  I just want to let you know that he

13   has got a hip problem, so if you don't mind.  Whenever you

14   need to get up, I know you need to get up.

15        THE WITNESS:  All right.

16        MR. CALLCOTT:  Oh, by all means, as we go through

17   today's deposition, anytime you need to stand up, take a

18   break, if there is a question pending, I'll ask you to answer

19   that particular question, but we will take a break

20   immediately thereafter.

21        THE WITNESS:  Okay.

**EXHIBIT 1**

22   BY MR. CALLCOTT:

23   Q    You understand that you have a right to ask for that and

24   the right to get that anytime you want to today?

EXHIBIT 1

15

1    A    Okay.

2    Q    Okay.  Prior to 2000 what position did you have with the

3    company?

4    A    Prior to 2000 I was president.

5    Q    Okay, all right.  And after 2000 you say you have acted

6    as treasurer?

7    A    Yes, sir.

8    Q    Have you continued to assist with jobs that have been in

9    process for the company?

10   A    Yes, sir.

11   Q    Have you continued to oversee construction projects?

12   A    Yes, sir.

13        MR. ROMANO:  Objection to form.

14   BY MR. CALLCOTT:

15   Q    Now, when you were working on the City Building, did

16   that particular project have a timeline during which it had

17   to be completed?

18   A    Yes, sir.

19   Q    And, in fact, probably most, if not all, of the

20   construction contracts that you dealt with had particular

21   timelines that had to be dealt with?

**EXHIBIT 1**

22   A   Yes, sir.

23   Q   If the timeline wasn't met, what was the typical -- what

24   would happen?

EXHIBIT 1

16

1    A    There was normally liquidated damages on the job if it

2    wasn't finished on time.

3    Q    So it is fair to say that throughout your experience in

4    the business that you have been involved in that time is an

5    essential component of the work that you have done?

6         MR. ROMANO:  Objection to form.

7         THE WITNESS:  Well, I can say time -- I mean, there

8    is a deadline on the job but I can also say that we have

9    never -- in the thirty-seven years we have been in business

10   we have never paid liquidated damages.

11   BY MR. CALLCOTT:

12   Q    Always got the job done on time?

13   A    No.  It just worked out that we didn't have to pay

14   liquidated damages.

15   Q    I guess where I'm going with this is that you have had

16   an understanding throughout your business career that time

17   can often equal money and it is important to pay attention to

18   things during times when things are happening?

19        MR. ROMANO:  Objection to form.

20        THE WITNESS:  I guess you could say that.

21   BY MR. CALLCOTT:

**EXHIBIT 1**

22   Q   Anything wrong with that?

23       I mean, do you disagree with that?

24   A   I don't know.  I'd have to think about it a little bit.

**EXHIBIT 1**

17

1   Q   We can sit here as long as you like.

2       MR. ROMANO:  Why don't you repeat the question.

3   I'm not sure I understood it.

4       THE WITNESS:  Yeah.

5       MR. ROMANO:  Let him think about it.

6   BY MR. CALLCOTT:

7   Q   Well, if we come back to it today, if you have anymore

8   thoughts on it, please let us know.

9   A   Okay.

10      MR. ROMANO:  I'll just give you an instruction.  He

11   did kind of give it to you.

12      Make sure you understand his question because I didn't

13   understand it.

14      If you did, you are better than me.

15   BY MR. CALLCOTT:

16   Q   And that raises another important point.  It is critical

17   that you understand my question; and whether my esteemed

18   counsel understands the question or not, that's not so

19   important.

20      MR. ROMANO:  You are right but whether you

21   understand the question is.

**EXHIBIT 1**

22      My point is I didn't understand it and I'm trained at

23   this job and this is my expertise.  Yours may be

24   construction.

**EXHIBIT 1**

18

1   BY MR. CALLCOTT:

2   Q   Now, what positions has Mrs. Marks held in the company

3   since it was formed?

4   A   She did a lot of the book work, invoicing.

5   Q   Since 2000 she has been president?

6   A   Yes, sir.

7   Q   Okay, all right.  Now, do you know is this an

8   S Corporation, a C Corporation?

9   A   I don't know.

10   Q   Okay.  Who does your accounting for your business?

11   A   Smith & Denny.

12   Q   How long have they been your accountants?

13   A   As near as I can remember, probably since -- I don't

14   know.  I can't answer that.  I can't remember.

15   Q   A long time?

16   A   Yeah.

17   Q   They are the accountants for the business and for you

18   personally?

19   A   Yes, sir.

20   Q   Was Smith & Denny your accountants for the business

21   prior to 2000?

EXHIBIT 1

22   A   Yes, sir.

23   Q   What is the name of the individual you have worked with

24   most at Smith & Denny or has at least been your primary

**EXHIBIT 1**

19

1   contact?

2   A    Jim Denny.

3   Q    And was he the person that Marks Construction consulted

4   when it set about to take some loans out from the plan, the

5   loans that are the subject matter of this lawsuit?

6   A    Yeah, Jim Denny was the person I talked to.

7   Q    I want to go back to your experience working with

8   contractors on your jobs.

9      Have you ever had a situation in your business history

10   where a contractor has done something wrong on a job where

11   you have been expected to make it right?

12   A    Not that I can recall.

13   Q    So it has never happened in the thirty year business?

14      MR. ROMANO:  Objection.

15    Asked and answered and argumentative.

16      THE WITNESS:  I can't recall of any, no.

17      MR. CALLCOTT:  You have good subcontractors.

18   BY MR. CALLCOTT:

19   Q    What I'm getting at is have you ever heard the word

20   indemnification?

21   A    I have heard the word, yes.

EXHIBIT 1

22   Q   Do you understand what indemnification means?

23   A   Not really.

24   Q   Do you understand that the bank has a claim for

**EXHIBIT 1**

20

1    indemnification back against Marks Construction?

2    A    No, sir.

3    Q    You don't understand that that's part of this lawsuit?

4    A    I don't know what indemnification means.

5    Q    Oh!

6         Do you understand that the bank has brought a

7    counterclaim against Marks Construction and all of the

8    plaintiffs in this case seeking to be reimbursed for its cost

9    for this case?

10   A    I think I remember that going on.

11   Q    Okay.  Do you understand that there was a clause in a

12   plan document which included an indemnification clause?

13        Were you aware of that?

14   A    No, sir, I'm not.

15   Q    Have you ever retained any lawyers, and I'm not talking

16   about Mr. Romano, but that you consulted with say from 2000

17   to 2005 -- any other legal counsel on any matter except

18   related to this lawsuit?

19   A    Except for this lawsuit?

20   Q    Yes.

21   A    I don't think so, not that I can remember.

**EXHIBIT 1**

22   Q   Have you ever consulted with any other accountants on

23   any matters?

24       I'm talking just about business.

EXHIBIT 1

21

1   A   Not that I remember, no.

2   Q   Let's move on to the loan transaction that is the

3   subject of this matter.

4       Do you recollect a time when you took a loan out for

5   $50,000?

6   A   I remember that, yes.

7       (Deposition Exhibit No. 1 marked for the purpose of

8   identification.)

9   BY MR. CALLCOTT:

10   Q   I'm going to hand you a series of documents marked as

11   Exhibit 1 and ask you to take a look and see if you can

12   identify these and we'll go through these one at a time.

13       MR. ROMANO:  This is going to be your first

14   exhibit?

15       MR. CALLCOTT:  This is collective Exhibit 1.

16       MR. ROMANO:  While he is looking that over, if you

17   don't mind, let me remind you I'm still waiting -- it has

18   been two weeks now -- on the items remaining --

19       MR. CALLCOTT:  You know, --

20       MR. ROMANO:  Just give me a second.

21       MR. CALLCOTT:  No.  It's not your deposition.

**EXHIBIT 1**

22          MR. ROMANO:  Well, I agree with that.

23       Are you going to be harsh while he is looking it over to

24    not let me ask him where the conversion manual if he knows --

**EXHIBIT 1**

22

1        MR. CALLCOTT:  I'm not going to let you put this

2   all on the record.

3        MR. ROMANO:  It is going to go on a motion to

4   compel on Tuesday.  So I wanted to tell you that so that it

5   is on the record.

6     That's fine.  I'm done.

7        MR. CALLCOTT:  You can do whatever you need to do

8   with the court.

9        MR. ROMANO:  Well, I will.  Thank you.  I

10   appreciate that.

11   BY MR. CALLCOTT:

12   Q    Do you recognize the first page of this document which

13   has Plaintiff's Bates number on it 546?

14   A    I mean, I see it, but I don't remember ever seeing it.

15   Q    Is that your signature on that document?

16   A    Yes, sir, it is.

17   Q    Okay.  So you recognize this as your signature and you

18   recognize that date.

19     Is that also in your handwriting?

20   A    No, I don't think the date is in my handwriting.

21   Q    Do you have any doubt though that you actually signed

**EXHIBIT 1**

22    this document?

23    A    No, I signed it.  This is my signature.

24    Q    Okay, all right.  Do you recollect reading this document

EXHIBIT 1

23

1   when you signed it?

2   A   Not at all.

3   Q   Any particular reason why you wouldn't have read a

4   document entitled Promissory Note?

5   A   I signed a lot of documents that I didn't read.

6   Q   Okay.

7   A   So no particular reason.  I don't remember reading it at

8   all.

9   Q   Okay.  Moving onto the second page of this document,

10   547.

11      Is that your signature on this document?

12   A   Yes, sir.

13   Q   And do you ever recollect reading this particular

14   letter?

15   A   No, sir.

16   Q   Do you know who would have prepared this letter?

17   A   I have no idea.

18   Q   Do you know who would have prepared the Promissory Note

19   which is the first page?

20   A   I have no idea.

21   Q   You did receive $50,000 in exchange for signing the

**EXHIBIT 1**

22   Promissory Note, didn't you?

23   A   Yes, sir.

24        MR. ROMANO:  Objection to form.

**EXHIBIT 1**

24

1   BY MR. CALLCOTT:

2   Q   The next two pages are on amortization of interest.

3       Have you ever seen this amortization before?

4   A   I have never seen that at all, not that I remember.

5   Q   Okay.  Have you ever taken out a loan prior to this one

6   personally or in terms of business?

7   A   I can't remember any right now.  I'm sure I probably

8   have but nothing sticks in my mind right now.

9   Q   Did you ever take a loan out for a car?

10  A   No.

11  Q   Did you ever take out a loan to buy a house?

12  A   No.

13  Q   Did your company ever borrow money for any purpose?

14  A   I think we -- Probably.  I don't remember.  I really

15  don't.

16      We probably bought a piece of equipment before where we

17  borrowed money.

18  Q   Would you have expected to have paid back that money

19  that you borrowed for that piece of equipment?

20  A   Oh, we did pay it back.

21  Q   Did you pay it back on time?

**EXHIBIT 1**

22   A   Yes, sir.

23   Q   I guess where I'm going with this, Mr. Marks, is when

24   you receive a loan you understood that it would need to be

**EXHIBIT 1**

25

1    repaid?

2    A    Not in this case.

3    Q    Why not in this case?

4    A    I thought we were taking our own money.

5    Q    Was it your accountant that advised you that you were

6    taking your own money?

7    A    No, sir.

8    Q    But it was the accountant who, in fact, drafted these

9    letters, wasn't it?

10        MR. ROMANO:  Objection.

11      Asked and answered.

12        THE WITNESS:  I don't know.  I really don't know.

13    BY MR. CALLCOTT:

14    Q    When you received this $50,000, you understood at some

15    point it would have to be paid back?

16    A    No, sir.

17    Q    So the accountant never mentioned that to you when these

18    loans were taken out?

19    A    Not that I recall.

20    Q    Have you had any discussions since this loan was taken

21    out with your accountant about these loans?

EXHIBIT 1

22   A   No, sir.

23   Q   You haven't spoken with him at all?

24   A   I don't remember speaking with him about these.

EXHIBIT 1

26

1    Q    Would anyone else in Marks Construction Company have had

2    any contact with him about these loans?

3    A    Not that I know -- not that I know of.

4    Q    When the 1099s were issued, did you have any

5    communications with him then about these loans?

6    A    Not that I recall.

7        Let me back up.  I may have.  I can't recall for sure.

8    I know I called Ms. Hughes.

9    Q    Did it ever occur to you that he might be a source of

10   tax advice with respect to whether these loans were taxable

11   given the fact that he was your accountant?

12   A    Like I said, I thought we were taking our own money

13   out.  I didn't realize it had to be repaid.

14   Q    Since this lawsuit has been filed have you entered into

15   any settlement agreements with the accountant regarding the

16   advice that he has given you with respect to any of the

17   matters that are the subject of this lawsuit?

18   A    I don't understand the question.

19       Say it again.

20   Q    Have you spoken with your accountant about him paying

21   you any money as a result of advice he did or did not give

EXHIBIT 1

22    you related to these loans?

23    A    About him paying us money?

24         Not that I recall, no.

**EXHIBIT 1**

27

1   Q   Okay.  Are you aware of any documents which outline what

2   this accountant is supposed to do for you in terms of what

3   advice he is supposed to provide either you or your business?

4   A   I'm not aware of any.

5   Q   Do you ever recollect receiving any communications from

6   him in writing say in the past five years?

7   A   Concerning what?

8   Q   Any matter.

9   A   I possibly could have but I can't recall of anything in

10   particular right now.

11   Q   And you are the treasurer or have been since the year

12   2000?

13   A   Yes, sir.

14   Q   Okay.  If you have received any communications from this

15   accountant, would those have been retained or kept?

16   A   I can't answer that.  I don't know.

17   Q   Are you saying that it's possible that since the filing

18   of this lawsuit that some of the documents he may have

19   provided you may have been thrown away?

20   A   Oh, no, I'm not saying that at all.

21   Q   So they have been all retained?

EXHIBIT 1

22   A   I don't know that we have received any is what I'm

23   trying to say.

24   Q   Okay.  But if you had received any, would they have been

EXHIBIT 1

28

1   maintained or kept?

2   A   Well, I believe if we received them I would say they

3   have been maintained, yes.

4   Q   Who would have maintained them?

5   A   My wife.

6   Q   Now, when did your office first become computerized, the

7   office for Marks Construction?

8        MR. ROMANO:  Objection to form.

9        THE WITNESS:  I have no idea.

10   BY MR. CALLCOTT:

11   Q   When did you get your first computers for Marks

12   Construction?

13   A   I don't know.

14   Q   Do you have any computers at Marks Construction?

15   A   Yes, sir.  We have two.

16   Q   Were those purchased before 2000 or after?

17      Do you have any idea?

18   A   Prior.

19   Q   Prior to 2000?

20   A   Yes.

21   Q   Do you have the same two computers now?

**EXHIBIT 1**

22   A    We started out with one and one was added.  I don't know

23   if they are the same ones or not.

24   Q    Do you know who installed those computers for you?

**EXHIBIT 1**

29

1    A    No, sir, I don't.

2    Q    Would it have been someone inside your company or

3    outside?

4    A    I don't recall.

5    Q    Do you recollect when your business would have gotten an

6    Internet connection?

7    A    No, I have no idea.

8    Q    Who would have handled that for you?

9        Would that have been Mrs. Marks or someone else?

10   A    Probably it would have been Mrs. Marks.

11   Q    So that is a better question for her then?

12   A    I would say.

13      I don't know anything about computers.

14   Q    Do you have a personal e-mail account?

15   A    I don't.

16   Q    Does the business?

17   A    Yes.

18   Q    Do you know how long it has had that?

19   A    No, sir, I don't.

20   Q    Less than five years, more than five years?

21   A    My guess would probably be five years or less.

**EXHIBIT 1**

22   Q   I want to focus in very specifically on a time period

23   between April 1, 2003, and September 1, 2003, and I just want

24   to make sure that you have no recollection that you made any

**EXHIBIT 1**

30

1   contacts with your accountant during that particular

2   timeframe?

3   A   As far as I could remember, we did not.

4   Q   Do you recollect any discussions with your accountant

5   when the plan was terminated when you took all of your money

6   out?

7   A   I don't specifically remember any in particular.  We may

8   have called and told them that we were going to but I don't

9   remember that.

10   Q   Did he handle taking all of the money out?

11       I mean, did he handle transferring it out to different

12   people?

13   A   I don't think so.

14   Q   Who would have done that for you?

15   A   I don't understand the question.

16       Repeat that.

17   Q   Well, it's my understanding that there is a certain

18   point in time a request was made from Marks Construction to

19   terminate the plan, to transfer the assets out to the

20   individuals.

21       Is that your understanding?

**EXHIBIT 1**

22   A   I didn't know they were transferred out to the

23   individuals.  I thought they were just transferred to where

24   we requested them to go.

EXHIBIT 1

31

1    Q    Okay.  Where did they go?

2         Where did your money go, for example, the money that was

3    in your account?

4    A    Chase Bank?

5         MR. ROMANO:  And just so you know, it was Bank One

6    at that time?

7         THE WITNESS:  Yeah, right.

8    BY MR. CALLCOTT:

9    Q    Okay.  Do you know where Mrs. Marks's money went?

10   A    The same.

11   Q    Do you know where Ms. Davis's money went?

12   A    The same.

13   Q    And what about Mr. Straight?

14   A    I have no idea.

15   Q    Do you have any notion about what he did with his

16   money?

17        I mean, did he transfer it to someone else?

18   A    I don't know.

19   Q    Who would know that?

20   A    Richard Straight probably would be my guess.

21   Q    Is Mr. Straight still employed with you folks?

**EXHIBIT 1**

22   A   No, sir.

23   Q   When did he cease his employment?

24   A   Four or five months ago, I guess.  That's my guess.  I

EXHIBIT 1

32

1   can't remember the exact date.

2   Q   Do you know where he is now?

3   A   I just know he lives in Fairmont.

4   Q   Okay.  So he hadn't moved out of state or anything?

5   A   Not that I know of.

6   Q   How many folks do you currently employ?

7   A   Right now full-time we have three, myself, my wife and

8   my daughter.

9   Q   And when a contract comes in, are you just

10   subcontracting out all of the work?

11      I mean, the three of you aren't managing the work of the

12   job on site, are you?

13   A   Well, probably I ought to add something.

14   Q   Okay.

15   A   Marks Construction is still doing a little bit of work

16   and I still manage it and we all take care of it.  She takes

17   care of the book work and my daughter does, but we have

18   merged with another company.  So they are actually handling

19   the business end of it.

20   Q   What company have you merged with?

21   A   Landau Building Company out of Pittsburgh, out of

**EXHIBIT 1**

22   Wexford, PA.

23   Q    How did that merger take place?

24        Did they buy you out?

**EXHIBIT 1**

33

1   A   No, sir, they didn't buy anything.

2   Q   Okay.

3   A   They wanted our name and wanted to get established in

4   this area.

5       MR. ROMANO:  And just for your information, I'll

6   let you ask him the question, but merge is a term or art for

7   us.  It's not for him.

8       MR. CALLCOTT:  And if you want to fill in blanks --

9       MR. ROMANO:  I really can't fill in a lot.  I'm

10   just telling you I know it is not a merger in the sense that

11   we think of a merger.

12       MR. CALLCOTT:  Right, okay.

13       MR. ROMANO:  So they got a joint adventure I think

14   is what would be the proper term.

15       THE WITNESS:  Yes.

16       MR. CALLCOTT:  Okay.

17       MR. ROMANO:  Marks still has its own assets.

18   Landau still has its own assets.

19       There are rental agreements when they use equipment and

20   that type of thing.

21   BY MR. CALLCOTT:

EXHIBIT 1

22   Q    And are they using your name to do business in this

23   area?

24   A    Yeah.  They formed a new company called Marks-Landau.

**EXHIBIT 1**

34

1   Q   They formed a new company called Marks-Landau?

2   A   Yes.

3   Q   Okay.  Do you have an ownership stock in that new

4   company or something like that?

5   A   No, sir.

6   Q   Okay.  Do you have any position in that new company?

7   A   Vice-president.

8   Q   Do you receive a salary from that new company?

9   A   Yes, sir.

10   Q   Is that salary or are all of the -- Does your wife

11   receive a salary?

12   A   No, sir.

13   Q   Okay, or your daughter?

14   A   No, sir.

15   Q   Okay.  Do you still receive a salary from -- I mean, is

16   Marks Construction, a separate entity, still paying your

17   salary or no?

18   A   When we need to, yes.  We get --

19   Q   I'm sorry, sir.

20       What was that?

21   A   Yes, we take some money out of Marks Construction as a

**EXHIBIT 1**

22   salary.

23   Q    I guess I'm trying to figure out how Marks Construction

24   is deriving income right now.

EXHIBIT 1

35

1     Is it getting income from this joint venture or --

2  A   We are getting income from the joint venture.

3  Q   Okay.

4  A   We are still doing a little bit of work like we do work

5  for Alcan Aluminum.

6     When they call for people, we go down and take care of

7  the job and invoice them and that's Marks Construction.

8  Q   When this joint venture goes out, they also use the name

9  Marks Construction?

10  A   Marks-Landau.

11  Q   They use the name Marks-Landau?

12  A   Yes.

13  Q   Did they ever purchase the right to use the name Marks

14  Construction?

15  A   I don't know what you mean by purchase.

16  Q   Pay you money for it.

17  A   No.

18  Q   Did you all ever sign any written agreements?

19  A   Yes.

20  Q   Regarding your relationship?

21  A   Yes.  We have a Joint Venture Agreement.

**EXHIBIT 1**

22          MR. ROMANO:  I'll object to this line of

23   questioning only that it is irrelevant to the claims in this

24   matter.

EXHIBIT 1

36

1   BY MR. CALLCOTT:

2   Q   When you entered into this joint venture, were there any

3   resolutions that were passed by the board of Marks

4   Construction memorializing what was going on?

5   A   Not that I recall.

6   Q   Did anyone generally prepare -- Well, let me ask you

7   this.

8       For Marks Construction did they ever have board

9   meetings?

10   A   Yes, we have board meetings.

11   Q   Do they generate minutes from those board meetings?

12   A   I can't answer that.

13   Q   Who would know the answer to that?

14   A   Karen.

15   Q   Your spouse, okay.

16       Do you know whether there would have been any board

17   minutes or whether there would have been any meetings about

18   or board minutes regarding this joint venture?

19   A   No, I don't know.

20   Q   You say you don't remember whether there were any

21   meetings or not?

**EXHIBIT 1**

22   A   No, I don't remember.

23   Q   Okay.  When did this occur, the joint venture that you

24   are talking about?

**EXHIBIT 1**

37

1   A    Four or five months ago, something like that, six months

2   as near I can remember.

3        MR. ROMANO:  Since you are interested, you might

4   ask him if he has even had an annual board meeting since four

5   or five months ago.

6        THE WITNESS:  No.

7   BY MR. CALLCOTT:

8   Q    Did your company, Marks Construction Company, have

9   annual board meetings?

10   A    Annual board meetings, yes, sir.

11   Q    But you just don't recollect whether they have ever had

12   any other board meetings?

13   A    No.

14   Q    All right.  Is there a corporate minute book somewhere

15   which would have those minutes in it or do you know?

16   A    I don't know but I'd say we probably do.

17   Q    But the person who would maintain those minutes to the

18   extent they have been maintained would be Mrs. Marks or

19   Ms. Davis; is that correct?

20   A    Yes, unless it is possible maybe Jim Denny.  I'm not

21   sure.  I'm not really sure.

**EXHIBIT 1**

22   Q    Now, you have indicated you don't know where

23    Mr. Straight may have taken his money?

24          MR. ROMANO:  Objection as to form.

EXHIBIT 1

38

1        MR. CALLCOTT:  Okay.  I'll ask the question again

2   then.

3        MR. ROMANO:  Let me just clarify.

4      He said he didn't know what Richard Straight did with

5   his money, not that he took it anywhere.  So that was the

6   basis of the ambiguous question just so you don't have to go

7   through the whole thing again.

8   BY MR. CALLCOTT:

9   Q   Mr. Straight, when he left though, didn't have any money

10   still in your company, did he, or your company wasn't still

11   managing any of his money, was it?

12        MR. ROMANO:  Objection as to form.

13        THE WITNESS:  Our company never managed anything.

14        MR. ROMANO:  Objection as to form.

15      Go ahead.

16        THE WITNESS:  We never managed any money.

17   BY MR. CALLCOTT:

18   Q    Okay.  Let's talk a little bit about your investment

19   history.

20      When is the first time you recollect ever investing in

21   the stock market?

**EXHIBIT 1**

22      Did you do it in the '70s?

23   A   We didn't.  We never did.  We never was involved in the

24   stock market.

EXHIBIT 1

39

1   Q   You have never had a personal --

2   A   Personally, no.

3   Q   Your 2001 tax returns reference a Merrill Lynch

4   account.

5      What is that?

6   A   We had an account with Merrill Lynch.  They did all of

7   the investing.

8   Q   Did you pay them some sort of management fee to manage

9   that account?

10   A   No, I don't know.  They maybe took it out of the

11   monies.  I don't know.  I'm sure they probably did.

12   Q   Do you recollect how long you have been using Merrill

13   Lynch for stock transactions, that sort of thing?

14   A   No.

15      I don't have anything with them now.

16   Q   Where did this Merrill Lynch money go?

17   A   This bank as far as I remember.  I'm pretty sure.

18   Q   You just moved everything to Chase?

19   A   Yes.

20   Q   But it's your testimony though that you simply turned

21   the money over to Merrill Lynch; you didn't have any further

**EXHIBIT 1**

22    interest in how it was handled?

23         MR. ROMANO:  Objection to form.

24         THE WITNESS:  Well, not really.  I mean, we dealt

EXHIBIT 1

40

1   with Sam Guarscio at the time and he was with Merrill Lynch

2   and he said he would do the investment for us.  So whatever

3   investing was done he did.

4        THE COURT REPORTER:  Do you have a spelling on that

5   name?

6        MR. ROMANO:  G-U-A-R-S-C-I-O.

7   BY MR. CALLCOTT:

8   Q   Do you know what type of account your retirement dollars

9   went into?

10  A   You mean now?

11  Q   Um-hum.

12  A   What type of account?

13      Well, I think that Chase Bank is invested in mutual

14  funds and stocks, I think.

15  Q   Okay.

16       MR. ROMANO:  I don't think that's what you meant

17  but I'll let him ask the next question.

18       THE WITNESS:  Oh, is that not what he meant?

19      He can reask me then.

20  BY MR. CALLCOTT:

21  Q   Let's go to the late 2002 time period.  What I want to

EXHIBIT 1

22   do next is talk about your recollections of your

23   conversations with Mrs. Hughes.

24        Do you recollect a time in late 2002 when you contacted

EXHIBIT 1

41

1    Huntington Bank regarding the status of the plan?

2    A    Yeah, I remember contacting Huntington Bank.

3    Q    What did say to them?

4    A    I told them I wasn't happy with the returns we were

5    getting and we didn't have any personal touch with anybody at

6    the bank.  From the time they had taken the account we had

7    very few contacts with them.

8    Q    Who did you first contact; do you recollect?

9    A    Somebody at the local bank.  I don't know who it was.

10   Q    In response to that, what did Huntington Bank do?

11   A    We receive a call from Sharon Hughes.

12   Q    What can you recollect about that conversation?

13   A    I just remember she said she would like to come up and

14   talk to us about our account.

15   Q    Anything else that you can recollect?

16   A    No.

17   Q    Were you the only one on the phone at the time?

18   A    As far as I can remember.

19   Q    Now, the next contact you had with Mrs. Hughes, was that

20   when she came up and spoke with you all?

21   A    At the first meeting, yes.

**EXHIBIT 1**

22   Q   Tell me about that meeting.

23   A   Well, Mrs. Hughes came in and introduced herself and

24   told us she would like to have our account, that she would

EXHIBIT 1

42

1    give us personal touch to our account, and said she would

2    look after it personally and see that it made money, and she

3    said it was horrible the percentage we was making and that we

4    weren't talking to anybody and she would take care of it and

5    just invest the money the way it should be.

6        She said our fee would be less by using her and then she

7    would make all of the investments and see that we made more

8    money.

9    Q   Is it your testimony that she stated that she would make

10   the investments?

11   A   Yes, sir, definitely.

12   Q   Do you recollect her giving you any documents at that

13   time?

14   A   At the first meeting, no.

15       She gave us a couple of Huntington Bank hats and some

16   pens, I think.

17   Q   What else do you recollect about that meeting?

18   A   That's about all I can remember.

19   Q   Do you have any notion as to when that meeting would

20   have taken place?

21   A   I really can't remember.

**EXHIBIT 1**

22   Q   Do you recollect who was present at that meeting?

23   A   Yes.

24       It was myself and my wife and my daughter Angela.

EXHIBIT 1

43

1   Q    What is the next contact you can recollect with anyone

2   you would associate with Huntington Bank?

3   A    Mrs. Hughes called back and we decided to go with her,

4   and she made another trip to Clarksburg to our office.

5   Q    Tell me about that meeting.

6   A    Well, she came in, and again the three of us were at the

7   meeting, and she wanted to know whether we wanted to be

8   aggressive or conservative, and we filled out a little form

9   that she had saying whether we wanted to be aggressive or

10   conservative, and we told her that we wanted to be

11   conservative because of our age, and I think our daughter

12   Angela told her that she wanted to be a little more

13   aggressive because she was younger, and she says -- Sharon

14   said that if you give the plan to me, I'll take it and see

15   that it makes money and your fee is going to be less.

16      Like she told me it is going to drop to 24 or $2500.00 a

17   year, and she said that everything will be the same as it was

18   except she said I'll have another feature where you will be

19   able to get online and check to see what your money is

20   doing.  If you want to change anything, you can, and I told

21   her at that time that I didn't even know how to turn a

**EXHIBIT 1**

22   computer on which I still don't.

23      So she said, well, you don't have to worry about it.

24   She said, I'll take care of it and I'll be responsible.

**EXHIBIT 1**

44

1      We never done any investing, so we didn't know anything

2   about it, and we told her that, and she said you don't have

3   to worry about it, I'll take care of it.

4   Q   You understood at that meeting though that you had had

5   the capacity if you so chose to go in and designate what was

6   going to be invested where?

7   A   No, no.  She said you will be able to get online and

8   look at your account and, if there is anything that you don't

9   like, you can change it, but we told her we wouldn't do that

10   because we don't know anything about investing.

11   Q   So it is your specific recollection that you told her

12   you don't know anything about investing?

13   A   Oh, definitely, yes.

14      We all three told her that.

15   Q   It is your specific recollection that each person in the

16   room told her that?

17   A   Yes.

18   Q   And so at the end of that second meeting it's your

19   testimony that you had no idea that under the plan that you

20   selected that you would be directing your own accounts?

21   A   Oh, no.  She told us everything would be the same as it

**EXHIBIT 1**

22   was.

23      (Deposition Exhibit No. 2 marked for the purpose of

24   identification.)

EXHIBIT 1

45

1   BY MR. CALLCOTT:

2   Q   I'm going to hand you a document that has been marked as

3   Exhibit 2.

4        MR. CALLCOTT:  I got a copy for you here, Mike.

5   BY MR. CALLCOTT:

6   Q   It's a four-page document.

7     I would just like you to look over all four pages.

8        (Pause in proceedings.)

9        MR. ROMANO:  I think I'm thinking of the old plan.

10   There is no effective date on this first page.

11        MR. CALLCOTT:  I don't know.  I pulled these out of

12   the plaintiff's disclosures.

13        MR. ROMANO:  Yeah, I see it.

14   BY MR. CALLCOTT:

15   Q   Have you ever seen this document before?

16   A   No, sir.

17   Q   On the last page, page Bates Number 579, do you

18   recognize that as your spouse's signature, Mrs. Marks?

19   A   It looks like it, yes.

20   Q   If you would have been provided a series of documents to

21   look over with regard to any changes that were being made as

**EXHIBIT 1**

22  between Marks Construction and Huntington Bank in the nature

23  of its accounts, would you have read those documents?

24  A   Probably not.

EXHIBIT 1

46

1   Q   Even though you were treasurer of the company?

2   A   Probably not.

3   Q   Any reason why not?

4   A   I was too busy.

5   Q   Now, let's go to your next recollection of any

6   communication with Mrs. Hughes.

7   A   After the second meeting?

8   Q   After the second meeting when is the next time you

9   remember speaking with her?

10   A   Oh, the next time I remember speaking to her was after

11   we got the 1099s.

12   Q   Okay.  So you don't recollect any other conversations

13   between that second meeting that you have described and fast

14   forward all the way to the 1099s in two thousand --

15   A   And four.

16       MR. ROMANO:  Let him figure it out.

17       MR. CALLCOTT:  2004.

18   BY MR. CALLCOTT:

19   Q   Actually you would have gotten the 1099s in 2005,

20   wouldn't you have, for the year 2004, or would it have been

21   you got the 1099s for the years 2003 in 2004?

**EXHIBIT 1**

22   A   As near as I can remember, we got the 1099s in early

23   2004 for 2003.

24       MR. ROMANO:  I'm glad somebody is on top of the

**EXHIBIT 1**

47

1    facts here.

2        THE WITNESS:  As near as I can remember, that's the

3    way it was.

4        MR. CALLCOTT:  Okay.

5    BY MR. CALLCOTT:

6    Q    Tell me about that conversation.

7    A    I called Sharon.  Initially I didn't know what the 1099s

8    were for; and when I found out, I called Sharon and told her,

9    I said, what's this all about.  She said, well, it's for the

10   loans that are in default.  I said, well, we'll pay them

11   off.  I said, we need these 1099s reversed; and she said,

12   well, let me see what I can do and I'll get back with you.

13       And I don't know whether she got back to me or I ended

14   up getting a call from somebody at the local bank and they

15   said they were going to try to reverse them also, but then we

16   got another call and said it couldn't be done.

17   Q    Now, you recollect receiving a letter in September of

18   '03 where Mrs. Hughes brought to your attention the issue of

19   the loans and the need for repayment?

20   A    No, sir, I don't.

21       MR. ROMANO:  It's a 9-3 letter -- 9-6, I'm sorry.

EXHIBIT 1

22   I'm confusing myself.

23        (Deposition Exhibit No. 3 marked for the purpose of

24   identification.)

EXHIBIT 1

48

1   BY MR. CALLCOTT:

2   Q   I hand you a document that has been marked Exhibit 3.

3       MR. ROMANO:  9-9.  I was close.

4   BY MR. CALLCOTT:

5   Q   Do you ever recollect seeing this letter?

6   A   No, sir.

7   Q   Any particular reason why you wouldn't have seen a

8   letter like that?

9   A   I don't know.

10  Q   But you can't say as you sit here today one way or the

11  other whether that letter was received by Marks Construction

12  or not?

13  A   No, I can't say.  I have never seen it.

14  Q   Let's go back to your conversation with Mrs. Hughes.

15      Do you remember one or two conversations with her about

16  the 1099?

17  A   Well, I think as far as I can remember, I remember two.

18      MR. ROMANO:  And I'm going to object only to the

19  extent you asked him about the first conversation, so he has

20  really never talked about any others.  He might be getting

21  confused but go ahead.

**EXHIBIT 1**

22   BY MR. CALLCOTT:

23   Q   What was your answer?  I'm sorry.

24   A   I said as near as I can remember there was two.

EXHIBIT 1

49

1   Q   Okay.

2   A   One when I called and complained about it.

3   Q   Right.

4   A   And the other one when she called and said -- At that

5   first one she said she was going to try to get it reversed

6   and I told her if she didn't I was taking the money out, and

7   the second one is when they told me they couldn't do it.

8       But in between that time I was contacted by somebody

9   locally.

10  Q   Okay.  Let's go back to that first conversation.

11  A   Okay.

12  Q   Tell me what else you remember about that conversation.

13  A   That's about it.  That's about all I can remember.

14  Q   You don't remember threatening Mrs. Hughes at that time?

15  A   Threatening?

16      No.

17  Q   You don't remember saying "Either you reverse these" or,

18  quote, "I'll sue your ass," end quote?

19  A   Oh, no, I never said that.

20  Q   You never said that?

21  A   No, not that I can remember.

EXHIBIT 1

22   Q   Well, would you remember had you said that?

23   A   Well, I would think I would, but I don't ever remember

24   telling her that.

**EXHIBIT 1**

50

1   Q   Do you think that would be totally out of your character

2   to use that kind of language?

3   A   I think it would, yes.

4        MR. ROMANO:  Objection to form.

5        THE WITNESS:  I told her that we would take the

6   money out but that's all I remember telling her.

7   BY MR. CALLCOTT:

8   Q   If she has a specific recollection that you threatened

9   her with that language, --

10        MR. ROMANO:  Objection to form.

11      Go ahead.

12        THE WITNESS:  I would say I never used that

13   language to her.

14   BY MR. CALLCOTT:

15   Q   -- would you say that her recollection is in error?

16   A   I would say yes.

17   Q   Tell me about the conversation, the second conversation,

18   where she called back and indicated that 1099s could not be

19   reversed.

20   A   That's all I remember happening.  She told me they

21   couldn't be reversed.

EXHIBIT 1

22      I don't know if I told her.  I may have told her then

23   that I was going to take the money out.  I don't remember.

24   Q   Was it at some point shortly thereafter that you first

**EXHIBIT 1**

51

1   sought legal counsel?

2        MR. ROMANO:  Objection to form.

3        THE WITNESS:  I can't remember.  It was probably

4   not too long after that.

5   BY MR. CALLCOTT:

6   Q    A matter of weeks, months?

7        MR. ROMANO:  Objection.

8        THE WITNESS:  Months.

9        MR. ROMANO:  The same objection.

10   BY MR. CALLCOTT:

11   Q    Prior to that time though you hadn't had any inkling in

12   your mind of bringing any kind of lawsuit against Huntington

13   Bank or Mrs. Hughes; is that true?

14   A    No, I can't say that's true.

15   Q    When did you think --

16   A    I don't know.  Repeat the question.

17        MR. CALLCOTT:  Do you want to read it back.

18        (The question was read back by the court reporter as

19   follows:

20        Question:  "Prior to that time though you hadn't had any

21   inkling in your mind of bringing any kind of a lawsuit

**EXHIBIT 1**

22   against Huntington Bank or Mrs. Hughes; is that true?")

23        MR. ROMANO:  Objection to form.

24        You can go ahead.  You can answer.

**EXHIBIT 1**

52

1        THE WITNESS:  I don't recall whether I did or not

2    at that time.

3        The timeframe has got me kind of confused, so I can't

4    honestly answer.

5    BY MR. CALLCOTT:

6    Q    After that second conversation which you have described,

7    do you have any recollection of any other conversations you

8    have had with Mrs. Hughes?

9    A    I don't remember any.

10   Q    Do you have any recollections of any other conversations

11   you have had with people who you would associate with

12   Huntington Bank?

13   A    Other than the person I told you who called me, I can't

14   recall any others.

15   Q    You said someone from a local bank?

16   A    From the local Huntington Bank called me.

17   Q    Tell me about that conversation.

18   A    They just called and said they were going to try to get

19   the 1099s reversed.

20   Q    Okay.  That call was before the second call you have

21   described with Mrs. Hughes where she simply said it?

**EXHIBIT 1**

22   A   As far as I can remember, yes.

23   Q   Okay.  And you don't -- If you remember any other

24   conversations that you have had with Mrs. Hughes, will you

**EXHIBIT 1**

53

1   tell your counsel?

2   A   Sure.

3   Q   Okay.  Now, one conversation we left out that I want to

4   go to momentarily is the conversation that you had with

5   Mrs. Hughes in Mr. Romano's office.

6       Were you present in there for that?

7   A   Yes.

8   Q   That telephone call?

9   A   Yes.

10  Q   Was that call recorded?

11  A   I don't know.

12  Q   Did you see any tape-recording devices, anything like

13  that in the room?

14  A   I don't recall.  It may have been.  I don't know.  I

15  don't recall seeing any.

16  Q   So you just have no idea one way or the other?

17  A   No, I don't recall.

18      MR. CALLCOTT:  I'm going to ask you in discovery,

19  Mike -- you don't have to answer me now -- but was that call

20  recorded?

21      MR. ROMANO:  You can submit a discovery request and

**EXHIBIT 1**

22   we will respond.

23        MR. CALLCOTT:  I think that's the answer I got from

24   you on a number of those questions at the last deposition.

**EXHIBIT 1**

54

1     I guess my response is I would ask that you do it

2   promptly and immediately within the next five days or

3   something like that in response to that.

4        MR. ROMANO:  That was when it was a pre-existing

5   discovery request.  This would be a new discovery request and

6   I think it gives me thirty days.  At least that's what Sara

7   Hauptfuehrer is arguing now on depositions.

8   BY MR. CALLCOTT:

9   Q   Tell me what you can recollect about that conversation

10   with Mrs. Hughes which may or may not have been recorded.

11        MR. ROMANO:  And I'm going to object to that

12   characterization.  He says he doesn't recollect seeing any

13   recording equipment so, I mean, that may or may not have been

14   recorded is a bit of an overstatement.

15      Go ahead.  You can answer the question.

16      What do you remember about the conversation?

17        THE WITNESS:  I don't remember anything to tell you

18   the truth.  I don't.

19      I mean, Mike had talked to her for from my guess

20   probably ten or fifteen minutes, something like that, but I

21   can't remember what he really discussed.

**EXHIBIT 1**

22   BY MR. CALLCOTT:

23   Q   Let's go back to that second telephone conference call

24   with Mrs. Hughes after the first one where you asked her to

**EXHIBIT 1**

55

1   return or reverse the 1099.

2      Do you have any recollection of telling her that the

3   1099 would cause a difficult situation for Angela and that

4   you didn't care so much for yourself but you felt that Angela

5   would have a hard time and you made the request that the 1099

6   be posted the next year?

7   A   I don't recall that exactly.  I told her that it would

8   be a hard time for Angela and myself from what I remember as

9   near as I can remember.

10   Q   So now that I have jogged your memory here, do you have

11   an additional recollection about that telephone call?

12   A   I think I remember something about it would be a

13   hardship.  I said that's what I recall.

14      MR. ROMANO:  Mr. Callcott, I'm going to ask you

15   for Deposition Exhibit Number 3, there is a second page that

16   I request be shown to Mr. Marks just by the happenstance.

17      MR. CALLCOTT:  Sure.

18      What page would you like?

19      MR. ROMANO:  I assume it is the next one but I

20   can't remember, but I know there is a second page because it

21   references a breakdown of the loans here.

**EXHIBIT 1**

22      Try 379.  I mean 639, excuse me.  One more time, 739.

23   I'm about half asleep today.

24      You have a Bates number, too, down here at the bottom,

**EXHIBIT 1**

56

1   don't you?

2       MR. CALLCOTT:  739?

3       MR. ROMANO:  Yes, sir.

4       MR. CALLCOTT:  Okay.  If you hold it up, I can tell

5   you if that is it.

6     He may not have seen it but I think that is what was

7   attached to the original.

8     Can we make a copy of this?

9       MR. CALLCOTT:  Yes.

10       MR. ROMANO:  You are as bad as me with the

11   documents.

12       MR. CALLCOTT:  At least I try to provide copies to

13   everybody.

14       MR. ROMANO:  No, I did.

15     What do you mean?

16     Are you trying to refer that I didn't?

17     I have more copies in my hands.  Why don't we just

18   attach it if you want to.

19       MR. CALLCOTT:  We will make that a two-page

20   exhibit.

21       MR. ROMANO:  Just for the record, Deposition

**EXHIBIT 1**

22   Exhibit 3 now is a two-page document bearing Bates numbers

23   000738 to 739.

24       Do we have a stapler handy?

**EXHIBIT 1**

57

1       MR. CALLCOTT:  Yes.

2   BY MR. CALLCOTT:

3   Q   Going back to Exhibit 3, it has got a breakout of the

4   loans as indicated by your counsel.

5       Do you recollect ever seeing this document?

6   A   No, sir.

7   Q   Okay.  Now, you indicated earlier that your investment

8   philosophy was conservative; is that true?

9   A   Yes, sir.

10   Q   So what would have concerned you most in that regard is

11   preservation of principal?

12       MR. ROMANO:  I'm going to object to leading and

13   form.

14   Go ahead.

15       MR. CALLCOTT:  Mr. Romano, I get to lead in my

16   deposition.

17       MR. ROMANO:  Well, not necessarily, not when it

18   assumes facts not in evidence, but go ahead.

19       THE WITNESS:  I really don't understand what you

20   are saying.

21   BY MR. CALLCOTT:

**EXHIBIT 1**

22   Q   Do you know what the phrase preservation of principal

23   means?

24   A   I guess preserving the principal amount of your money,

**EXHIBIT 1**

58

1   yes.

2   Q    And that would have been an important consideration for

3   you?

4   A   I think by us saying conservative I think we meant that

5   we didn't want to put it in anything that was iffy and I

6   might have used the word iffy.

7   Q   Let's go and look at what you did choose to put your

8   money into.

9   A   We didn't choose.

10   Q    At anytime you never chose?

11   A   I never chose.

12   Q   And you are sure about that?

13   A   I'm positive.

14   Q   Absolutely one hundred percent sure?

15       MR. ROMANO:  Objection.

16       THE WITNESS:  I never choose anything, period.

17       MR. ROMANO:  Can we have a break here soon, John,

18    since we have been going about this an hour-and-a-half?

19       MR. CALLCOTT:  Sure.

20     Let me finish this last point.

21       MR. ROMANO:  Sure, and I didn't mean to try to

EXHIBIT 1

22   interrupt you actually.

23        (Deposition Exhibit No. 4 marked for the purpose of

24   identification.)

**EXHIBIT 1**

59

1   BY MR. CALLCOTT:

2   Q   I hand you a document that has been marked as Exhibit 4,

3   and ask you to verify that it's your writing on this page?

4   A   That is not my writing.

5   Q   Is that your signature at the bottom?

6   A   It's my signature but not my writing.

7   Q   Is the rest of the writing the writing of your spouse,

8   Mrs. Marks?

9   A   I don't know.

10   Q   Do you ever recollect looking over this document?

11   A   No, sir.

12         MR. ROMANO:  Is that your signature?

13         THE WITNESS:  No.

14         MR. ROMANO:  I think you answered differently.

15   BY MR. CALLCOTT:

16   Q   Now, wait a minute now.  Yeah, that's a big difference.

17   A   You said is that my signature?

18   Q   Is that your signature?

19   A   No.  I think that was my answer.

20         MR. ROMANO:  You may have misspoken.  I'm not sure

21   what you said.  We can check.  It's not a big deal.

**EXHIBIT 1**

22   BY MR. CALLCOTT:

23   Q   Do you know who would have signed it for you?

24   A   Possibly my wife.  I don't know.

**EXHIBIT 1**

60

1   Q    Did your wife ever sign documents for you?

2   A    Not that I recall, no.

3        That is definitely not my signature.

4   Q    Do you have any recollection of ever signing a Power of

5   Attorney or signing any legal document that would have given

6   anyone else the right to sign your name?

7   A    No, sir, not that I recall.

8        MR. WIGGINS:  Do you want to take a break?

9        MR. CALLCOTT:  Yeah, let's take a break.  Let's

10   take a break for everyone.

11      (Recess taken in proceedings at 11:22 a.m.)

12                   R-E-C-E-S-S

13      (Proceedings reconvened at 11:35 a.m. as follows:)

14        MR. CALLCOTT:  Let's go back on.

15      (Deposition Exhibit No. 5 marked for the purpose of

16   identification.)

17   BY MR. CALLCOTT:

18   Q    I'm going to hand you, Mr. Marks, a document that has

19   been marked as Exhibit 5 and ask you to compare the writing

20   at the bottom of the page between Exhibit 4 and Exhibit 5.

21      In your opinion are those written in the same hand?

**EXHIBIT 1**

22          MR. ROMANO:  Objection.

23          THE WITNESS:  It appears to be.  I mean, I don't

24     know for sure but it looks similar.

EXHIBIT 1

61

1   BY MR. CALLCOTT:

2   Q    But to your eye it looks to be?

3   A    It looks similar.

4   Q    Are you aware whether there can be any concerns or

5   problems with a bank document like this submitted that didn't

6   actually bear your signature?

7   A    I don't know.

8   Q    This form 4 has a listing of mutual funds and

9   percentages next to them.

10      Do you have any idea -- Let me start over again and

11   rephrase the question.

12      At the time the plan was terminated do you know how your

13   money was invested?

14      Do you know in what form of mutual fund or security it

15   was invested?

16   A    I have no idea.

17   Q    And had you ever made a request to Huntington to know

18   that information?

19   A    During what period of time?

20   Q    During the period of time say anytime in 2004.

21      MR. ROMANO:  I'm going to object to the term

**EXHIBIT 1**

22   request.

23        MR. CALLCOTT:  Asked for that information?

24        MR. ROMANO:  Looked for?

EXHIBIT 1

62

1        THE WITNESS:  Where was it vested?  Is that what

2    you are asking me?

3    BY MR. CALLCOTT:

4    Q   I'm trying to figure out if you ever asked Huntington

5    Bank where is my money invested anytime in the year 2004?

6    A   Not that I recall.

7        I mean, I assumed that it was being handled the way it

8    should be and I don't recall ever asking.

9    Q   Do you think that Marks Construction had any

10   responsibility to ask where the money might be or how it

11   might be invested?

12   A   No, I don't know.  You know, we had never done any

13   investing, so we didn't know ourselves.

14       I mean, we had this profit-sharing plan since 1974 or

15   something like that and we never got involved in the

16   investments at all, never, so I don't know of any reason we

17   had to call to ask.

18   Q   Did you have any understanding about whether Marks

19   Construction had an obligation in either 2003 or 2004 to

20   monitor the status of the investments of the assets in the

21   plan?

**EXHIBIT 1**

22   A   No, we were never told that we needed to do that.

23   Q   Aside from being told, did you ever think that Marks

24   Construction had that obligation?

EXHIBIT 1

63

1   A   I had no reason to think that that I recall.  I don't

2   remember.

3   Q   Okay.  Did you have any understanding about whether

4   Marks Construction had an obligation to monitor anything with

5   respect to the plan?

6       MR. ROMANO:  Objection to form.

7       THE WITNESS:  The only thing we could not monitor

8   it.  We were supposed to be able to if we wanted to, and I

9   know that my wife tried to monitor it a couple of times and

10   couldn't get online.

11   BY MR. CALLCOTT:

12   Q   And when would that have been?

13   A   It seems as near as I can remember probably during the

14   summer months of 2003.

15      I told her a couple of times to go online and she told

16   me she couldn't do it.

17   Q   And did someone from Huntington actually come out in

18   September of 2003 to help you with that?

19   A   Not that I recall.

20   Q   You don't recollect that?

21   A   No.

**EXHIBIT 1**

22   Q   Would you have been aware of that if they had come out?

23   A   I thought I should have been but I don't know.

24   Q   But I'm asking you are you sure you would have been

EXHIBIT 1

64

1   aware of such a visit?

2   A   No, I'm not positive of that.

3   Q   Earlier we talked a little bit about corporate form

4   issues in Marks Construction Company.

5        Do you actually hold shares of stock in Marks

6   Construction Company?

7   A   I think so.

8   Q   But you are not sure one way or another?

9   A   I'm not positive.  I think I do.

10   Q   How much do you think you own?

11        MR. ROMANO:  Percentage wise?

12        MR. CALLCOTT:  Percentages.

13        THE WITNESS:  I have no idea. I couldn't answer

14   that.

15   BY MR. CALLCOTT:

16   Q   Is anyone a stockholder of the company outside of your

17   family, you, Mrs. Mark, your daughter?

18   A   No.

19        MR. ROMANO:  And let me say certainly we would be

20   happy to answer any question proposed in discovery, take a

21   look at the records, the stock certificates, although -- I'm

**EXHIBIT 1**

22   sorry.

23       I was thinking.  You didn't ask for corporate returns,

24   did you, because I was going to suggest it would be reflected

**EXHIBIT 1**

65

1   on your Schedule M.  I don't think you asked for them.

2      (Deposition Exhibit No. 6 marked for the purpose of

3   identification.)

4   BY MR. CALLCOTT:

5   Q   I'm going to hand you a document that has been marked as

6   Exhibit 6.  It has got a Bates number of 571.

7       MR. ROMANO:  Can we go off the record for a quick

8   second?

9       MR. CALLCOTT:  Sure.

10     (Discussion off the record.)

11      MR. CALLCOTT:  We'll go back on.

12   BY MR. CALLCOTT:

13   Q   Have you had the opportunity to read over Exhibit 6?

14   A   Just now, yes.

15   Q   Have you ever seen this document before?

16   A   No, sir.

17   Q   Do you recognize the signature of your spouse there at

18   the bottom under signature?

19   A   It looks like her's, yes.

20     (Deposition Exhibit No. 7 marked for the purpose of

21   identification.)

**EXHIBIT 1**

22   BY MR. CALLCOTT:

23   Q    I'll hand you a document that has been marked as Exhibit

24   7.

**EXHIBIT 1**

66

1          MR. CALLCOTT:  And if there is no objection, Mike,

2    we'll just plan on using the same set of exhibits for both

3    depositions.

4          MR. ROMANO:  Oh, I have no objection.

5          MR. CALLCOTT:  That will save a little bit on the

6    cost.

7    BY MR. CALLCOTT:

8    Q    Could you read over Exhibit Number 7, please.

9        (Pause in proceedings.)

10   Q    Have you had the opportunity to review the document?

11   A    Yes, sir.

12   Q    Have you ever seen this document before?

13   A    Not that I recall.

14   Q    Are you on the Board of Directors?

15   A    Yes.

16   Q    So any document that would have gone through the Board

17   of Directors would have been something that would have been

18   your duty to read?

19          MR. ROMANO:  I'm going to object only because there

20   is no requirement for a Board of Directors to read a

21   resolution.

**EXHIBIT 1**

22        THE WITNESS:  I don't know that --

23    BY MR. CALLCOTT:

24    Q    Do you perceive that it would have been a good business

EXHIBIT 1

67

1   practice for you to read the resolutions?

2   A   I would say that --

3       MR. ROMANO:  Objection to form.

4       THE WITNESS:  -- I don't remember seeing this,

5   either one of them.

6   BY MR. CALLCOTT:

7   Q   I guess my question was do you think it would be a good

8   business practice for board members to read the resolutions

9   of the board?

10   A   I don't know.

11   Q   Do you recognize that signature at the bottom as that of

12   your wife?

13   A   You mean Karen E. Marks?

14   Q   Yes.

15   A   It looks like her signature.

16   Q   We have a number of documents in this file that relate

17   to the quote, unquote, plan document itself, and I can pull

18   out those documents and we can go through them, but I'm

19   trying to find a way to shortcut that, if we can.

20       And the question is, and this may be too broad a

21   question, but do you ever recollect reviewing any of the

**EXHIBIT 1**

22   documents that would have been part of the plan documents?

23   A   No, sir I don't think I did.  I don't remember.

24   Q   I mean, do you ever recollect looking at anything that

**EXHIBIT 1**

68

1   would have to do with benefits or plan assets?

2   A   I don't remember of looking at them.

3   Q   And when you say you don't have any recollections of

4   looking at them, let's give a timeframe on them.

5      From the period of time 2000, the year 2000 forward, do

6   you have any recollection of looking at any plan documents?

7   A   2004?

8   Q   2000, from the year 2000 forward.

9   A   Oh, forward.  No, I don't recall looking at any.

10  Q   Who within Marks Construction would have looked at those

11  documents?

12  A   Probably nobody.

13  Q   And why is that?

14  A   I don't know other than to say that we didn't feel it

15  was necessary, I guess.

16  Q   Let me ask you this.

17  A   We put a lot of basis on what Sharon told us.

18  Q   Well, now, of course, you only started working with

19  Sharon in 2000 when was it?

20  A   1, I think, or 2 -- 2001 or 2.

21  Q   And would you have looked at any plan documents before?

**EXHIBIT 1**

22   A    No, no, I never did.

23         MR. CALLCOTT:  Let's go ahead and break for lunch.

24         What time do you have now?

EXHIBIT 1

69

1        MR. ROMANO:  I have about five till give or take.

2        MR. CALLCOTT:  Let's go and have some lunch and

3   come on back and we'll spend an hour or two and we're done.

4        THE WITNESS:  Okay.

5   (Luncheon recess taken at 11:48 a.m.)

6              LUNCHEON RECESS

7   (Proceedings reconvened at 12:48 p.m. as follows:)

8        MR. CALLCOTT:  Mr. Marks, we are back on the

9   record.

10  BY MR. CALLCOTT:

11  Q   Do you understand that this is a continuation of this

12  deposition and that you are still under oath?

13  A   Yes, sir.

14  Q   Did you review any documents in preparation for your

15  deposition today?

16  A   A few.

17  Q   What did you review?

18  A   I don't know.  I don't remember what they were.  We just

19  went over a couple of documents but I can't remember exactly

20  what they were.

21  Q   Were they letters?

EXHIBIT 1

22   A   Yeah, I think there was a couple of letters maybe.  I

23   don't know.

24   Q   To or from who?

**EXHIBIT 1**

70

1   A   I don't remember.

2   Q   When did you review those documents?

3   A   When?

4   Q   Yes, sir.

5   A   Yesterday.

6   Q   How much time did you spend with your lawyer?

7   A   Maybe an hour-and-a-half, something like that, not

8   much.

9   Q   And during that time you reviewed a couple of documents

10   yesterday that you don't remember?

11   A   I don't remember.

12   Q   All right.  Besides talking to your lawyer, did you talk

13   with anyone else in preparation for your deposition?

14   A   No, sir.

15   Q   You didn't talk with your wife?

16   A   Not --

17       MR. ROMANO:  Out of the presence of the lawyer?

18       MR. CALLCOTT:  Absolutely.

19       MR. ROMANO:  Yeah.  I just wanted to make that

20   clarification.

21       Maybe that will help him.

EXHIBIT 1

22          THE WITNESS:  I really don't remember even

23    discussing it with her.

24          MR. CALLCOTT:  Okay, all right.

**EXHIBIT 1**

71

1   BY MR. CALLCOTT:

2   Q   Back when you took the loans out, you took a loan out

3   and your spouse took a loan out, your daughter took a loan

4   out, what were those monies used for?

5   A   We bought our daughter a house.  She was moving back to

6   this area.

7   Q   Did all 113,000 go to that house?

8   A   Yes, sir.

9   Q   No other purpose?

10   A   No, sir.

11   Q   When did you first find out that that portfolio of funds

12   had been liquidated?

13   A   I found out that they were liquidated when we first went

14   to see Mr. Romano.

15   Q   And you would have first saw Mr. Romano when?

16   A   Probably in --

17   Q   And I'll help you out in this.  There is a letter in the

18   file, I think, where you or maybe it was Mr. Romano sent a

19   letter of January of '05, I think.

20      I want to be real sure about that.  I'll see if I can

21   find that letter real quick.

**EXHIBIT 1**

22          MR. ROMANO:  And let me save you the time.  It was

23     a letter from Sharon Hughes authorizing me to get documents

24     from them, and I think it was in January of '05.

**EXHIBIT 1**

72

1   BY MR. CALLCOTT:

2   Q    Would it have been around that time?

3   A    I would say around that time.  I don't know exactly

4   when.

5   Q    Would it have been before or after you spoke with

6   Mr. Romano that you found out to your testimony that the

7   funds in the portfolio had been liquidated?

8   A    I can't remember whether he knew at that first meeting

9   or whether he found out later.

10   Q    And I'm not asking what he found out.  I'm asking what

11   you knew.

12        MR. ROMANO:  And I'd say asked and answered.  He's

13   not sure.

14        MR. CALLCOTT:  You can put your objection to form

15   on but that's a speaking objection or pretty close.

16        MR. ROMANO:  Well, I don't think so, but it was

17   asked and answered, but go ahead.

18        THE WITNESS:  Well, I don't know.  I mean, I don't

19   know whether he knew the first time I went to see him or

20   whether --

21        MR. ROMANO:  I'm not talking about what I knew.  I

**EXHIBIT 1**

22   don't know what you are talking about.

23        THE WITNESS:  Oh, I did not know.  I didn't know

24   they had been liquidated.

**EXHIBIT 1**

73

1   BY MR. CALLCOTT:

2   Q   Okay.  So the first time that you saw Mr. Romano at that

3   time you didn't know that they had been liquidated?

4   A   That is exactly right.

5   Q   And that would have been sometime around January of '05,

6   2005?

7        MR. ROMANO:  I'm going to object to that

8   characterization.

9        THE WITNESS:  I don't know exactly when it was.

10   I can't remember now, but that sounds like the timeline you

11   are talking about.

12   BY MR. CALLCOTT:

13   Q   But would it have been in 2005?

14   A   I can't answer that exactly.  I mean, I don't know.  I

15   think it was but I don't know.

16   Q   Okay, all right.  To the best of your recollection?

17   A   Yeah, yeah.

18      (Deposition Exhibit No. 8 marked for the purpose of

19   identification.)

20   BY MR. CALLCOTT:

21   Q   All right.  I'm going to hand you a document that has

**EXHIBIT 1**

22   plaintiff's Bates number 810 on it.  It has been marked as

23   Exhibit 8.

24       I ask if you have ever seen this document before?

**EXHIBIT 1**

74

1   A   Not that I remember I never saw it.

2   Q   Do you know whose handwriting that is?

3   A   No, sir.

4   Q   Now, I think I know the answer to this question but I

5   just want to make sure.

6       When you look at a document, you can read and write

7   without any problem; is that true?

8   A   Yes.

9   Q   What?

10   A   Yes.

11   Q   I just want to make sure.

12       (Deposition Exhibit No. 9 marked for the purpose of

13   identification.)

14   BY MR. CALLCOTT:

15   Q   Take a look at Exhibit Number 9, if you would for me.

16       Can you please tell me whether you can identify that

17   document, whether you have ever seen it or whether you know

18   whose handwriting that is?

19   A   I have never seen it that I know of and I don't know

20   whose handwriting it is.

21   Q   Do you know whether Marks Construction ever told the

**EXHIBIT 1**

22   bank the amount of the employee contributions to the plan say

23   in 2003 or 2004?

24       Do you have any idea?

EXHIBIT 1

75

1    A    If Marks Construction --

2    Q    -- ever notified the bank of the amount of employee

3    contributions made to the plan?

4    A    What bank are you talking about, Huntington?

5    Q    Huntington.

6    A    I don't know that they did, not to my knowledge.

7    Q    And I guess to clarify, that would have been in 2003 and

8    only in the first eight months of -- the first seven months I

9    guess of 2004 because the plan terminated August 1st of 2004;

10    is that correct, if you can answer?

11          MR. ROMANO:  Well, --

12          MR. CALLCOTT:  Your client --

13          MR. ROMANO:  I object.

14          MR. CALLCOTT:  I understand your objection.  Let

15    your client answer.

16          MR. ROMANO:  I am going to let him answer.

17       Go ahead.

18          THE WITNESS:  That sounds to my knowledge that is

19    when we terminated them.

20          MR. CALLCOTT:  Okay.

21          THE WITNESS:  From what I remember I think that's

EXHIBIT 1

22    about when the monies were terminated and went to Chase Bank

23    or Union Bank or whatever.

24          MR. CALLCOTT:  I want to hand you a document --

**EXHIBIT 1**

76

1   MR. ROMANO:  I just want to place an objection as

2 to form because you asked a bunch of other stuff.  It is a

3 compound question.  I think he only answered the termination

4 question.

5   MR. CALLCOTT:  Okay.

6  (Deposition Exhibit No. 10 marked for the purpose of

7 identification.)

8 BY MR. CALLCOTT:

9 Q I'm going to hand you a document that has been marked as

10 Exhibit 10 and ask if you have ever seen that document

11 before?

12 A Yeah, I have seen it.

13 Q Did you see this document before it was filed?

14 A I don't recall.

15 Q You have got a complaint in here that you have styled

16 for fraud and I want to ask you a little bit about that.

17  As we sit here in this room today, do you think that

18 Mrs. Hughes actually ever intentionally misled you about

19 anything?

20 A Yes, I think so.  It's my opinion.

21 Q And you base that on?

**EXHIBIT 1**

22   A   On what she told us.  She told us that everything was

23   going to stay the same, that she would take care of our

24   investments and see that it made more money, and the only

EXHIBIT 1

77

1   change was that we were going to be able to get online to

2   check if we wanted to, to change anything.  Other than that,

3   everything would be the same and the same meaning that they

4   had been taken care of for the last decade.  They chose all

5   of the investments.

6       MR. ROMANO:  And I'm going to object to the extent

7   that the answer called for a legal conclusion but certainly

8   he has given a full and complete answer.

9       (Deposition Exhibit No. 11 marked for the purpose of

10   identification.)

11   BY MR. CALLCOTT:

12   Q   I'm going to hand you the next document that has been

13   marked as Exhibit 11.

14       Actually why don't you hand me that document back real

15   quick.  I might have marked on this copy.  I just want to

16   make sure it's clean.

17       MR. ROMANO:  Oh, we love marked up copies.

18   BY MR. CALLCOTT:

19   Q   Have you ever seen this document before, referring to

20   Exhibit 11?

21   A   I think from what I can recall I think I have seen it.

**EXHIBIT 1**

22   Q   Did you look over those before they were sent back to

23   us?

24   A   I don't know.

**EXHIBIT 1**

78

1    Q    So as we sit here today you don't have any knowledge or

2    you don't know one way or the other whether you looked over

3    these before they were provided to us?

4    A    I don't recall whether I did or not.  I may have.

5    Q    Well, why don't we do this.  Why don't we take some time

6    for you to read through these because I can either go through

7    them one at a time and ask if there is anything you would

8    change or alter or I can simply ask you to review the

9    document and tell me if there is anything you would change or

10   alter about the answers.  I'm happy to do it whichever way

11   your counsel prefers.

12          MR. ROMANO:  I mean, I don't know what to tell you,

13   John.  You are certainly welcome to ask him.  I mean, this is

14   the corporation's answers.

15          MR. CALLCOTT:  And that's why I have got to ask

16   him.

17          MR. ROMANO:  Well, not necessarily.  They were

18   verified by the president of the corporation.

19      I mean, I'm not sure whether he gathered any information

20   or provided any information for them.

21      I mean, the only thing I can tell you is if you feel

**EXHIBIT 1**

22   like you got to ask him, you better ask him about each one.

23          MR. CALLCOTT:  Okay.

24          MR. ROMANO:  I just don't know what to tell you.

**EXHIBIT 1**

79

1   They weren't verified by him.

2       MR. CALLCOTT:  Fair enough.

3   BY MR. CALLCOTT:

4   Q    Mr. Marks, the reason I'm doing this is I just got to

5   make sure that when we get a little bit down the road here I

6   don't run into a situation where the company's answer might

7   be different from yours.

8       So let's start with interrogatory number 1 and if you

9   can read over the question and the answer and tell me if

10   there is anything in that answer that you think is wrong or

11   incorrect.

12       MR. ROMANO:  I'm going to object.

13       Just give me a standing objection that to the extent

14   Mr. Marks answers, these are answers to Marks Construction

15   Company.

16       MR. CALLCOTT:  Sure.  No problem with that.

17       (Pause in proceedings.)

18       MR. ROMANO:  Do you want to direct him to any

19   particular one?

20       There are a lot of them on there.

21       MR. CALLCOTT:  Well, I know.  I know there are a

**EXHIBIT 1**

22   lot of them.

23        MR. ROMANO:  Well, why don't we take them one at a

24   time.

**EXHIBIT 1**

80

1        MR. CALLCOTT:  Let's go one at a time.

2   BY MR. CALLCOTT:

3   Q    After reading the first question, the first

4   interrogatory 1 and the first answer, is there anything in

5   there that you think is wrong?

6        MR. ROMANO:  Just to be clear, you are talking

7   about the answer to interrogatory number 1?

8        MR. CALLCOTT:  That is correct.

9        THE WITNESS:  Where is this?

10       MR. ROMANO:  You start right here, Jim.  Here is

11  the question and the answer.  (indicating)

12      And while he is reading that, John, just to make clear,

13  subject to whatever else he has testified to today, of

14  course.

15      I mean, he has given sworn testimony here now for four

16  hours.

17       MR. CALLCOTT:  For a couple hours, that's right.

18       MR. ROMANO:  Yeah.  I mean, I just don't want you

19  to -- I mean, I would assume that if anything is relevant to

20  this request that he has answered, and I don't know what it

21  is, but it would be subject to his other answers today.  I

**EXHIBIT 1**

22    mean, you can't expect him to recount all of his answers

23    today.

24          MR. CALLCOTT:  I don't expect his recollections to

EXHIBIT 1

81

1   differ.

2   BY MR. CALLCOTT:

3   Q   This first question and first answer, is there anything

4   you object to with respect to the answer?

5   A   No.

6   Q   Let's go down to interrogatory number 4?

7       MR. ROMANO:  Let me just give him this

8   instruction.

9       Jim, you need to read these carefully because

10  Mr. Callcott properly is asking you to see if there is

11  anything that you are going to change or that you would

12  change from what was written in these answers several months

13  ago.  So just read every word.

14      You know, it's not a test.  So just do what you can do

15  to the best of your ability.

16      (Pause in proceedings.)

17      THE WITNESS:  Well, what does paragraph 5 of the

18  complaint say?

19      MR. CALLCOTT:  Well, we will make that available to

20  you.

21      THE WITNESS:  I need to look at that.

**EXHIBIT 1**

22          MR. ROMANO:  He has got it right here.

23      Do you need your glasses?

24          THE WITNESS:  No.

EXHIBIT 1

82

1         MR. ROMANO:  I would.

2      (Pause in proceedings.)

3         THE WITNESS:  Well, if I'm reading it right, my

4   answer would be that's true that Sharon Hughes agreed to be

5   the trustee and adviser, the manager of the account.

6   BY MR. CALLCOTT:

7   Q   Is there anything in that answer that you would disagree

8   with?

9   A   As far as I can see now, no.

10  Q   Let's go on to number 2.  If you could read that

11  question.

12     (Pause in proceedings.)

13        THE WITNESS:  Okay.  I need to look at --

14        MR. CALLCOTT:  And it refers you back to your first

15  answer.

16        MR. ROMANO:  Right here.  (indicating)

17        THE WITNESS:  We found out since that it wasn't out

18  of Columbus.  It was out of Michigan.

19  BY MR. CALLCOTT:

20  Q   And that's with respect to number 2?

21  A   Yeah.

EXHIBIT 1

22   Q   Okay.  Anything else you would add or change about the

23   answer to interrogatory number 2?

24   A   Well, you are asking a lot of me.  I don't -- Right now

**EXHIBIT 1**

83

1   I don't see anything.  I'd have to study it more maybe.

2   Q    Well, you see, today is my only day to ask you questions

3   unless --

4        MR. ROMANO:  Well, it's up to you, John, how much

5   time you want to spend on it but that is a good example.  I

6   will let him answer the question because I didn't want you

7   to --

8        THE WITNESS:  You are asking a lot.

9        MR. ROMANO:  But I would like to state the

10  objection that this exercise is difficult for a layperson

11  such as Mr. Marks.

12      For example, he testified at length to something.  You

13  know that these are written by attorneys.  You know how they

14  go.

15       MR. CALLCOTT:  Well, I understand.

16       MR. ROMANO:  He has already given the answer, so

17  let me just tell you that he has told us about Mrs. Hughes

18  said she would cut the fees.

19       MR. CALLCOTT:  Well, I don't --

20       MR. ROMANO:  What is your problem with me saying

21  that?

EXHIBIT 1

22        MR. CALLCOTT:  Because it is a speaking objection

23    and you are putting stuff on the record.

24        I'll tell you what.  If you want to put it on the

**EXHIBIT 1**

84

1  record, we can have the deponent step out and you can put

2  whatever on the record you want.

3      MR. ROMANO:  Okay.  Let me do that.

4      Step out of the room for a second.

5      (Whereupon, Mr. Marks exited the room at this point,

6  after which time the following proceedings transpired out of

7  his presence:)

8      MR. ROMANO:  I thought I accomplished the same

9  thing by allowing him to answer to the best of his ability,

10  but the objection is that this exercise is really an exercise

11  in futility.  You have asked him all of the questions.  He

12  has given you all of the answers to the best of his

13  knowledge.  Now you are asking him to try to revisit all of

14  the answers he has already provided by testimony with the

15  answers prepared by attorneys and gone over with the client

16  in normal course to have him verify them.

17      But, for example, he testified quite distinctly that one

18  of the promises Mrs. Hughes made at one of their meetings was

19  that if they turned the account over to her, that she would

20  reduce their fees.  He said there is no doubt he testified to

21  that.  That's not in the factual allegation and it certainly

**EXHIBIT 1**

22   is not in the interrogatory probably because that is a minute

23   detail, but he is not going to be able to remember all of

24   those.

EXHIBIT 1

85

1      I think the objection is that regardless of what his

2   answers are to this exercise of going through each count of

3   the Complaint when called for by the plaintiff's response to

4   defendant's first set of interrogatory requests, it's subject

5   to his prior testimony.

6      With that said, I just think it is going to be a

7   difficult exercise.

8      I don't have anything further and I'm certainly going to

9   let him answer.

10      But let me also add that if you want him to sit and

11   study them, that's your call.  You got the timeframe like you

12   told me about with Mrs. Hughes and I'm going to give you

13   that, but we can be here all day but, you know, certainly it

14   seems like a bit of a futile exercise.

15      Let me get him back in here.

16      (Whereupon, Mr. Marks entered the room at this point, at

17   which time the following proceedings transpired:)

18   BY MR. CALLCOTT:

19   Q   Let's go to interrogatory number 6.

20      If you could read that question and then read the

21   answer.

**EXHIBIT 1**

22      (Pause in proceedings.)

23   A   All right.

24   Q   Do you agree with the answer that was provided to

EXHIBIT 1

86

1   interrogatory number 6?

2   A   It says that --

3       MR. ROMANO:  Read to yourself, Jim.  Just take your

4   time.

5       (Pause in proceedings.)

6       THE WITNESS:  I can answer what my feeling was,

7   that we did not have to repay the loans and we were never

8   advised by Mrs. Hughes that we were, that we did have to.

9   BY MR. CALLCOTT:

10   Q   So you disagree with this answer?

11       MR. ROMANO:  I'm going to object as to form.  It

12   misstates the client's answer.

13   BY MR. CALLCOTT:

14   Q   Well, I mean I want to be clear.  This answer says:

15   "To plaintiff's knowledge and belief, it has never been

16   claimed that participant loans did not have to repaid."

17       Are you saying it was your belief that those loans never

18   had to be repaid?

19   A   That's what I'm saying, yes.

20   Q   And you base that belief on the fact that Huntington

21   did not specifically come out and tell you they had to be

**EXHIBIT 1**

22   repaid?

23   A   They never did tell us until we got the 1099s.  I was

24   shocked when we got them.

EXHIBIT 1

87

1   Q   So when you got those 1099s, that was the first time

2   that you ever had any awareness that these loans had to be

3   repaid?

4   A   That's my opinion.

5   Q   Let's move on to the next one which would be number 7.

6       If you could read the interrogatory and the answer.

7       (Pause in proceedings.)

8           MR. ROMANO:  I'm going to state another quick

9   objection.  It is not going to be a speaking one.

10          This is not a 30(b)(6) representative and I just wanted

11   to be clear that this does not bind -- Mr. Marks's answers do

12   not bind the corporation with regard to the interrogatories

13   that you are now reviewing.

14          MR. CALLCOTT:  That's true except to the fact that

15   I am going to ask him -- I'm asking him what he knows and he

16   is a officer, --

17          MR. ROMANO:  That's fine, sir.  Yeah, that's fine.

18          MR. CALLCOTT:  -- et cetera, of the company.

19          MR. ROMANO:  Again, he is not required to have

20   corporate knowledge.

21          MR. CALLCOTT:  As the treasurer?

**EXHIBIT 1**

22          MR. ROMANO:  He is not required to have corporate

23    knowledge of any areas not notified in a 30(b)(6) because he

24    might not be the appropriate corporate representative for

EXHIBIT 1

88

1   these issues.

2        THE WITNESS:  I can't say that I would change

3   anything.

4   BY MR. CALLCOTT:

5   Q    So this answer relates to what you want to be paid back

6   at the end of the day?

7   A    As far as I can tell right now, I'd say yes.

8   Q    You want Huntington Bank to cut a check, put this money

9   in your pocket and the pocket of your spouse, the pocket of

10   your daughter and Mr. Straight, and the pocket of

11   Mr. Straight?

12   A    Yes, sir.

13        MR. ROMANO:  Mr. Straight had no loan.

14        Go ahead.

15   BY MR. CALLCOTT:

16   Q    Let's go on to number -- We can move on a couple of

17   pages here.

18        I'm looking now at interrogatory number 20, but there

19   may be a better way to deal with that interrogatory than

20   going through all of the language that's there.  I want to

21   make sure I understand the whole universe of people that

**EXHIBIT 1**

22   would have a right to communicate on behalf of Marks

23   Construction with Huntington Bank.

24       I take it that that would be you and your wife; is that

**EXHIBIT 1**

89

1   correct?

2   A    And possibly my daughter.

3   Q    Okay.  And so only you three individuals and no one else

4   would have had the authority to talk to Huntington National

5   Bank on behalf of the plan; is that correct?

6        MR. ROMANO:  I'm going to object to form.

7        THE WITNESS:  I think so as far as I can tell right

8   now.

9        MR. CALLCOTT:  I want to take just a minute.  I may

10  be done.

11       MR. ROMANO:  Do you want me to go?

12       Well, go ahead and take a moment and see if you have

13  anymore questions and then I got a few.

14       MR. CALLCOTT:  Let's take a break real quick.

15   (Recess taken in proceedings at 1:15 p.m.)

16             R-E-C-E-S-S

17   (Proceedings reconvened at 1:24 p.m. as follows:)

18       MR. CALLCOTT:  We are on the home stretch,

19  Mr. Marks, but I do have a couple more questions, assuming

20  your lawyer doesn't keep us here.

21       MR. ROMANO:  That's all right if I can persuade you

EXHIBIT 1

22   guys to vote democrat, and you can put that on the record.

23   BY MR. CALLCOTT:

24   Q   Let's go back.  I want to make sure I understand all of

**EXHIBIT 1**

90

1   the things the company -- Well, let me rephrase.

2       Do you know anything about plan contributions or is that

3   something I need to ask your wife about?

4   A   Plan contributions?

5   Q   Contributions to the plan, salary deferrals, anything

6   like that.

7   A   No, sir.

8   Q   Okay.  Now I want to make sure that I understand the

9   world of things that you want out of this lawsuit and I asked

10   you about one interrogatory.  I'm going to ask you about

11   interrogatory 18, the last interrogatory we want to cover

12   today.

13       If you could read that and then read the answer, and we

14   talked a little bit about the loans, but I just want to make

15   sure that I understand this part of it, too.

16       (Pause in proceedings.)

17   BY MR. CALLCOTT:

18   Q   Are you finished reviewing that?

19   A   I read it.

20   Q   And so kind of like we discussed with respect to

21   interrogatory 7 regarding the loans.

EXHIBIT 1

22      Interrogatory 18 in its answer sets out the damages that

23   you want paid back to you, your wife, your daughter and

24   Mr. Straight; is that correct?

**EXHIBIT 1**

91

1        MR. ROMANO:  Objection to form.

2        THE WITNESS:  Yes.

3        MR. CALLCOTT:  Now that your lawyer has objected I

4   got to ask you another question.

5        MR. ROMANO:  You don't have to.

6   BY MR. CALLCOTT:

7   Q    But this is the money or rather these are the damages

8   that you want paid to you, your wife, your daughter and

9   Mr. Straight?

10        MR. ROMANO:  The same objection.

11        THE WITNESS:  As I understand the question and

12   answer, yes.

13   BY MR. CALLCOTT:

14   Q    I guess the problem is I'm listing all of those people.

15        These are the damages you want paid to you?

16        You want your share paid to you, correct?

17   A    Yes.

18        MR. ROMANO:  I object.  The same objection.

19        Go ahead.

20   BY MR. CALLCOTT:

21   Q    And you want a share paid to your wife?

EXHIBIT 1

22        MR. ROMANO:  Same objection.

23        THE WITNESS:  I have to say yes.  As far as I know,

24   yes.

EXHIBIT 1

92

1   BY MR. CALLCOTT:

2   Q   And paid to Ms. Davis?

3   A   Yes.

4   Q   And paid to Mr. Straight?

5   A   Yes, sir.

6        MR. ROMANO:  Same objection on both of your

7   questions.

8        MR. CALLCOTT:  I have kind of a closing spill that

9   I do about you having the right to read and sign.

10        MR. ROMANO:  I'm going to ask some questions if you

11   want to save that.

12        MR. CALLCOTT:  I can save that and let your lawyer

13   ask questions.

14        MR. ROMANO:  Yeah, however you want to do it, but

15   I'll remind you at the end.

16        MR. CALLCOTT:  Okay.

17              EXAMINATION

18   BY MR. ROMANO:

19   Q   Jim, just a couple clarifying questions.

20      To your knowledge Jim Denny is your tax accountant,

21   right?

**EXHIBIT 1**

22   A   Yes, sir.

23   Q   Is he anything else other than tax accountant to your

24   knowledge?

**EXHIBIT 1**

93

1   A   Other than the tax accountant?

2   Q   Yes.

3       Is that what he does for you?

4   A   Yeah, he does the year-end taxes.

5   Q   With regard to the loans, Mr. Callcott asked you a

6   number of questions.

7       Now, you stated that you believe that the loans did not

8   have to be repaid in accordance to any schedule, correct?

9       MR. CALLCOTT:  Objection to form.

10      THE WITNESS:  Yes, sir.

11  BY MR. ROMANO:

12  Q   And did you ever receive any notice from the bank saying

13  that you did have to make loan repayments and they were

14  delinquent?

15      MR. CALLCOTT:  Object to form.

16      THE WITNESS:  No, sir.

17  BY MR. ROMANO:

18  Q   Did anybody ever contact you from the bank and ask you

19  where your loan repayments were?

20  A   No, sir.

21  Q   In 2001 when those loans were taken out who was in

**EXHIBIT 1**

22   control of the investments for the Marks Construction Company

23   profit-sharing plan?

24   A   Huntington Bank.

EXHIBIT 1

94

1   Q   Okay.  Now, I just want to be clear when you say that

2   you never had to repay the loans --

3       MR. CALLCOTT:  Object to form.

4       MR. ROMANO:  I'm not finished yet.

5       MR. CALLCOTT:  I know where you are going.

6       MR. ROMANO:  Well, I get to finish the question.

7   Let's make a cleaner transcript.  Let me finish the

8   question.

9   BY MR. ROMANO:

10   Q   Did you think you were going to receive the money you

11   had borrowed again when you retire?

12       MR. CALLCOTT:  Object to form.

13       THE WITNESS:  Oh, no.

14   BY MR. ROMANO:

15   Q   When you say that they were never going to be repaid,

16   did you believe that the money was going to be repaid out of

17   your retirement assets that were due you?

18   A   Yeah, I believed it was going to be out of the funds

19   after we retired where we wouldn't be taxed so bad.

20   Q   And that was going to be your repayment?

21   A   Right.

**EXHIBIT 1**

22   Q   Anybody from Huntington Bank ever tell you anything

23   different?

24   A   No, sir.

**EXHIBIT 1**

95

1    Q    Let me show you, and I realize you testified that you

2    had never seen it before, but let me show you what has been

3    previously marked in the Deposition Exhibit Number 3.

4        This is a September 9, 2003, letter to Karen Marks from

5    Sharon Hughes.

6        Remember we looked at that earlier?

7    A    Yes, sir.

8    Q    There was an attachment to that which Mrs. Hughes

9    evidently refers to.  I attached a breakdown of the loans and

10   the interest they accumulated since the inception.

11       Do you see that?

12   A    Yes, sir.

13   Q    The second column -- The first column is just some

14   labels, loan, principal, loan rate, days, et cetera.

15       The second column says Jim Marks and Karen Marks.

16       Did Jim Marks and Karen Marks ever take out a $50,000

17   loan against their plan assets from Huntington Bank?

18   A    We took out more than that.

19   Q    Well, let me ask you.  Did Jim and Karen Marks ever take

20   out a $50,000 loan?

21   A    Each, yes.

**EXHIBIT 1**

22   Q   But not a $50,000 loan?

23   A   No, no.

24   Q   Jim Marks took out a $50,000 loan?

**EXHIBIT 1**

96

1        MR. CALLCOTT:  Object to form.

2        THE WITNESS:  Yes.

3   BY MR. ROMANO:

4   Q   Karen Marks took out a $50,000 loan?

5        MR. CALLCOTT:  Object to form.

6        THE WITNESS:  Yes.

7   BY MR. ROMANO:

8   Q   Is this inaccurate to that extent?

9        MR. CALLCOTT:  Object to form.

10       THE WITNESS:  Yes.

11   BY MR. ROMANO:

12   Q   What would you have done if you would have received a

13   delinquency notice regarding the first payment that was

14   otherwise due for these loans from Huntington Bank?

15   A   We would have paid them, I'm sure.

16   Q   You would have paid the payment?

17   A   Yes.

18   Q   And do you remember in Mrs. Hughes deposition we looked

19   at some of those notices that Huntington Bank had for

20   delinquent loan repayments from participants?

21       Do you remember seeing those?

**EXHIBIT 1**

22   A   No, I don't.

23   Q   They were form letters.

24        Now, Mr. Callcott asked you some questions that elicited

**EXHIBIT 1**

97

1   your response that you were a conservative investor.

2       Do you remember that?

3   A   Yes.

4   Q   How did you arrive at that conclusion that you were a

5   conservative investor?

6   A   Mrs. Hughes gave us a little test and she derived from

7   that test that Karen and I were conservative.

8   Q   Had you ever concluded on your own that you were a

9   conservative investor?

10   A   Oh, no.

11   Q   And do you remember in what timeframe Mrs. Hughes gave

12   you that test?

13   A   It was the second visit she was there.

14   Q   Back in 2002?

15   A   Right.

16   Q   And do you know -- And did she tell you what the purpose

17   of that test was?

18   A   Well, it was going to tell her how to make our

19   investments.

20   Q   That's what she told you?

21   A   Yes.  That's the purpose we were told.

**EXHIBIT 1**

22   Q    From the time Mrs. Hughes took over the plan when you

23   decided to go with her, as you put it, do you remember ever

24   taking a look at the performance of the plan?

EXHIBIT 1

98

1         MR. CALLCOTT:  Objection.

2     Asked and answered.

3         THE WITNESS:  After she took it over?

4         MR. ROMANO:  Yes.

5         THE WITNESS:  No, sir

6    BY MR. ROMANO:

7    Q   Mr. Callcott had asked you some questions and I think he

8    asked you essentially did you ever ask him at Huntington

9    National Bank how the plan was doing.

10       Do you remember that question?

11   A   Yes.

12   Q   Did you try to determine regardless whether you asked

13   anyone at Huntington National Bank how the plan was doing

14   after Mrs. Hughes took it over?

15       MR. CALLCOTT:  Objection to form.

16       THE WITNESS:  Well, the only thing we did was Karen

17   tried to get on the computer to check and see what it was

18   doing and she couldn't get on, but we assumed it was doing

19   fine because she told us it was going to be the same as it

20   was, so we had no reason to think otherwise.

21   BY MR. ROMANO:

**EXHIBIT 1**

22   Q    And that was where you said she tried to get online

23   sometime in the summer of 2003?

24   A   Yes.

**EXHIBIT 1**

99

1   Q    Did you or to your knowledge Karen Marks do anything

2   when she couldn't get online?

3   A    I think, if I remember right, I think Karen called

4   Sharon and told her we couldn't get on.

5   Q    Did anybody ever tell you to your knowledge that you

6   couldn't get online because the bank had not yet made the

7   conversion to the plan that Sharon Hughes was doing and

8   therefore you couldn't get online to look at your accounts?

9   A    No, sir.

10   Q    Were they sending you regular account statements to your

11   knowledge?

12   A    We never received any statements.

13        MR. ROMANO:  Let me have the court reporter mark

14   this as Deposition Exhibit Number 12.

15       (Deposition Exhibit Number 12 marked for the purpose of

16   identification.)

17   BY MR. ROMANO:

18   Q    I'm going to ask you to take a look at that.

19       Do you remember signing that document?

20   A    That's my signature.  I don't exactly remember it.

21   Q    Let me read for the record.  This is a Plan

**EXHIBIT 1**

22   Authorization Form.

23      "Purpose of the form:  Huntington National Bank will

24   receive instructions only from persons authorized to give

EXHIBIT 1

100

1  instructions.  We will retain on file the names of those

2  persons for whom the Employer Sponsor has given authority to

3  give instructions to Huntington National Bank."

4       And I'm going to skip this and it says:

5       "The following individuals have been authorized to give

6  instructions to Huntington National Bank for the above

7  plans."

8  A    Right.

9  Q    And you are the only person listed there; is that

10  correct, Mr. Marks?

11  A    That is correct.

12  Q    And evidently your signature is dated March 24, 2003; is

13  that correct?

14  A    That is correct.

15  Q    And this is signed by Karen Marks on behalf of the plan

16  dated February 18th of 2003?

17  A    Yes.

18       MR. ROMANO:  And by the way, for the record this

19  bears Bates Stamp D635.

20  BY MR. ROMANO:

21  Q    Did anybody from Huntington Bank ever ask for your

**EXHIBIT 1**

22    authorization to liquidate the investment portfolio of the

23    Marks Construction profit-sharing plan?

24    A    No, sir, never.

**EXHIBIT 1**

101

1   Q    Did anybody ever ask you for authority to liquidate the

2   investment portfolio of the Marks Construction Company,

3   Incorporated, 401K plan?

4   A    No.

5         MR. CALLCOTT:  Objection to form.

6   BY MR. ROMANO:

7   Q    Did anybody from Marks Construction -- Excuse me.  Did

8   anybody from Huntington National Bank -- Did I say Huntington

9   National Bank for the last question?

10       Let me ask it again.

11  A    I think you did.

12  Q    Did anybody from Huntington National Bank ever ask for

13  authorization from you to liquidate any investment portfolio

14  for the Marks Construction Company, Inc., 401K plan?

15        MR. CALLCOTT:  Objection to form.

16        THE WITNESS:  No, sir.

17  BY MR. ROMANO:

18  Q    Did anybody from Huntington National Bank ask your

19  authorization to leave the entire plan portfolio in a

20  Huntington Bank Money Market Account for the months of April

21  through September?

**EXHIBIT 1**

22   A   No, sir.

23        MR. CALLCOTT:  Objection to form.

24

EXHIBIT 1

102

1    BY MR. ROMANO:

2    Q    Did they ever ask you -- Did anybody from Huntington

3    National Bank ever ask you for authorization to leave all of

4    the plan assets in a Huntington National Bank Money Market

5    from essentially April 7th or 8th through September 9th of

6    2003?

7    A    No, sir.

8    Q    The same question with regard to leaving the plan assets

9    in a Huntington National Bank Money Market Account from

10   April 7th or 8th through January 20th, 2004?

11   A    No, sir.

12        MR. ROMANO:  I don't have anything further.

13        MR. CALLCOTT:  Objection to form to the last

14   question.

15             REEXAMINATION

16   BY MR. CALLCOTT:

17   Q    With respect to Exhibit 12, it's your testimony,

18   Mr. Marks, that after March 23, 2003, you never gave

19   Huntington National Bank any instructions of any kind?

20   A    Not to my knowledge, no.

21   Q    Now, with respect to the loan and notices of default,

**EXHIBIT 1**

22   do you understand that it was the employer's responsibility

23   to issue the notice of default?

24        MR. ROMANO:  I'm going to object.  It calls for a

**EXHIBIT 1**

103

1   legal conclusion

2   BY MR. CALLCOTT:

3   Q    And I understand the objection but I'm asking you your

4   understanding?

5   A    Ask it again.

6   Q    Did you understand that it was the employer's

7   responsibility to issue the notice of default?

8   A    No, sir, I didn't know that.

9   Q    Okay.

10   A    I didn't know there was a default.

11   Q    Did you ever review the loan policy with respect to the

12   plan?

13   A    No, sir.

14   Q    At any point in time?

15   A    No, sir.

16   Q    Do you deny that Mr. Denny, the accountant, gave advice

17   to the plan?

18   A    I don't recall if he did.

19   Q    He may have; you just don't know?

20   A    I don't remember if he did.

21        MR. CALLCOTT:  Okay.  Mr. Romano, do you have

**EXHIBIT 1**

22   anymore questions?

23        MR. ROMANO:  No, I don't, sir.  I don't believe

24   so.

EXHIBIT 1

104

1      I mean, if you are done, I'll think about it for a

2    second but I don't believe I do.

3           MR. CALLCOTT:  I'll just go through my wrap-up

4    here.

5           MR. ROMANO:  Yeah, go ahead and wrap it up.

6           MR. CALLCOTT:  I'll wrap it up.

7           MR. ROMANO:  Just give me one minute.

8           MR. CALLCOTT:  Sure.  Take your time.

9           MR. ROMANO:  You know, I'm sorry.  I did want to go

10   back and ask one more thing.

11                  REEXAMINATION

12   BY MR. ROMANO:

13   Q    Mr. Marks, Mr. Callcott asked you some questions and way

14   in the beginning of this deposition several hours ago about

15   your conduct in your construction company.

16       Do you remember that?

17   A   Yes, sir.

18   Q   And, sir, you testified that you graduated from high

19   school, correct?

20   A   Yes.

21   Q   Victory?

**EXHIBIT 1**

22   A   Yes, sir.

23   Q   Is that true?

24   A   Yes.

**EXHIBIT 1**

105

1   Q   1956?

2   A   Right.

3   Q   You didn't go on to any other college, correct?

4   A   No, sir.

5   Q   How did you learn about the construction company

6   business?

7   A   By working.

8   Q   By on-the-job training?

9   A   Right.  I was working for another contractor until I

10   started my own business.

11   Q   And you testified that when you had complex bids to put

12   out, did you do those?

13   A   No, sir.

14   Q   You had Richard Straight do them, correct?

15       MR. CALLCOTT:  Object to form.

16       THE WITNESS:  As long as Richard Straight was on

17   the payroll, that's what he did.

18   BY MR. ROMANO:

19   Q   And why did you have Richard Straight do it instead of

20   you?

21   A   Because I couldn't do it.

**EXHIBIT 1**

22   Q   Why not?

23        Your expertise wasn't in bidding?

24   A   I don't know anything about estimating, bidding.

EXHIBIT 1

106

1   Q   Your expertise was in construction?

2   A   Right.

3        MR. CALLCOTT:  Objection to form.

4   BY MR. ROMANO:

5   Q   And why did you go to Huntington Bank at least since

6   1996 to handle your profit-sharing plan?

7   A   Because they were an investment bank and we depended on

8   them since '96 at least.  I don't know exactly how long, and

9   we just depended on them to take care of our money, and --

10  Q   Did you have any education?  I'm sorry.

11  A   I was just going to say that we were told by Mrs. Hughes

12  that she would take care of it and guarantee us a better

13  profit and less fees.

14  Q   Did you ever have any education in investing?

15  A   None.

16  Q   Did you ever have any on the job experience for making

17  investments?

18  A   No, sir.

19  Q   When it came to investing, did you go to somebody you

20  believed had the expertise just like you went to Mr. Straight

21  for bidding?

**EXHIBIT 1**

22   A   Exactly.  We had to.

23   Q   Do you have any idea how to operate a computer?

24   A   I can't turn it on.

**EXHIBIT 1**

107

1   Q    When Mr. Callcott asked you about who do you think the

2   damages should go to in this case, is it more accurate to say

3   that you believe --

4        MR. CALLCOTT:  Objection to form.

5   BY MR. ROMANO:

6   Q    -- that the damages that are sought from Huntington

7   National Bank should be allocated to the participants'

8   accounts who lost them?

9   A    Certainly.

10  Q    Not to the individuals?

11  A    No, correct.

12       MR. CALLCOTT:  Object to the form.

13  BY MR. ROMANO:

14  Q    Mr. Callcott pointed out several documents to you and he

15  started to point out plan documents but I don't think he ever

16  got around to it.

17       But the documents that he pointed out to you that you

18  did not read, why did you not think you needed to read

19  documents related to the Marks plan after Mrs. Hughes took it

20  over?

21  A    Again, as I keep saying, Sharon told us she would take

EXHIBIT 1

22   care of it and it would stay the same as it was.  The only

23   change would be that we would be able to get on the computer

24   to look at it, and that wouldn't let me on because I didn't

**EXHIBIT 1**

108

1    know how, but she said other than that it would stay the same

2    as it was and she would guarantee us that it would make money

3    and that we would get more personalized help, you know, from

4    her --

5    Q    And everything else you testified about?

6    A    -- because prior to that we had nobody local that was

7    following us.

8           MR. ROMANO:  If you promise not to ask anymore

9    questions, I'm done.

10          MR. CALLCOTT:  No, I have got more questions.

11          MR. ROMANO:  Oh, see, you have got more questions.

12                 REEXAMINATION

13    BY MR. CALLCOTT:

14    Q    Let's say hypothetically speaking that you get some kind

15    of recovery --

16          MR. ROMANO:  Objection to a hypothetical question

17    but you can go ahead.

18          MR. CALLCOTT:  Well, no, it's a hypothetical.

19    BY MR. CALLCOTT:

20    Q    -- hypothetically you get a recovery in this case, the

21    check gets cut, a chunk of money, it's handed over to you,

**EXHIBIT 1**

22    what would you do with that chunk of money?

23    A    Probably go to our accountant to distribute it

24    properly.

**EXHIBIT 1**

109

1   Q   Okay.  Where would he put it?

2   A   Where would he put it?

3   Q   Where would you direct him to put it?

4   A   With the participants who it belongs to, I guess.  I

5   don't know.  He would have to do that.

6   Q   But you just answered a question for Mr. Romano and you

7   said it would go to the participants' accounts?

8   A   No.

9   Q   What do you mean by that?

10   A   What I'm saying is we have one plan and one lump sum of

11   money and this was the way it was all along.  At the end of

12   every year, at the end of our fiscal year, Jim Denny would go

13   and allocate and tell us how much each one of our accounts

14   was worth.

15   Q   Okay.

16   A   That's what I'm saying.

17   Q   But where is that plan now?

18       Does Marks Construction still have a plan to your

19   knowledge?

20       I thought it was terminated August 1st?

21   A   Well, we reinvested the money with Chase Bank.

**EXHIBIT 1**

22   Q   With a different plan?

23   A   I don't know what it is.  They just took our money and

24   invested it for us.

**EXHIBIT 1**

110

1   Q   Okay.

2   A   We had all of the money directed from Huntington Bank to

3   Chase Bank or Bank One at the time.

4   Q   Okay.  So when you say participants' accounts, you

5   really don't know what that means?

6   A   No.

7   Q   Okay.  In fact, Richard Straight, he doesn't have any

8   kind of account left with Marks Construction at all?

9       MR. ROMANO:  Objection.

10      Asked and answered.

11      THE WITNESS:  I don't think so.  I think he took

12   his money and did something else with it.  I don't know what

13   he did with it.

14   BY MR. CALLCOTT:

15   Q   Okay.  But if you receive money, you would expect it to

16   go to you, to end up with you?

17      MR. ROMANO:  Objection.

18      Asked and answered.

19      THE WITNESS:  Well, I'm assuming if we received any

20   money, it would be made out to Marks Construction and our

21   accountant would handle it.

**EXHIBIT 1**

22   BY MR. CALLCOTT:

23   Q   But you don't know?

24   A   I don't know, no.

EXHIBIT 1

111

1          MR. CALLCOTT:  I'll pass the witness.

2          MR. ROMANO:  I have one more statement for the

3    record.

4      I'm still waiting on the documents from Mrs. Hughes's

5    deposition.  I can go over them again.  You have them.  I

6    want to state that on the record that you promised to have

7    those in so many days.  Those days have long passed.

8      Any chance we are going to get those without me having

9    to file a motion to compel?

10         MR. CALLCOTT:  What records are you asking for?

11         MR. ROMANO:  You got to be kidding.  We went over

12    them on the record at the end of the deposition.

13      Conversion manual, e-mails of 5-1-03, 7-23-03, 9-29-03,

14    --

15         THE COURT REPORTER:  7-23 --

16         MR. ROMANO:  I'm sorry, Rosalie.  I get excited.  I

17    forget that you are still trying to do this.

18      E-mails from Sharon Hughes to Marks Construction dated

19    5-1-03, 7-23-03 and 9-29-03.

20         MR. CALLCOTT:  I can't get all of this down as

21    quickly as you are saying it.

**EXHIBIT 1**

22          MR. ROMANO:  I'm sorry.

23          5-1-03 which is May 1, 2003, July 23, 2003 and

24    September 29, 2003.

EXHIBIT 1

112

1     There were also some faxes that were noted in discovery

2   on a telephone log sheet from Sharon Hughes to Mr. Denny you

3   were going to isolate for us and we have asked for a

4   30(b)(6).  So quite frankly Mrs. Hughes said that she thought

5   she knew what documents but couldn't identify them at her

6   deposition where Huntington National Bank requested the

7   allocation of the participant accounts for Mr. Denny, and

8   she also indicated that she couldn't identify them in her

9   deposition but she thought she could identify the documents

10   where the census data was requested from Marks Construction

11   in 2003.

12     Now, we had that July 23, '03, e-mail which nobody has

13   produced.

14     And then you were going to revisit the lost and

15   destroyed request and the combined discovery request and you

16   were going to revisit the discovery request regarding the

17   1099 issue allowing people to pay off their loans to avoid a

18   1099.

19     And if your answer is I'm not going to do it, that's

20   fine.  I just need to know because otherwise I don't want to

21   breach my duty of trying to in good faith resolve the issue.

**EXHIBIT 1**

22          MR. CALLCOTT:  I'm not sure that you correctly

23   characterized matters and I believe that some communications

24   have gone to you from Ms. Hauptfuehrer regarding attempts to

**EXHIBIT 1**

113

1   locate additional records.

2       MR. ROMANO:  Well, I mean, just to let you know,

3   and why don't you finish up and I'll tell you.  I mean, it

4   doesn't have to be on the record.  Ms. Hauptfuehrer has

5   refused to allow a representative of the Huntington National

6   Bank to appear for a 30(b)(6) deposition.

7       MR. CALLCOTT:  Now, I understand that is absolutely

8   not correct, Mike, absolutely not correct.  I saw the

9   exchange of letters, and I understand that you sent a letter

10   and I understand that it's entirely disputed as to what that

11   conversation actually incurred.

12      MR. ROMANO:  I mean, I don't know.  I mean, I'm not

13   saying that she's right or wrong.  She may be right.  She is

14   objecting to producing a representative for the Rule 30(b)(6)

15   deposition.  I mean, there is no dispute.

16      MR. CALLCOTT:  I mean, look, I'm going to let those

17   correspondence speak for themselves.

18      MR. ROMANO:  There is no dispute.

19      MR. CALLCOTT:  Well, --

20      MR. ROMANO:  I said how come I got an e-mail from

21   her.

**EXHIBIT 1**

22          MR. CALLCOTT:  Well, we will let those e-mails

23     speak for themselves.

24          MR. ROMANO:  Yeah, the judge is going to have to

**EXHIBIT 1**

114

1  see that.

2  I'm not trying to bash anybody here, but we did ask for

3  an identification of the documents that represent the

4  requests for the allocations from the accountant and the

5  census information.

6  MR. CALLCOTT:  And I'm sure that is going to be an

7  issue which the judge is going to look at.

8  MR. ROMANO:  Well, I don't think we have any

9  choice.

10  But regardless, that's everything as far as I know.

11  MR. CALLCOTT:  You have the opportunity to read and

12  sign this deposition.

13  MR. ROMANO:  We will read and sign.

14  MR. CALLCOTT:  That means you will receive a copy

15  of this transcript.

16  MR. ROMANO:  Counsel will receive a copy, correct?

17  MR. CALLCOTT:  Yes.

18  You will have the opportunity to read it over.

19  You will be given a sheet of paper where you can state

20  any changes you wish to make.

21  You can change a word.  You can change the meaning of a

EXHIBIT 1

22    whole sentence.  You can say white is black or black is

23    white.

24          MR. ROMANO:  Let me say this.

EXHIBIT 1

115

1      I will advise him on all of that extensively.  He will

2   follow the advice of counsel on that.

3          MR. CALLCOTT:  Well, I understand that.

4      You understand that if you make a change, however, that

5   there will be two sets of sworn testimony?

6          MR. ROMANO:  I disagree with that but go ahead.

7          MR. CALLCOTT:  And --

8          MR. ROMANO:  It is possible that the court reporter

9   could make a mistake that requires a correction in which case

10   there will be two sets.

11          MR. CALLCOTT:  Upon our request I guess your

12   attorney has indicated you will read and sign and we will

13   make that same request as well.

14      You do understand that you have this opportunity to read

15   and review your deposition?

16          THE WITNESS:  Yes.

17          MR. CALLCOTT:  Nothing further for the record.

18      (Deposition adjourned at 1:55 p.m.)

19                  *  *  *

20              A-D-J-O-U-R-N-M-E-N-T

21                  *  *  *

**EXHIBIT 1**

22

23

24

**EXHIBIT 1**

116

1            C E R T I F I C A T E

2

3    STATE OF WEST VIRGINIA)   SS:

4
        I, Rosalie B. Eanone, Registered Merit Reporter,
5   Notary Public in and for the State of West Virginia, do
    hereby certify that the within witness was by me first duly
6   sworn to tell the truth, the whole truth, and nothing but the
    truth; that I did report said deposition in stenotype; and
7    that the foregoing pages are a true and correct transcription
    to the best of my ability of my said stenotype notes of said
8   deposition.

9
        I further certify that the above deposition was
10   taken at the time and place hereinabove set forth and that
    the taking of said deposition was commenced and completed as
11   hereinabove set out.

12
        I further certify that I am not attorney or counsel
13   of any of the parties, nor am I a relative or employee of any
    attorney or counsel or party connected with the action, nor
14   am I financially interested in the action.

15
        IN WITNESS WHEREOF, I have hereunto set my hand this 7th
16   day of October, 2006.

17

18

19

20           ROSALIE B. EANONE, RMR, NOTARY PUBLIC

21

**EXHIBIT 1**

22

23

24

**EXHIBIT 1**

117

1       IN THE UNITED STATES DISTRICT COURT FOR THE
        NORTHERN DISTRICT OF WEST VIRGINIA
2                    CLARKSBURG
                        -----
3

4    MARKS CONSTRUCTION CO., INC., et al,

5           Plaintiffs
     VS                    CIVIL ACTION NO. 1:05-CV-73
6                      (Judge Frederick P. Stamp, Jr.)
     THE HUNTINGTON NATIONAL BANK, et al,
7
            Defendants
8
                        ------
9

10                   CERTIFICATE

11          I, James C. Marks, do hereby certify that
        I have read the foregoing transcript of my deposition
12       and certify that it is a true and correct copy of my
        testimony, except for additions, corrections or changes,
13       if any, in form or substance as set forth by me on the
        attached Deposition Correction Sheet.

14

15

16
                        Deponent
17

18

19

20

21

EXHIBIT 1

22

Notary Public

23

24   (date)

**EXHIBIT 1**

118

1            CORRECTION SHEET
    DO NOT WRITE ON TRANSCRIPT   -   ENTER CHANGES BELOW
2
    DEPONENT:  JAMES C. MARKS
3
    PAGE LINE  CHANGE FROM    TO    REASON
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

**EXHIBIT 1**

22

23

24   Signature of Deponent            Date

**EXHIBIT 1**