1          IN THE UNITED STATES DISTRICT COURT FOR THE
              NORTHERN DISTRICT OF WEST VIRGINIA
2                        CLARKSBURG
                            -----
3

4    MARKS CONSTRUCTION CO., INC., et al,

5          Plaintiffs
     VS                    CIVIL ACTION NO. 1:05-CV-73
6                       (Judge Frederick P. Stamp, Jr.)
     THE HUNTINGTON NATIONAL BANK, et al,
7
           Defendants
8
                           ------
9

10          DEPOSITION OF KAREN E. MARKS,

11   a plaintiff herein, called by the Defendants for examination,

12   taken pursuant to West Virginia Rules of Civil Procedure,

13   by and before Rosalie B. Eanone, Court Reporter, and Notary

14   Public in and for the State of West Virginia, at the offices

15   of Steptoe & Johnson, PLLC, 229 Main Street, Clarksburg,

16   West Virginia, on Monday, October 9, 2006, commencing at

17   10:06 a.m.

18

19

20

21

22

23          ROSALIE B. EANONE, RPR, RMR, NOTARY PUBLIC
                       126 Overlook Drive
24              Clarksburg, West Virginia 26301
                     Tel. (304) 623-4544

**Exhibit 2**

**Exhibit 2**

2

1    APPEARANCES:

2

3    FOR THE PLAINTIFFS:     MICHAEL J. ROMANO, ESQUIRE
                     128 South 2nd Street
4                    Clarksburg, West Virginia 26301
                     Tel. (304) 624-1100
5

6    FOR THE DEFENDANTS:     JOHN R. CALLCOTT, ESQUIRE
                     STEPTOE & JOHNSON, PLLC
7                     P. O. Box 1616
                     United Center, Suite 400
8                     1085 Van Voorhis Road
                     Morgantown, West Virginia 26507-1616
9                     Tel. (304) 598-8000

10
                     KEVIN A. WIGGINS, ESQUIRE
11                    STEPTOE & JOHNSON, PLLC
                     Chase Tower - Sixth Floor
12                    P. O. Box 2190
                     Clarksburg, West Virginia 26302-2190
13                    Tel. (304) 624-8195

14

15

16

17

18   ALSO PRESENT:      JAMES C. MARKS
                     SHARON LYNN HUGHES
19

20

21

22

23

24

**Exhibit 2**

3

1          * * * * *
               I N D E X
2

3   WITNESS          EXAMINATION REEXAMINATION

4   JAMES C. MARKS

5    By Mr. Callcott:      4
      By Mr. Romano:       48
6    By Mr. Callcott:           82
      By Mr. Romano:            88
7

8

9

10
     EXHIBITS               MARKED
11
     DEPOSITION EXHIBIT NO. 13        6
12   DEPOSITION EXHIBIT NO. 14         10
     DEPOSITION EXHIBIT NO. 15        18
13   DEPOSITION EXHIBIT NO. 16        22
     DEPOSITION EXHIBIT NO. 17        23
14   DEPOSITION EXHIBIT NO. 18        23
     DEPOSITION EXHIBIT NO. 19        24
15   DEPOSITION EXHIBIT NO. 20        26
     DEPOSITION EXHIBIT NO. 21        27
16   DEPOSITION EXHIBIT NO. 22        28
     DEPOSITION EXHIBIT NO. 23        28
17   DEPOSITION EXHIBIT NO. 24        37
     DEPOSITION EXHIBIT NO. 25        52
18   DEPOSITION EXHIBIT NO. 26        74

19   *Exhibits attached.

20

21

22

23

24

**Exhibit 2**

**Exhibit 2**

4

1              - - -

2          P R O C E E D I N G S

3              - - -

4        KAREN E. MARKS, A PLAINTIFF, SWORN

5              EXAMINATION

6   BY MR. CALLCOTT:

7   Q    Good morning, ma'am.

8   A    Good morning.

9   Q    We have met a couple times before.  My name is John

10   Callcott representing the defendants in this matter.

11       This is my opportunity this morning to ask some

12   questions about this case.

13       Let me start out by asking that you identify yourself

14   for the record.

15   A    Karen E. Marks.

16   Q    Other than sitting in these past couple of depositions,

17   have you ever given a deposition before?

18   A    No, sir.

19   Q    Other than the lawsuits that your husband mentioned on

20   Friday, can you recollect any other lawsuits that you would

21   have been involved in or that Marks Construction would have

22   been involved in?

23   A    No, sir.

24   Q    Okay.  And I take it he mentioned that he had lived in,

**Exhibit 2**

**Exhibit 2**

1   and I forget the county, Harrison or Marion County.

2        Harrison, was it?

3   A    Harrison County.

4   Q    And I take it, ma'am, have you lived in that county all

5   of your life as well?

6   A    Yes, sir.

7   Q    Where did you graduate from high school?

8   A    Victory High School.

9   Q    As well, okay.

10        Did you go on to any additional formal education after

11   high school?

12   A    No, sir.

13   Q    Where did you first start working after high school?

14   A    With Marks Construction.

15   Q    With Marks Construction.

16        And have you been employed with them continuously since

17   Marks Construction was founded I forget whether it was '71 or

18   '73, somewhere in the early '70s?

19   A    Yes, sir, that is the only place I have been employed.

20   Q    Could you tell me what positions you have held at Marks

21   Construction?

22   A    Actually I have only been a bookkeeper, office manager.

23   Q    So you kept the accounts as bookkeeper for Marks

24   Construction?

**Exhibit 2**

**Exhibit 2**

1   A   As bookkeeper, yes.

2   Q   And as office manager you say you managed -- What would

3   you describe as your duties as office manager?

4   A   Just overseeing the paperwork that came in.

5   Q   Now, since 2000 you have been acting -- Well, you have

6   been the president of the corporation?

7   A   Yes, sir.

8   Q   And you continue to be the president at the present

9   time?

10   A   That is correct.

11   Q   I'm going to apologize to you as I did to Mr. Marks for

12   asking this question but I have to ask it in every deposition

13   I do.

14      Have you ever been convicted of any crime?

15   A   No, sir.

16   Q   And I assume that, like Mr. Marks, you have no problem

17   reading and writing?

18   A   No, sir.

19      (Deposition Exhibit No. 13 marked for the purpose of

20   identification.)

21   BY MR. CALLCOTT:

22   Q   I'm going to hand you a document that has been marked as

23   Exhibit 13 and ask if you have ever seen this document

24   before?

**Exhibit 2**

**Exhibit 2**

1        MR. ROMANO:  Why don't you put on the record real

2    quick that we are going to use the prior exhibits.

3        MR. CALLCOTT:  Absolutely.

4        From Mr. Marks's deposition of Friday, October 6th, we

5    have introduced twelve exhibits, 1 through 12, and we are

6    going to utilize for these two depositions, the deposition

7    of Mr. Marks and Mrs. Marks, the same set of exhibits, and

8    so the first exhibit that will be introduced today will be

9    Exhibit 13 and references 1 to 12 will refer to 1 through 12

10    from Mr. Marks's deposition.

11    BY MR. CALLCOTT:

12    Q    Have you had the opportunity, ma'am, to look over

13    Exhibit 13?

14    A    I have looked it over.  It is my signature.

15        MR. ROMANO:  Let him ask the questions.

16        THE WITNESS:  Oh, I'm sorry.

17        MR. CALLCOTT:  Fair enough.  Just being helpful.

18    BY MR. CALLCOTT:

19    Q    On the page that bears Plaintiff's Bates 274, is that

20    what you were speaking of when you said that it was, in fact,

21    your signature?

22    A    Yes, sir.

23    Q    Okay.  So this would have been signed on February 18th

24    of '03?

**Exhibit 2**

**Exhibit 2**

8

1   A   Yes, sir.

2   Q   Okay.  And did you read this document before you signed

3   it?

4   A   No, sir.

5   Q   Any particular reason why not?

6   A   Because I was advised to sign it for the loan.

7   Q   Advised by who?

8       Would that have been Smith & Denny?

9   A   Yes, sir.

10   Q   All right.

11       MR. ROMANO:  Are you done?

12       Let me just object.  This is not the loan policy for the

13   loan.  I'm sure from the time the loan was taken out this was

14   the loan policy that was signed in February of '03 when the

15   plan was restated.

16       MR. CALLCOTT:  Mike, am I going to start asking you

17   questions?

18       MR. ROMANO:  I'm stating an objection.

19       MR. CALLCOTT:  You are stating an objection in a

20   fairly long-winded manner.

21       MR. ROMANO:  Well, my only point is you handed it

22   to her.  I think she is under a misconception of what the

23   date of this particular document bears and you are getting

24   bad testimony, but that's fine.

**Exhibit 2**

**Exhibit 2**

1      The loans were taken out in '01, John.

2      Go ahead.  I thought you were done with your questions.

3   That's why I waited until --

4         MR. CALLCOTT:  Testify a little bit.

5         MR. ROMANO:  No, no, I disagree, but go right

6   ahead.

7   BY MR. CALLCOTT:

8   Q    Based on your counsel's testimony there, is there

9   anything you want to say about that last answer?

10   A    Yes.  I was not paying attention to the actual date and

11   I was assuming this was the loans that we had personally

12   taken out.

13   Q    I notice it says effective date of October 1, 2002.

14       Is there another loan policy?

15   A    No, sir, not that I am aware of or not that I recall.

16       The only time I ever signed any of these was upon the

17   advice of Sharon Hughes if this was to do with the plan,

18   reinstatement of the plan.

19   Q    You understand, ma'am, that as president of the company

20   that you would have a responsibility to review and come to an

21   understanding of whatever documents you were signing on

22   behalf of the company?

23       MR. ROMANO:  I'm going to object as to form.

24       That is a statement of the law.

**Exhibit 2**

**Exhibit 2**

1       MR. CALLCOTT:  You can answer.

2       THE WITNESS:  Would you repeat that again.

3       MR. CALLCOTT:  If you could please read back the

4   question.

5      (Whereupon, the question was read back by the court

6   reporter as follows:)

7      Question: "You understand, ma'am, that as president of

8   the company that you would have a responsibility to review

9   and come to an understanding of whatever documents you were

10  signing on behalf of the company?"

11      THE WITNESS:  I did not read these because, when

12  Sharon Hughes came to us, she told us that she would take

13  care of everything.  It would be the same as it had been all

14  the years that Huntington Bank had been taking care of this

15  and just put stickers on "sign here" for me to sign, and

16  that's all I did.

17  BY MR. CALLCOTT:

18  Q    Do you have any recollection as to whether you had begun

19  working with Ms. Hughes at the time that you took a loan out,

20  a $50,000 loan?

21  A    I don't recall.

22      I do not remember.

23      (Deposition Exhibit No. 14 marked for the purpose of

24  identification.)

**Exhibit 2**

**Exhibit 2**

1    BY MR. CALLCOTT:

2    Q    I'll hand you a document that has been marked as Exhibit

3    14.

4        I'll refer you to the first page, ma'am, which has a

5    Bates number on it, Plaintiff's Bates Number 541.

6        Is that your signature at the bottom of the page?

7    A    Yes, sir.

8    Q    Did you expect to pay this money back?

9    A    We expected to pay it back upon our retirement because

10   our tax consequences would be a lot -- our income tax bracket

11   would be much less.

12   Q    But you had no intent at the time when you signed this

13   document to make payments on the loan?

14        MR. ROMANO:  Objection to form.

15        THE WITNESS:  We thought this was our money.

16   BY MR. CALLCOTT:

17   Q    Did you read the Promissory Note before you signed it?

18   A    No, sir.

19       Again, I was advised to sign it.

20   Q    Do you know who created this Promissory Note?

21   A    No, sir, I do not.

22   Q    Do you know who drafted the letter which is on page

23   542?  Well, I'm sorry, Bates Number 542.  It is the next page

24   over.  It is a letter dated April 6, 2001.

**Exhibit 2**

**Exhibit 2**

1   A    No, sir, I don't know who drafted the letter.

2       I did not.

3   Q    Could it have been Smith & Denny?

4   A    Yes, I would believe that it could have been them.

5   Q    Do you think it was them or do you just not know?

6   A    I'm not sure, sir.

7   Q    Okay.  When speaking of the Promissory Note, you made

8   the comment you were simply advised to sign this.

9       Do you have any recollection as to who it was that you

10   were indicating advised you with respect to that?

11   A    No, sir, I do not remember.

12   Q    Do you recollect receiving this Amortization Schedule

13   which is Bates Numbers 543 and 544 and 545?

14      Do you recollect receiving that with the Promissory

15   Note?

16   A    No, sir, I do not.

17      All I recall are the two pages that I signed, not

18   anything else.  Nothing else was attached to it as far as I

19   can remember.

20   Q    Do you know whether these Amortization Schedules came

21   out of Marks Construction's records?

22       MR. ROMANO:  Objection.

23      Asked and answered.

24      Go ahead if you can answer.

**Exhibit 2**

**Exhibit 2**

1       THE WITNESS:  No, sir, because I wouldn't have the

2   capacity to do this.

3   BY MR. CALLCOTT:

4   Q    And I'm sorry.  I wasn't clear with my question.

5   A    Okay.

6   Q    Are you aware of whether these Amortization Schedules

7   were kept by Marks Construction and provided to Huntington in

8   discovery?

9       The reason I ask is simply because this has a

10   Plaintiff's Bates number on it which means it was produced by

11   Marks Construction, and so what I'm trying to find out is

12   whether it came out of Marks Construction's records?

13   A    Sir, I have no idea.  No, I do not remember seeing

14   this.

15   Q    But you are indicating it would not have been something

16   which would have been created at Marks Construction, the

17   Amortization Schedule?

18   A    No, sir.

19   Q    Is it possible -- Well, I mean, is it probable that it

20   was created by Smith & Denny --

21       MR. ROMANO:  Objection.

22       Speculation.

23   BY MR. CALLCOTT:

24   Q    -- or do you not know?

**Exhibit 2**

**Exhibit 2**

1   A   I don't know, no, sir.

2   Q   All right.  Were you still acting as bookkeeper at the

3   time that you were acting as president at the time this loan

4   was signed in April of '01?

5   A   Yes, sir.

6   Q   Just as a housekeeping matter, previously I discussed

7   with Mr. Marks last Friday his allocation form which was

8   marked as Deposition Exhibit 4.

9      Did you simply sign his name on this document?

10      Mr. Marks had indicated that it was not his signature.

11      MR. ROMANO:  Let her have it.

12   BY MR. CALLCOTT:

13   Q   And I'm asking you to look at Exhibit 4 which contains

14   the signature name of James Marks.

15   A   Yes, sir, I did sign this for him because Sharon said

16   that this had to be taken care of that day.  He wasn't in the

17   office and I signed it in front of her.

18   Q   Is that also your handwriting above that where it makes

19   the allocations out to how much money goes into which fund?

20   A   Yes, sir, and there again it was upon the advice of

21   Sharon because I know nothing, and she was told over and over

22   again that we knew nothing about investments and Huntington

23   Bank had always taken care of it.

24      So she helped me or she picked out and brought up the

**Exhibit 2**

**Exhibit 2**

15

1  screen on the computer and went down and said since we were

2  conservative, this was a good one, because I didn't know

3  what to pick.  I had no idea on financial planning or

4  investments.

5      So she said since we were conservative, we should put

6  ten percent on this one and ten percent on this one until we

7  got to the hundred percent.

8  Q   So it's your claim that on the day that you signed that

9  for Mr. Marks that she had advised you specifically as to

10  what to pick out and to put down there?

11  A   Correct, yes, sir.

12  Q   Is that your signature on Exhibit 5?

13  A   Yes, sir.

14      And it was done at the same time that I signed his name

15  in front of Sharon.

16  Q   Did you also do Ms. Davis's at the same time or do you

17  recollect?

18          MR. ROMANO:  Can we see that?

19          MR. CALLCOTT:  I'm just asking if she remembers.

20          MR. ROMANO:  Oh, so she can answer.  I just thought

21  it would help her.

22          MR. CALLCOTT:  No, I did not do Angela Davis's.

23  BY MR. CALLCOTT:

24  Q   Okay.  So did Ms. Davis do her own?

**Exhibit 2**

**Exhibit 2**

1   A   Yes, sir.

2   Q   According to your testimony?

3   A   Yes, sir.

4   Q   And according to your testimony Mr. Straight would have

5   done his own?

6   A   Yes, sir.  I don't know what Richard did with his.

7   Q   Okay, all right.  Do you have any recollection of

8   inquiring with Smith & Denny about the tax ramifications of

9   these loans?

10   A   I don't understand your question.

11   Q   At the time that the loans were taken out, do you have

12   any recollection as to whether you consulted with Smith &

13   Denny about whether the loans should be taken out?

14   A   I don't recall the conversation with them.

15      There again I thought it was our money and, other than

16   that, no, I don't know of anything about any tax consequences

17   or anything.

18   Q   And I guess what I'm trying to figure out is when you

19   say you don't know, do you simply not recollect whether you

20   had conversations about tax matters with Smith & Denny one

21   way or the other or are you saying that you did not have

22   conversations with Smith & Denny about the tax consequences

23   of these loans at the time they were taken out?

24      Do you see the difference, ma'am?

**Exhibit 2**

**Exhibit 2**

1      One is I think back and they didn't happen and the other

2    is I'm just not sure whether they happened one way or the

3    other, and I'm just trying to figure out where you are at.

4    A    I don't remember ever discussing about tax consequences

5    on them.

6        It may have been in the conversation but I do not

7    remember.

8            MR. ROMANO:  When you get to a good point, let's

9    take a short break.

10           MR. CALLCOTT:  Sure.

11           MR. ROMANO:  I just think she needs a second to

12   compose.  I can tell she's very nervous and I just want to

13   give her a second just to relax.  Coming in here and doing

14   this is hard on lay people.  You know that.

15           MR. CALLCOTT:  I'm happy to do that now, ma'am.

16           MR. ROMANO:  Do you want to do that right now?

17           THE WITNESS:  Thank you.

18   (Recess taken in proceedings at 10:25 a.m.)

19                   R-E-C-E-S-S

20   (Proceedings reconvened at 10:27 a.m. as follows:)

21   BY MR. CALLCOTT:

22   Q    Ma'am, last Friday Mr. Marks had indicated that loans

23   were taken out to assist with Ms. Davis's purchase of a

24   home.

**Exhibit 2**

**Exhibit 2**

1      Is that correct to your recollection?

2   A    Yes, sir, that is correct.

3   Q    If you needed the money to do that, why not simply take

4   a distribution from the plan as opposed to a loan?

5   A    Sir, I don't know.

6   Q    Do you have a recollection, ma'am, as to how you came up

7   with the notion of actually taking out a loan from the plan?

8      And before you answer that, I simply show you this

9   letter.  This is why we have focused on Smith & Denny.  It is

10   a letter dated April 12, 2001, written to Denise Boshnyak.

11      MR. ROMANO:  We will make that 14 -- 15?

12      MR. CALLCOTT:  We can.

13      (Deposition Exhibit No. 15 marked for the purpose of

14   identification.)

15   BY MR. CALLCOTT:

16   Q    Here, ma'am.  I will hand you the one that has got the

17   actual sticker on it there and it is a letter from Mr. Denny

18   to Huntington Bank.

19      After having reviewed that letter, does that help your

20   recollection as to how you came up with the notion of a loan

21   from the plan?

22      MR. ROMANO:  Objection as to form.

23      THE WITNESS:  No, sir.  I believe Jim handled most

24   of that as far as the loan was concerned inquiring about the

**Exhibit 2**

**Exhibit 2**

1    loan or the monies from Huntington Bank.

2    BY MR. CALLCOTT:

3    Q    When you say Jim handled that, you are talking about Jim

4    Denny of Smith & Denny?

5    A    No, I'm sorry, my husband Jim Marks.

6    Q    Okay, all right.  So you are saying your husband was the

7    one involved in working out whether to do a loan or not?

8         MR. ROMANO:  Objection as to form.

9    It misstates her testimony.

10        THE WITNESS:  As best as I can remember.

11   BY MR. CALLCOTT:

12   Q    I'm going to have you take a look now at a document that

13   has been marked as Exhibit 6.

14        Is that your signature at the bottom of that exhibit?

15   A    Yes, sir, it is.

16   Q    And is that the correct date to your recollection,

17   February 18, 2003?

18   A    I don't remember the exact date.  This has been three

19   years ago.

20   Q    But you have no reason to believe that that date is

21   incorrect?

22   A    No, sir, I have no reason to believe that it's

23   incorrect.

24   Q    Did you read this resolution before you signed it?

**Exhibit 2**

**Exhibit 2**

1   A   No, sir, I did not read any of those things.  These were

2   all told to me by Sharon Hughes to sign, that she was going

3   to take care of everything, that it was going to be the same

4   as it had always been so, therefore, I didn't read them.

5   Q   Is the same true of document that has been marked as

6   Exhibit 7, and let me just break the questions down?

7       First of all, is that your signature on the page?

8   A   Yes, sir.

9   Q   And you have no reason to believe that the dates filled

10   in on that document are incorrect?

11   A   I have no reason to believe they are incorrect, no.

12   Q   And is it your testimony that you didn't read this

13   document either?

14   A   No, sir, I did not, upon the advice of Sharon.

15   Q   I hand you a document that has been marked previously as

16   Exhibit 8.

17       Do you know whose handwriting that's in?

18   A   No, sir, I do not.

19   Q   Who would know -- Who is responsible for Marks

20   Construction's record-keeping?

21       MR. ROMANO:  Objection as to form.

22       THE WITNESS:  Well, I as the bookkeeper and the

23   president.

24       MR. ROMANO:  You need to clarify what you mean by

**Exhibit 2**

**Exhibit 2**

1  record-keeping.

2      MR. CALLCOTT:  Fair enough.

3  BY MR. CALLCOTT:

4  Q    I'm simply trying to figure out where these documents

5  came from and who sent them to Marks Construction because

6  they were produced by Marks Construction.

7      MR. ROMANO:  Which documents are you referring to?

8      MR. CALLCOTT:  I'm referring to Deposition Exhibit

9  8 and also Deposition Exhibit 9, and they bear Plaintiff's

10  Bates numbers, so I believe they were produced by Marks

11  Construction.

12      THE WITNESS:  Sir, I do not know.

13  BY MR. CALLCOTT:

14  Q    There is a reference on Exhibit 9 to "Sam" up at the top

15  and then a phone number 624-3415.

16    Do you know who that is?

17  A    Well, if it's the name "Sam" and that phone number, that

18  is Sam Guarscio at Bank One or Chase with his phone number.

19  Q    Who at Smith & Denny at worked Marks Construction in

20  this timeframe of July of 2004?

21  A    Jim Denny.

22  Q    And who would Jim Denny have worked with at Marks

23  Construction?

24  A    He would have worked with myself and Jim.

**Exhibit 2**

**Exhibit 2**

1   Q   Nobody else?

2   A   Not that I would be aware of.

3   Q   And you don't have any recollection that these two

4   documents, Exhibit 8 and 9, came from Smith & Denny?

5   A   No, sir, I do not.

6       MR. ROMANO:  And, John, let me offer this as just a

7   courtesy.

8       We got documents at Kevin Wiggins's request from Smith &

9   Denny.  I don't know if those were part of those documents

10   that may have answered that question.  I'm looking at the

11   Bates number.  It doesn't help me but I'm just pointing that

12   out to you.

13       MR. CALLCOTT:  Okay.

14   BY MR. CALLCOTT:

15   Q   As a housekeeping matter, ma'am, on Deposition Exhibit

16   12, is that your signature at the bottom?

17   A   Yes, sir.

18       (Deposition Exhibit No. 16 marked for the purpose of

19   identification.)

20   BY MR. CALLCOTT:

21   Q   I'm going to hand you a document that has been marked as

22   Exhibit 16.

23       Have you seen this letter before?

24   A   I don't recall.

**Exhibit 2**

**Exhibit 2**

1   Q   Do you know who prepared this letter?

2   A   No, sir, I do not.

3      (Deposition Exhibit No. 17 marked for the purpose of

4   identification.)

5   BY MR. CALLCOTT:

6   Q   I'm going to hand you a document that has been marked as

7   Exhibit 17.

8      It's a letter dated June 29, 2004, and it bears your

9   name at the bottom, although no signature.

10      Do you recollect seeing this document?

11   A   No, sir, I do not.

12   Q   Do you know who prepared it?

13   A   No, sir, I do not.

14   Q   Do you know if it was ever sent?

15   A   No, sir, I do not know that.

16      (Deposition Exhibit No. 18 marked for the purpose of

17   identification.)

18   BY MR. CALLCOTT:

19   Q   I hand you another letter that has been marked Exhibit

20   18.  It is a letter dated June 29, 2004.  It bears your

21   signature at the bottom.

22      Is that, in fact, your signature?

23   A   Yes, sir.

24   Q   Are the statements in this letter true and correct?

**Exhibit 2**

**Exhibit 2**

1   A   Yes, sir, to the best of my knowledge.

2       (Deposition Exhibit No. 19 marked for the purpose of

3   identification.)

4   BY MR. CALLCOTT:

5   Q   I'm going to hand you a document that has been marked as

6   Exhibit 19.

7       Do you have any recollection of receiving this letter

8   and the items it sets forth in the document, the Enrollment

9   Books and the Plan Administrator's Guide, on or around

10   April 30th of 2003?

11   A   Yes, sir, I do.  We received the Enrollment Books.

12   Q   You also recollect receiving the Plan Administrator's

13   Guide?

14   A   Yes, sir.

15   Q   And that would have been on or around give or take a few

16   days of April 30th, 2003?

17   A   Yes, to the best of my knowledge.

18   Q   Upon receipt of those documents, did you review or read

19   them?

20   A   No, sir, I did not.

21   Q   And when you say you did not, I didn't ask the question

22   in a good manner to cover the timeframe that I was looking

23   for.  Let me rephrase my question this way.

24       After you received those documents, was there ever a

**Exhibit 2**

**Exhibit 2**

1   point in time that you read over the Plan Administrator's

2   Guide or reviewed the Enrollment Books?

3   A    No, sir, because I was told by Sharon that she would

4   take care of everything, that everything would be the same.

5   So by that statement I didn't read them.  I just signed where

6   she put the "sign here" stickers.

7   Q    And you didn't perceive that you had any responsibility

8   to read those documents and come to an understanding of them?

9   A    No, sir, because she had assured us everything was taken

10   care of, that she was handling everything personally.

11   Q    Do you have an understanding of what the term Plan

12   Administrator means?

13   A    No, sir.

14   Q    Do you have an understanding of what the term named

15   fiduciary means?

16   A    No, sir.

17   Q    Do you have an understanding of whether Marks

18   Construction ever delegated the plan fiduciary responsibility

19   to anyone or anything?

20       MR. ROMANO:  Objection.

21       If she doesn't know what it means, it is a little hard

22   for her to answer.

23       MR. CALLCOTT:  Well, and that's fine.  If you don't

24   know what any of those terms mean, that's fine, but I got to

**Exhibit 2**

**Exhibit 2**

1  have an understanding one way of the other of what you

2  understand.

3        MR. ROMANO:  I'm going to object.

4     If you want to explain what it means, then perhaps she

5  can answer it, but she has indicated that she does not know.

6        MR. CALLCOTT:  Again, the objections -- I don't

7  mind you making a record --

8        MR. ROMANO:  Objections don't go there.

9        MR. CALLCOTT:  -- and I'll have her step out if you

10  want to put more on.

11        MR. ROMANO:  No, I'm done.

12        MR. CALLCOTT:  Can you read back the question.

13     (Whereupon, question was read back by the court reporter

14  as follows:

15     Question:  "Do you have an understanding of whether

16  Marks Construction ever delegated the plan fiduciary

17  responsibility to anyone or anything?")

18        THE WITNESS:  Sir, I don't understand what the

19  terms are.

20        MR. CALLCOTT:  I'm mark this as Exhibit 20.

21     (Deposition Exhibit No. 20 marked for the purpose of

22  identification.)

23  BY MR. CALLCOTT:

24  Q   Ma'am, I'm going to hand you a document that has been

**Exhibit 2**

**Exhibit 2**

1   marked as Exhibit 20.

2        Is that your signature on the document?

3   A   Yes, sir.

4   Q   Did you have an understanding of why this information

5   was being requested to be sent to Smith & Denny, the census

6   information?

7        MR. ROMANO:  I'm going to object that it

8   misconstrues the nature of this letter.

9        THE WITNESS:  No, I don't understand why it was

10   sent.

11   BY MR. CALLCOTT:

12   Q   Did you draft this letter?

13   A   I didn't draft the letter.  I signed the letter.

14   Q   Did Smith & Denny draft this letter?

15   A   Yes, sir, I would assume they did.

16   Q   And was that fairly common for them to do, to draft

17   letters for your signature as it related to the plan?

18   A   In this case, yes, but otherwise I don't know if they

19   drafted letters prior to this.

20        (Deposition Exhibit No. 21 marked for the purpose of

21   identification.)

22   BY MR. CALLCOTT:

23   Q   I hand you a document that has been marked as Exhibit

24   21.

**Exhibit 2**

**Exhibit 2**

1     Is that your signature on the document?

2   A   Yes, sir.

3   Q   You have no reason to question the date; is that

4   correct?

5   A   No, I have no reason to question the date.

6   Q   And did you review this and the documents related to it

7   before you signed this document?

8   A   No, sir.

9     (Deposition Exhibit No. 22 marked for the purpose of

10  identification.)

11  BY MR. CALLCOTT:

12  Q   I hand you a document that has been marked as Exhibit

13  22.

14    Is that your signature on this document?

15  A   Yes, sir.

16  Q   Did you understand that -- I'll withdraw the question.

17    (Deposition Exhibit No. 23 marked for the purpose of

18  identification.)

19  BY MR. CALLCOTT:

20  Q   I hand you a document that has been marked as Exhibit

21  23.

22    Is that your signature on this page?

23  A   Yes, sir.

24  Q   No reason to question the date?

**Exhibit 2**

**Exhibit 2**

1   A   No, sir.

2       MR. ROMANO:  That copy is not very good, is it,

3   Bates 36 or Bates 30?

4       MR. CALLCOTT:  My guess is 36.

5       MR. ROMANO:  Mine, too.

6   BY MR. CALLCOTT:

7   Q   Right above the signature line there is at the top of

8   the page it says "XX Signatures" and then there is a

9   paragraph, a part of which says, "The Sponsor recommends that

10  the Employer consult with its local counsel and/or tax

11  advisor before executing this Adoption Agreement."

12      Did you consult with any legal counsel before signing

13  this Adoption Agreement?

14  A   No, sir, because I didn't read these agreements because

15  there again I have to revert back to Sharon telling us she

16  was going to take care of everything, everything would be the

17  same, all we needed to do was sign where she had her "sign

18  here" statements.

19      MR. ROMANO:  Statements or stickies?

20      THE WITNESS:  Or stickies, I'm sorry.

21  BY MR. CALLCOTT:

22  Q   Pursuant to your testimony, when do you state that you

23  became aware that participants of the plan were to direct

24  their own investments?

**Exhibit 2**

**Exhibit 2**

1    A    I don't believe I was ever aware because Sharon was

2    going to take care of these investments for us.  That was her

3    intentions or what she said each time we met with her because

4    we had been dissatisfied before and Huntington Bank had

5    always taken care of everything for us and she said she

6    would.

7    Q    Well, let's go back and talk a little bit about your

8    recollection about conversations with Ms. Hughes.

9        What I want to do is start at your earliest

10   recollections of either speaking with her on the telephone or

11   meeting with her and move forward.

12       I understand that you are not going to know exact dates

13   but let's start with what's your first recollection of

14   meeting or speaking with Ms. Hughes?

15   A    The first time she came to our office and saying that

16   she wanted to take care of our account for us so that we

17   would have a local person because we hadn't been able to talk

18   to anybody locally on our account, and she come in and said

19   that she would love to keep or Huntington Bank, her, would

20   love to keep our account because we were talking around the

21   range of a million dollars or so, and that she would take

22   care of everything, it would all remain the same, and she

23   brought little hats and pens from Huntington Bank and she

24   would like to have the account, and the meeting maybe lasted

**Exhibit 2**

**Exhibit 2**

1    a half hour, forty-five minutes.  It was an introduction to

2    her, I would assume.

3    Q    Do you have any recollections of any conversations or

4    meetings with Ms. Hughes prior to that point in time?

5    A    No, sir.

6    Q    Any other recollections about that particular half hour

7    meeting that you are describing?

8    A    No, sir.

9    Q    Do you ever recollect her or do you recollect her

10   mentioning the words Participant Director at that time?

11   A    No, sir.

12   Q    Is it possible that she mentioned that or you just don't

13   remember one way or the other?

14   A    I don't remember one way or the other.

15   Q    When was the next time that you recollect either

16   speaking on the telephone or in person with Ms. Hughes?

17   A    Her second visit to the office.

18   Q    When would that have been generally?

19   A    Sir, I don't remember the dates.

20   Q    The end of 2002?

21   A    I don't remember.

22   Q    Tell me about that second meeting.

23   A    That's when she came back to our office and we decided

24   to stay or go with her as our adviser or what have you for

**Exhibit 2**

**Exhibit 2**

1   our account and she just went over what would happen.  She

2   said the plan would remain the same, she would take care of

3   it, and the only thing that would be different would be the

4   fact that we could go online if we wanted to, and there we

5   told her we don't have any idea about investments, how to

6   take care of anything financially, and she said that she

7   would take care of it, we didn't have to worry.

8   Q   Now, before being president, you were bookkeeper at

9   Marks Construction for close to thirty years; is that true?

10   A   Yes, sir.

11   Q   So you handled and kept accounts for multimillion dollar

12   contracts throughout that entire period of time?

13   A   Yes.  To a degree, yes, as far as just bookwork.

14   Q   For how long have those books been kept on computer at

15   Marks Construction?

16   A   Since the early '80s.

17   Q   So you have been working with computers since the early

18   '80s.

19       MR. ROMANO:  Objection to form.

20       THE WITNESS:  Yes, but ours is a software and all

21   I can really do is our accounts payable, our accounts

22   receivable and payroll.

23   BY MR. CALLCOTT:

24   Q   Anything else you can recollect about that second

**Exhibit 2**

**Exhibit 2**

1    meeting with Ms. Hughes?

2    A    No, sir, other than again she would take care of

3    everything for us and it would all remain the same as it had

4    for the last ten years or more.

5    Q    Do you have any recollection one way or the other

6    whether she mentioned participant directed accounts at that

7    time?

8    A    No, sir, I do not.

9    Q    When you say you don't, you are saying you don't think

10   that occurred or are you saying you don't recollect one way

11   or the other?

12   A    I'm saying I don't remember one way or the other.

13   Q    When was the next time you recollect speaking or meeting

14   with Ms. Hughes?

15   A    Probably the third meeting.  There may have been some

16   telephone calls in between but I don't remember them.  I

17   don't remember them, but it was probably the third meeting

18   when she came in and told us that we had to do this today to

19   pick out whatever -- how we wanted to invest it, and that's

20   what I told her.  We didn't know how to do it or what funds

21   to pick.  So she set down with me on the computer and pulled

22   these up on the screen to get into putting the percentages in

23   the investments.

24   Q    Now, those forms indicate that -- the election forms

**Exhibit 2**

**Exhibit 2**

1   that we looked at earlier had a date of January, I believe,

2   '04; is that correct?

3   A   Yes, sir, that's the date that was on there.

4   Q   And you got no reason to question that date?

5   A   No, sir.

6   Q   And so you are saying you don't have any firm

7   recollections of conversations or meetings with Ms. Hughes

8   between the second meeting and that third meeting which we

9   can put to a date of January of '04; is that true?

10   A   No, we never had any meetings.

11   Q   I'm trying to get at your recollections of

12   conversations, ma'am, and I'm trying to determine whether you

13   have any other recollections of conversations between that

14   second meeting which you have described and the third meeting

15   which you have described which, according to your testimony,

16   I understand is January of 2004.

17      Do you have any other recollections between the second

18   and third meetings?

19   A   No, sir.

20   Q   Is it possible that telephone calls took place during

21   that time that you don't recollect?

22   A   There could have been telephone calls.  I don't

23   remember.

24   Q   Do you recollect any communications to you to the effect

**Exhibit 2**

**Exhibit 2**

1    that information was needed from Smith & Denny for purposes

2    of working with the plan?

3    A    No, sir.

4    Q    Do you remember any contacts to Smith & Denny to prompt

5    them to provide information to Huntington Bank between

6    April 1st of 2003 and January 1st or January of 2004?

7    A    I don't remember if there was any information

8    requested.  If there was any information requested, it would

9    have been taken care of.  We would have sent or done whatever

10   Ms. Hughes advised us to do.

11   Q    But you simply don't have a recollection whether that

12   occurred or not?

13   A    No, sir, I do not.

14   Q    And during this entire time period, in fact, from the

15   year 2000 up to the present, you have held the position as

16   president of the company; is that correct?

17   A    Correct.

18   Q    Do you have a recollection of attempting to log on to

19   anything having to do with the plan between the time period

20   of April 1st of 2003 and January of 2004?

21   A    Sharon told me that we could get on.  This was one of

22   the features, but I was never able to get on.

23         MR. ROMANO:  That wasn't his question though.

24         THE WITNESS:  Okay.

**Exhibit 2**

**Exhibit 2**

1       MR. CALLCOTT:  Ma'am, you were doing just fine.

2       MR. ROMANO:  I thought you asked her if she had any

3    recollection of trying to log on.  John, I'm sorry.  I was

4    trying to get her focused on your question.

5    BY MR. CALLCOTT:

6    Q   Do you have any recollections of trying to log on

7    between April 1st of 2003 and January of '04?

8    A   No, sir, I don't know the dates.

9    Q   So you might have but you just don't know?

10       MR. ROMANO:  Objection to form.

11       THE WITNESS:  I don't remember.

12   BY MR. CALLCOTT:

13   Q   One way or the other?

14       And you understand what I'm coming back to.  When you

15   say I don't remember, that could mean two different things

16   for me, and that's why I'm trying -- I'm not trying to be

17   difficult.  I'm just trying to make sure I understand your

18   testimony.

19       So when you say you don't remember, are you saying that

20   I didn't do it or are you saying I just don't know one way or

21   the other?

22   A   I'm saying that I at one given point tried to log on and

23   couldn't; but as far as the dates are concerned, I don't

24   know.

**Exhibit 2**

**Exhibit 2**

1      MR. CALLCOTT:  We'll make copies of this and make

2    this Exhibit 24.

3      Why don't we take a break a second and let's make some

4    copies of this and we'll make it our next exhibit.

5      (Recess taken in proceedings at 11:04 a.m.)

6              R-E-C-E-S-S

7      (Proceedings reconvened at 11:18 a.m. as follows:)

8      (Deposition Exhibit No. 24 marked for the purpose of

9    identification.)

10   BY MR. CALLCOTT:

11   Q    I'm going to hand you a document, ma'am, that has been

12   marked as Exhibit 24.  It has got a Bates number on it of

13   568.

14      I'm going to ask you if that is, in fact, your signature

15   on the document?

16   A   Yes, sir.

17   Q    And if you will note in this document, seven lines down

18   is a sentence that says, "A list of information is included

19   as to the automative format of the conversion data needed."

20      Did you have an understanding at the time that you sent

21   this letter in February of 2003 that the individual stocks

22   were going to be liquidated as part of the conversion of the

23   plan?

24   A    No, sir, I never knew that they were going to be

**Exhibit 2**

**Exhibit 2**

1   liquidated.

2   Q   What did you mean then or what were you referring to

3   when you were talking about the conversion data?

4   A   I didn't draft the letter.  All I did was sign.

5   Q   So did you read this letter that has been marked as

6   Exhibit 24?

7   A   No, sir.

8   Q   Do you have any understanding of what's in this letter?

9   A   No, sir.

10      MR. ROMANO:  And I'm going to object to the extent

11   that you said she sent the letter and I'm going to object to

12   form, to who and so forth.

13   BY MR. CALLCOTT:

14   Q   Previously in your testimony you made the statement that

15   you relied upon Ms. Hughes for various items.  Prior to

16   Ms. Hughes involvement with Marks Construction or prior to

17   the time that she communicated with you, obviously you

18   couldn't rely on her prior to that time.

19      At that point in time what did Marks Construction do for

20   advice regarding this plan under your testimony?

21      Let me rephrase the question.

22   A   Please.

23   Q   You have made the statement that you relied on

24   Ms. Hughes.  There was a point in time when Ms. Hughes hadn't

**Exhibit 2**

**Exhibit 2**

1   any contact with you, so obviously you couldn't rely on her

2   at that point.

3      Is it true that --

4         MR. ROMANO:  Can we go off the record for two

5   seconds --

6         MR. CALLCOTT:  Sure.

7         MR. ROMANO:  -- while you rephrase that question?

8      (Discussion off the record.)

9         MR. ROMANO:  I'm sorry.

10      Back on the record whenever you are ready, John.

11      While we are on this, can I have the exhibits from Jim

12   Marks deposition.  I don't see them here.  Are they here

13   somewhere?

14      It looks like the first one here is 14.

15      Here is 10.

16      Maybe they are all here.

17         THE COURT REPORTER:  They are all there.

18         MR. ROMANO:  Okay, thank you.

19   BY MR. CALLCOTT:

20   Q    Do you have any allegations as to who you would have to

21   use your language relied on with respect to the plan prior to

22   your contacts with Ms. Hughes?

23   A    It would have been Huntington Bank.

24   Q    Any person in particular?

**Exhibit 2**

**Exhibit 2**

1   A   No, sir.

2   Q   What, if anything, did you and Marks Construction do

3   after April 1st of 2003 to monitor plan performance?

4   A   I'm not quite sure what you mean by monitoring the plan

5   performance.

6   Q   What did you do or what did Marks Construction do, if

7   anything, to determine where the assets of the plan or how

8   the assets of the plan were invested?

9   A   We relied on Sharon Hughes and Huntington Bank because

10   they invested for us.

11   Q   Did you do anything after April 1st of 2003 to check up

12   on where the assets of the plan were or how they were

13   invested?

14   A   To check up to see what the amount was or how they were

15   doing.  We tried to log on and that's when we had problems.

16   We couldn't get online to check and see what the balance

17   was.

18   Q   When you tried to get online, was that in September of

19   2003?

20   A   I don't recall the dates.

21   Q   Prior to the time when you tried to get online -- Let's

22   ask the question this way.

23       Between April 1st of 2003 and when you tried to get

24   online, whenever that point in time was, did you and Marks

**Exhibit 2**

**Exhibit 2**

1   Construction do anything to determine where the plan assets

2   were or how much or just where the plan assets were?

3        MR. ROMANO:  Were invested, John?

4        MR. CALLCOTT:  Yes.

5        THE WITNESS:  Not that I can remember.

6   BY MR. CALLCOTT:

7   Q    After that attempt, as you have indicated, to log on,

8   between that time and January of '04, what, if anything, did

9   you or anyone else at Marks Construction do to determine

10   where the plan assets were invested or how they were

11   invested?

12        MR. ROMANO:  Objection.

13     Asked and answered.

14     Go ahead.

15   BY MR. CALLCOTT:

16   Q    It is a different timeframe.  It is between September or

17   it is between when you recollect trying to get online in

18   January of '04, what, if anything, did you or anyone else at

19   Marks Construction do to determine how the plan assets were

20   invested?

21        MR. ROMANO:  Same objection.

22        THE WITNESS:  We tried to get online and there were

23   some conversations between myself and Sharon to try to get us

24   online and we couldn't do it.

**Exhibit 2**

**Exhibit 2**

1   BY MR. CALLCOTT:

2   Q    And did you do anything else besides trying to get

3   online that one time?

4   A    No, sir.

5   Q    Okay.

6        MR. ROMANO:  And talking to Sharon Hughes.

7   BY MR. CALLCOTT:

8   Q    Did you at anytime call up the voice response unit after

9   April 1st of 2003?

10  A    No, sir.  I didn't know that there was a voice response

11  unit.

12  Q    Okay.  Do you know what the fees were associated with

13  the plan after April 1st of 2003 and whether they were less

14  than the fees prior to April 1st of 2003?

15  A    Well, there again Sharon said the fees would be less

16  but, no, I do not know the difference.  We're just going by

17  what she told us.

18  Q    Did you or anyone at Marks Construction ever check to

19  see whether the fees were, in fact, less?

20  A    Not to my knowledge.

21  Q    What responsibility do you think that Marks Construction

22  had, if any, with respect to the plan after April 1st of

23  2003?

24  A    I'm not quite sure if I understand what you mean on

**Exhibit 2**

**Exhibit 2**

1   responsibility.

2   Q    Well, we have discussed whether or not you or anyone

3   else at Marks Construction checked up on where the money

4   was.  We have asked questions about whether you or anyone

5   else at Marks Construction checked out to determine what the

6   fees were.

7       I'm asking you after April 1st of 2003 what, if any,

8   responsibilities of any type you felt you or Marks

9   Construction had for the plan?

10   A    The only thing I can say is that we had put everything

11   in Sharon's hands because we did not know how to invest,

12   we didn't know anything about the financial market.  She said

13   that she would take care of everything, it would all be the

14   same, we would get a better interest rate or make more money,

15   the fees would be lower, and from there we trusted what she

16   kept telling us.

17   Q    I understand that's your testimony, ma'am.

18       I guess my question was did you think that either you as

19   president of the company or Marks Construction itself had any

20   responsibility to look after the plan on its own?

21       Regardless of whatever responsibilities you felt

22   Ms. Hughes or Huntington Bank might have had --

23       MR. ROMANO:  Objection to form.

24   BY MR. CALLCOTT:

**Exhibit 2**

**Exhibit 2**

1   Q    -- I'm asking what your thoughts are on what

2   responsibilities you thought you as president of the company

3   or Marks Construction would have with respect to the plan?

4         MR. ROMANO:  Same objection.

5         THE WITNESS:  I could only say again that we were

6   not knowledgeable enough to know anything about the

7   investments, that we depended upon her.

8   BY MR. CALLCOTT:

9   Q    And I guess my question was did you believe that either

10   you or Marks Construction had any responsibility to look

11   after the plan after April 1st of 2003?

12   A    No, sir, I would feel that we left it up to Huntington

13   Bank.

14   Q    Did you think it was Huntington Bank's responsibility to

15   do things like enrollments?

16   A    And what are you referring to?

17   Q    Someone coming into the plan.

18   A    No, sir.

19   Q    So you thought that responsibility would be Marks

20   Construction?

21   A    If there were a new employee or something, yes.

22   Q    Aside from that, any other responsibilities of either

23   you as president or Marks Construction?

24         MR. ROMANO:  Objection to form.

**Exhibit 2**

**Exhibit 2**

1      THE WITNESS:  No, sir.

2   BY MR. CALLCOTT:

3   Q    When did you have a realization that the investments

4   were in a money market account for a period of time?

5   A    When we took everything to the attorney.  We had know

6   idea everything was in a Money Market account.  It wasn't

7   making any interest.

8   Q    And you went to an attorney sometime in early 2005?

9   A    As best as I can remember.

10   Q    Do you remember going to an attorney before or after you

11   found out that the 1099s were not going to be reversed?

12   A    After.  I would think after.

13   Q    Why did Mr. Straight leave his employment with the

14   business?

15   A    He had personal problems.  He had just lost his mother.

16   Q    Was it voluntary on his part or was his employment --

17   was he discharged?

18   A    He voluntarily finished with Marks Construction.

19   Q    He wasn't told he needed to find another job elsewhere?

20   A    No, sir, not that I'm aware of.

21   Q    This lawsuit has been brought against Huntington and

22   Ms. Hughes.

23      In your opinion what is it that either Ms. Hughes or

24   Huntington did or did not do that has damaged you?

**Exhibit 2**

**Exhibit 2**

1        MR. ROMANO:  Objection.

2        It calls for a legal conclusion.

3        Go ahead and answer.

4    BY MR. CALLCOTT:

5    Q    In short form, what are you saying that she or the bank

6    did to warrant a lawsuit or did not do that warrants a

7    lawsuit?

8    A    They caused us to lose quite a bit of money because of

9    the investments which we let her take care of and, you know,

10   we shouldn't have had to suffer this loss with this amount of

11   money because we were looking into this money for our

12   retirement.

13       MR. CALLCOTT:  I think we are just about done.  I

14   want to take a one or two minute break and then I'll wrap it

15   up and let you ask your questions.

16   (Recess taken in proceedings at 11:35 a.m.)

17              R-E-C-E-S-S

18   (Proceedings reconvened at 11:37 p.m. as follows:)

19       MR. CALLCOTT:  We can go back on the record.

20   BY MR. CALLCOTT:

21   Q    Ma'am, in production, the discovery production, from the

22   Plaintiffs to Huntington there was a document Bates number

23   585.  It has just got it looks like a date written on it, and

24   we don't quite know what it is, and we're curious whether you

**Exhibit 2**

**Exhibit 2**

1   know what this is, what it might relate to.

2       And let me show you -- I'm going to show you the page in

3   front and behind.

4       Here is 584, and 585 was here, and then we have the loan

5   policy.

6       Do you have any notion what this might be referring to?

7   A   No, sir, I do not.

8       MR. CALLCOTT:  Okay.  No other questions at this

9   time.

10      MR. ROMANO:  You are not going to make that an

11  exhibit?

12      MR. CALLCOTT:  No.

13      MR. ROMANO:  Are you all done, John?

14      MR. CALLCOTT:  Actually no.

15      MR. ROMANO:  Okay, go ahead, I'm sorry.  That's why

16  I asked.

17  BY MR. CALLCOTT:

18  Q   Do you have any recollections as to whether Marks

19  Construction, you or Marks Construction, informed the bank

20  about either the loan default or provided any information to

21  the bank at all about the loans at any point in time prior to

22  the issuance of the 1099?

23      MR. ROMANO:  Objection to form.

24      MR. CALLCOTT:  All right, I'll reask the question.

**Exhibit 2**

**Exhibit 2**

1      MR. ROMANO:  I don't know what you said, I'm

2   sorry.  I don't know what you are looking for.

3   BY MR. CALLCOTT:

4   Q    From the time the loans were taken out until the time

5   the 1099s were issued, did you or Marks Construction provide

6   any information to the bank about those loans?

7   A    Not that I can remember.

8      MR. ROMANO:  Let's go off the record for a second.

9   (Discussion off the record.)

10   BY MR. CALLCOTT:

11   Q    Do you know whether Marks Construction ever informed the

12   bank about the amount of employee contributions after tax to

13   the plan?

14   A    No, sir, I don't know.

15      MR. CALLCOTT:  With that, your witness.

16                   EXAMINATION

17   BY MR. ROMANO:

18   Q    Were there ever any employee contributions to the plan

19   that you know of?

20   A    In what period?

21   Q    In any period.

22      Let me start over again.

23      Where did the contributions to the plan come from?

24   A    From Marks Construction.

**Exhibit 2**

**Exhibit 2**

1   Q    Did any employee ever try to make a contribution to the

2   plan out of their own money?

3   A    No, sir.

4   Q    Did you know that they could do that?

5   A    No.

6   Q    Did anybody ever tell you that they could do that?

7   A    No, sir.

8   Q    Has this been hard for you today?

9   A    Extremely hard.

10   Q    Why?

11      How have you felt?

12   A    Nervous and tense.

13   Q    Okay.  It has been hard to answer questions?

14   A    It has been very difficult.  I don't understand a lot of

15   the legal questions.

16   Q    And I'm not going to apologize for Mr. Callcott.  He is

17   doing his job, but I will say that when lawyers talk

18   sometimes we talk in a different language than regular folk.

19   A    Correct.

20   Q    Let me try to ask you a few questions.

21      Mr. Callcott showed you what has been marked as

22   Deposition Exhibit Number 13.  This is entitled "Loan

23   Policy."  It is a multipage document.  Your signature appears

24   at the end.

**Exhibit 2**

**Exhibit 2**

1       In fact, he showed you a bunch of documents, all which

2   bore the date in or around February 18th, 2003, correct?

3   A   Correct.

4   Q   Did these documents come to you individually as

5   Mr. Callcott showed them to you?

6   A   No.  No, sir.

7   Q   How did they come to you?

8   A   In that big book that Sharon sent to us.

9   Q   Well, how did you possibly -- Did you go through it and

10   find all of the places you were supposed to sign?

11   A   Yeah, because she had the little name "sign here."

12   Q   So it was already tabbed where you were supposed to

13   sign, correct?

14   A   Yes.

15   Q   And let me show you a letter.  Actually it comes in two

16   forms and I'm going to show you the original, if I can pull

17   it out here.

18       I could have sworn we made that an exhibit.  Just give

19   me one second here.

20       (Pause in proceedings.)

21       MR. ROMANO:  Let me hand to Mr. Callcott actually a

22   letter that is Bates stamped plaintiffs 570 and 568.  It is a

23   two page document.  It's letter from Sharon Hughes to Karen

24   Marks dated February 12, 2003.

**Exhibit 2**

**Exhibit 2**

1          MR. CALLCOTT:  I'm sorry.  570 is a letter dated

2    2-12-03 to Sharon Hughes.

3          568 is a letter dated February 11th signed by

4    Ms. Marks.

5          I think we have made 568 an exhibit.

6          MR. ROMANO:  That is correct.

7          I'm going to go ahead and attach it because I think

8    Ms. Marks will testify that these letters came together as

9    part of that package and, therefore, that's why she signed

10   it.

11          MR. CALLCOTT:  Again and again you are giving

12    testimony to this witness.

13          MR. ROMANO:  No, it's my turn.

14          MR. CALLCOTT:  No, it is your turn but it is your

15    turn to question her but not testify.

16          MR. ROMANO:  You asked for the explanation but make

17    it an exhibit and then I'll ask her questions.

18          MR. CALLCOTT:  I'm going to object to a pattern --

19          MR. ROMANO:  That's fine.

20          MR. CALLCOTT: -- in this deposition.

21          MR. ROMANO:  That's fine.  I apologize.  You were

22    asking me the question and I was trying to explain.

23          Mark it as Deposition Exhibit Number 25.  If you hadn't

24    of questioned me, I wouldn't have answered you.

**Exhibit 2**

**Exhibit 2**

1      (Deposition Exhibit No. 25 marked for the purpose of

2    identification.)

3          MR. ROMANO:  Quite frankly, I thought we made this

4    an exhibit in Jim Marks deposition but apparently I'm wrong

5    because I did not see it.

6        There is your copy.

7    BY MR. ROMANO:

8    Q   Mrs. Marks, take a look at that.

9        Do you remember receiving that letter?

10         MR. CALLCOTT:  Objection to form.

11        You are talking about which of these two documents?

12         MR. ROMANO:  I'm talking about the letter Bates

13    stamp 570 which is a letter from Sharon Hughes to Karen Marks

14    dated 5-12-03.

15         THE WITNESS:  Yes, sir.

16    BY MR. ROMANO:

17    Q    I'm just talking about this letter?

18    A    Yes, sir.

19    Q    What came with this letter?

20    A    I really don't remember what came with it but it said to

21    sign and that's where she indicated and she had the stickers

22    on and that's what I did.

23    Q    Perhaps I'm doing what Mr. Callcott did.  I asked you a

24    little broadly.

**Exhibit 2**

**Exhibit 2**

1      Is this the letter that transmitted the plan documents

2   for your signature?

3         MR. CALLCOTT:  Objection to form.

4         MR. ROMANO:  Go right ahead.

5      You listen to me.

6         THE WITNESS:  Yes.

7   BY MR. ROMANO:

8   Q    Yes?

9   A    Yes.

10   Q    And that included the loan policy that we looked at in

11   Deposition Exhibit Number 13?

12   A    If all of this was included in that packet, yes.

13   Q    Okay.  It was a big stack of documents that you

14   described --

15         MR. CALLCOTT:  Objection to form.

16   BY MR. ROMANO:

17   Q    -- that came with this letter?

18   A    Yes.

19         MR. CALLCOTT:  Same objection.

20   BY MR. ROMANO:

21   Q    And how did you know -- Where she indicates simply

22   signed where I have indicated and return to me, how did she

23   indicate where to sign that big stack of documents?

24         MR. CALLCOTT:  Objection to form.

**Exhibit 2**

**Exhibit 2**

1      THE WITNESS:  With the little stickers, "sign here"

2   stickers.

3   BY MR. ROMANO:

4   Q   Can you give me your best guess as to how many pages of

5   documents there were?

6   A   My guess, and it would be a guess only, probably it

7   looked like five hundred.

8   Q   Okay.  And the little stickies that said "sign here"

9   were throughout the documents?

10   A   Yes, right on the edges.

11   Q   Now, if you could read the third sentence.

12   A   All right.

13   Q   It says, and I'll read for the record, "Also there is a

14   letter to your current record keeper authorizing release of

15   your documents."

16      Let me show you what is attached to this and it is Bates

17   stamped 568 which says "Notice to Current Record Keeper" and

18   let me also read for the record.

19      MR. CALLCOTT:  Objection to form.

20   BY MR. ROMANO:

21   Q   "Marks Construction, Incorporated hereby authorizes any

22   and all communication to commence between your company and

23   Huntington National Bank in order to facilitate the

24   conversion process.  In addition, Marks Construction Company

**Exhibit 2**

**Exhibit 2**

1   hereby authorizes the release of all records, relative to the

2   above plan, to Huntington National Bank.  This authorization

3   is effective immediately."

4       It bears your signature as you testified to earlier,

5   correct?

6   A   Correct.

7   Q   That letter that was addressed to Smith & Denny dated

8   February 11, 2003, do you know who authored that letter --

9       MR. CALLCOTT:  Objection.

10      Asked and answered.

11  BY MR. ROMANO:

12  Q   -- now looking at it in this context?

13  A   It would have had to have been from Huntington Bank,

14  Sharon Hughes.

15  Q   Okay.  What did you do with that letter after you signed

16  it?

17      What would you have done with that letter and all of the

18  other documents that were included with the February 12,

19  2003, letter addressed to you?

20  A   It would have been sent.

21  Q   To who?

22      To Sharon Hughes or to Smith & Denny?

23  A   It would have been sent to Smith & Denny, I guess.

24  Q   Do you have any recollection one way or the other?

**Exhibit 2**

**Exhibit 2**

1   A   No, I don't.

2   Q   Okay.

3        MR. CALLCOTT:  Object to form.

4   BY MR. ROMANO:

5   Q   There were a lot of documents that Ms. Hughes asked you

6   to sign?

7        MR. CALLCOTT:  Object to form.

8   BY MR. ROMANO:

9   Q   Correct?

10  A   Correct.

11  Q   That came with the February 12th letter which is

12  Deposition Exhibit Number 25?

13       MR. CALLCOTT:  Objection.

14     Continued leading.

15  BY MR. ROMANO:

16  Q   Is that correct?

17  A   That is correct.

18  Q   And what did you do with all of those documents after

19  you signed them?

20  A   Sent them back to Sharon Hughes.

21  Q   Okay.  Do you have any recollection that you did

22  something different with the February 11th, 2003, letter at

23  Bates 568 that was sent to you by Sharon Hughes with her

24  February 12, 2003, letter?

**Exhibit 2**

**Exhibit 2**

1       MR. CALLCOTT:  Object to form.

2       THE WITNESS:  No, sir.

3   BY MR. ROMANO:

4   Q    Now, in here there is a sentence that Mr. Callcott

5   pointed out to you, "A list of information is included as to

6   the automative format of the conversion data needed."

7       Do you see that?

8   A    Yes, sir.

9   Q    Do you have any recollection of there being a list

10   attached to this particular letter when you signed it at

11   Sharon Hughes's request?

12       MR. CALLCOTT:  Objection to form.

13   BY MR. ROMANO:

14   Q    You go ahead.  You pay attention to me.  Don't listen to

15   him.  He is doing his job.  But let me ask you again.

16       Do you have any recollection of there being any list of

17   data needed as indicated in the February 11th, 2003, letter

18   at Bates 568?

19   A    No, I don't remember anything being attached.

20   Q    Do you remember or have any recollection of anybody from

21   Huntington National Bank ever telling you that they needed

22   information from Jim Denny that was not being provided?

23       MR. CALLCOTT:  Objection.

24       Asked and answered.

**Exhibit 2**

**Exhibit 2**

1       THE WITNESS:  No, sir.

2   BY MR. ROMANO:

3   Q    And the reason I'm asking you is, as Mr. Callcott likes

4   to say, you have no recollection one way or the other or you

5   don't ever remember that question being asked of you?

6       MR. CALLCOTT:  Objection.

7    Asked and answered.

8       THE WITNESS:  I don't remember the question being

9   asked of me.

10  BY MR. ROMANO:

11  Q    Do you ever remember anyone from Huntington National

12  Bank asking you for information necessary for the plan that

13  you had not provided?

14  A    No, sir.  I provided any information that was asked of

15  me.

16  Q    Okay.  Did anybody from Huntington National Bank ever

17  advise you that there was a delay in causing the new plan to

18  be operational because there was information that either

19  Marks Construction or James Denny had not provided them?

20      MR. CALLCOTT:  Object to form.

21      THE WITNESS:  We sent any information that they

22  wanted from us in a timely manner.

23  BY MR. ROMANO:

24  Q    Okay.  So you don't remember anybody asking that?

**Exhibit 2**

**Exhibit 2**

1   A   No, sir.

2       MR. CALLCOTT:  Same objection.

3   BY MR. ROMANO:

4   Q   Mr. Callcott asked you several questions about a visit

5   from Ms. Hughes in January of '04 and you testified about her

6   bringing up on the computer the plan and sitting down and

7   selecting the funds for you.

8       Do you remember that?

9   A   Yes.

10   Q   When she arrived, did you remember or did you know why

11   she was there?

12       Did you know why she had come to your office to do

13   that?

14   A   No.

15   Q   Did you know why you were selecting funds on the

16   computer based on her instructions?

17       MR. CALLCOTT:  Object to form.

18   BY MR. ROMANO:

19   Q   Listen to me.

20   A   I'm listening to you.

21   Q   You got to focus on my question.  He is not doing that

22   to disrupt you but it is disrupting you.  Let me ask the

23   question again.

24       Did you understand while you were sitting at that

**Exhibit 2**

**Exhibit 2**

1   computer with Ms. Hughes and she was telling you which funds

2   to select for that piece of paper that we looked at -- let's

3   look at yours, that Deposition Exhibit Number 5 --

4       MR. CALLCOTT:  Same objection.

5   BY MR. ROMANO:

6   Q    -- did you have any idea why you were doing that?

7   A   No.

8   Q   What was Ms. Hughes -- What was her manner that day; do

9   you remember?

10      What was her behavior like?

11  A   Well, she was very cordial like she always is but she

12  was a little nervous as I am now and have been and, why, I

13  don't know.  I didn't question.

14  Q   But was she rushing you to get this done?

15      MR. CALLCOTT:  Objection to form.

16      THE WITNESS:  Yes, she said it had to be done that

17  day.

18  BY MR. ROMANO:

19  Q   Okay.  On January 21st, 2004, to the best of your

20  recollection?

21  A   To the best of my recollection.

22      MR. CALLCOTT:  Same objection.

23  BY MR. ROMANO:

24  Q   Why did you sign Jim Marks's name to his form which is

**Exhibit 2**

**Exhibit 2**

1   Deposition Exhibit Number 4?

2   A    Because she said it had to be done that day.  He wasn't

3   available, so she told me to go ahead and sign it, so I

4   signed his name.

5   Q    Mr. Callcott asked you about Richard Straight.

6        Do you have any idea what Richard Straight did?

7   A    No, sir.  That was his personal.  I didn't get into his

8   finances.

9   Q    And do you have any idea what the -- Well, let me just

10   strike that.

11        Do you have any idea what Angela Davis did with regard

12   to Ms. Hughes's visit on January 21st, 2004, one way or the

13   other?

14   A    No, I don't.

15   Q    I just wanted to clarify that.

16        Let me go back and show you the letter that Mr. Callcott

17   marked as an exhibit.  It is Deposition Exhibit 15.

18        They are not in order, so I'm having a little bit of a

19   hard time.

20        Let's be sure we get all of the exhibits together before

21   we leave today because I'm not sure they are all here.

22        Here it is.

23        It's a letter on Smith & Denny letterhead dated

24   April 12, 2001.

**Exhibit 2**

**Exhibit 2**

1       Have you ever seen that letter before today?

2   A   No, sir.

3   Q   In this letter in the first sentence it says, "Enclosed

4   please find the information you requested to process the loan

5   requests of James C. Marks, Karen E. Marks and Angela Davis"

6   signed by Mr. Denny to Denise Boshnyak.

7       How would Mr. Denny know Ms. Boshnyak; do you know?

8   A   No, other than possibly through the bank.

9   Q   Do you know who Ms. Boshnyak is --

10  A   No.

11  Q   -- or was?

12  A   No, I don't.

13  Q   Okay.  Does that refresh your recollection as to what

14  occurred with regard to the genesis of the loans; for

15  example, that Mr. Denny would have talked to the bank to see

16  what they required?

17      MR. CALLCOTT:  Object to form.

18  BY MR. ROMANO:

19  Q   I'm asking if it refreshes your recollection?

20  A   Not a whole lot, no.

21  Q   Okay.  Mr. Callcott asked you why you did not take a

22  distribution instead of a participant loan in 2001 to assist

23  your daughter in buying a home.

24      Do you remember that question?

**Exhibit 2**

**Exhibit 2**

1   A   Yes, sir.

2   Q   Do you know what a distribution is?

3   A   No, I don't.

4   Q   Okay.

5   A   I don't know the difference between the distribution and

6   the loan.

7   Q   Did the bank ever discuss with you the difference

8   between a distribution and a loan?

9   A   No, sir.

10   Q   Looking at the Corporate Resolution which has been

11   marked as Deposition Exhibit 6 and there is a second one

12   which is different than Deposition Exhibit 7 -- I'm going to

13   get those hopefully.

14       I really should have put these in order before I

15   started.

16       Let me show you these Bates Stamp Number 571 which is

17   Deposition Exhibit Number 6 and 572 which is Deposition

18   Exhibit Number 7.  They are both dated February 18, 2003.

19       You indicated these were your signatures on these

20   documents, correct?

21   A   Correct.

22   Q   Do you know in what context you would have signed these

23   Corporate Resolutions?

24       In other words, when did you sign these other than by

**Exhibit 2**

**Exhibit 2**

1   the date indicated?

2       MR. CALLCOTT:  Object to form.

3       THE WITNESS:  I would have only signed them and

4   dated them on the date that Sharon had this sticker again

5   "sign here."

6   BY MR. ROMANO:

7   Q    So these came with all of the other documents that we

8   have been talking about, all of the plan documents?

9   A    Yes, sir.

10  Q    And I notice there is a couple of blanks on Deposition

11  Exhibit Number 7 which it says, "RESOLVED, that the Employer

12  hereby designates the following individuals or positions to

13  serve as the Plan Administrator under the terms of the Plan."

14      Those are blank, aren't they?

15  A    Yes, sir.

16  Q    Did anybody ever tell you to fill those in?

17  A    No, there was no sticker that said to fill anything in.

18  Q    Okay.  To your recollection is everything that bears the

19  date February 18th, 2003, -- did that all come from Sharon

20  Hughes in the package of plan documents and the other letter

21  that we looked at?

22      Those all came on, I believe, -- those all came to you

23  on February 12, 2003, which is Deposition Exhibit Number 25;

24  is that accurate?

**Exhibit 2**

**Exhibit 2**

1       MR. CALLCOTT:  Object to form.

2       THE WITNESS:  As --

3   BY MR. ROMANO:

4   Q   Do you understand the question?

5   A   As best I can remember, everything came altogether.

6   Q   And the plan documents we have been looking at are all

7   dated in or around February 18, 2003, is that correct, and

8   I'll refer you to Deposition Exhibit Number 13?

9       MR. CALLCOTT:  Object to form.

10      THE WITNESS:  Yes.

11  BY MR. ROMANO:

12  Q   And I'll refer you to Deposition Exhibits 6 and 7,

13  correct, February 18, 2003?

14  A   Correct.

15  Q   And Deposition Exhibit Number 21?

16  A   Correct.

17  Q   22?

18  A   Correct.

19  Q   23.

20      And Mr. Callcott didn't tell you but this is part of the

21  basic plan document or some aspect thereof; it is just one

22  page out of there?

23      MR. CALLCOTT:  Object to form.

24

**Exhibit 2**

**Exhibit 2**

1   BY MR. ROMANO:

2   Q   The same date?

3   A   Yes.

4   Q   Now, what I was asking you is when do you believe you

5   received all of the documents that are dated February 18,

6   2003?

7        MR. CALLCOTT:  Object to form.

8        THE WITNESS:  Well, I would have received them at

9   that time and sent them back.

10   BY MR. CALLCOTT:

11   Q   At what time would you have received them?

12      Who did you receive them from?

13   A   We received them from Sharon Hughes.

14   Q   And these are the documents that had the "sign here"

15   stickies on them, correct?

16   A   Correct.

17   Q   And you described it as five hundred pages of

18   documents?

19        MR. CALLCOTT:  Object to form.

20        THE WITNESS:  Yes, it was in a big book.

21   BY MR. ROMANO:

22   Q   Mr. Callcott asked you whether Marks Construction had

23   ever delegated any of his fiduciary responsibilities.

24      Do you remember that question?

**Exhibit 2**

**Exhibit 2**

1   A   Yes.

2   Q   Do you have idea what he was talking about?

3   A   No, sir, I do not.

4   Q   If investment of the plan's assets were a fiduciary

5   duty, who was responsible for that?

6       MR. CALLCOTT:  Objection to form.

7       THE WITNESS:  I would think that Huntington Bank

8   because they were taking care of everything and had for many,

9   many years.

10   BY MR. ROMANO:

11   Q   Can you tell us what Ms. Hughes said about investment of

12   the plan funds when she met with you in 2002?

13       MR. CALLCOTT:  Objection.

14     Asked and answered.

15       THE WITNESS:  That she would take care of them,

16   that we would get a better return and that we didn't have

17   anything to worry about, that she would see to it that it

18   would make a greater return.

19   BY MR. ROMANO:

20   Q   Was Huntington Bank handling of the investments of the

21   plan anything different from what had occurred in prior

22   years?

23       MR. CALLCOTT:  Objection to form.

24   BY MR. ROMANO:

**Exhibit 2**

**Exhibit 2**

1   Q   Let me reask that question.  I didn't like it.

2       Was there any change in the responsibility for

3   investment of the plan funds after you met with Ms. Hughes

4   other than the fact that she would be personally

5   responsible?

6       MR. CALLCOTT:  Objection to form.

7       THE WITNESS:  No.  It would remain the same other

8   than the enhancement that we could get online and check, but

9   we would have a greater return, we would have somebody

10   personal, somebody in this area to talk to, and that she

11   would reduce our rate from what we had been paying.

12   BY MR. ROMANO:

13   Q   And I need to go back for one second.  I don't know if I

14   asked you this.

15       Deposition Exhibit Number 13 is the loan policy which

16   bears your signature dated February 18, 2003, correct?

17   A   Yes.

18   Q   Was this the loan policy under which the loans to you,

19   Jim Marks and Angela Davis would have been in effect at the

20   time?

21   A   No.

22   Q   Those loans were issued in April of 2001, correct?

23   A   Correct.

24   Q   So whatever loan policy governs them, it is not the one

Exhibit 2

**Exhibit 2**

1   at Deposition Exhibit 13, correct?

2        MR. CALLCOTT:  Objection to form.

3        THE WITNESS:  No, because this is at a later date

4   from when our actual loans were taken out.

5   BY MR. ROMANO:

6   Q    From the time Ms. Hughes visited your office do you

7   recollect receiving any regular account statements regarding

8   the plan?

9   A    No, I don't.

10   Q    And we have looked at this but I want to ask you one

11   more time.

12       With regard to the February 11, 2003, letter which is

13   marked as Deposition Exhibit Number 24 that you indicated

14   came with the February 12, 2003, letter from Sharon Hughes,

15   --

16       MR. CALLCOTT:  Object to form.

17   BY MR. ROMANO:

18   Q    -- do you have any recollection of transmitting that

19   letter to Jim Denny?

20   A    No, I don't have any.  I don't remember.

21   Q    Mr. Callcott asked you when you first became aware that

22   the plan was participant directed.

23       Do you remember that question?

24   A    I remember the question, but I don't understand what it

**Exhibit 2**

**Exhibit 2**

70

1    means.

2    Q    Do you not know what participant directed means?

3    A    No, sir.

4    Q    Let me try this.

5        When was the first time you became aware that Huntington

6    Bank believed investments were to be made by the individual

7    participants of the plan --

8        MR. CALLCOTT:  Objection.

9        Asked and answered.

10   BY MR. ROMANO:

11   Q    -- and that it was not their responsibility to handle

12   investments?

13      When did you first learn that?

14   A    We were never told that.  When we first came to the

15   attorney about it, about the losses.

16   Q    Mr. Callcott made reference to you handling million

17   dollar construction projects.

18      Do you remember that?

19   A    Yes.

20   Q    Do you have any idea how many multimillion dollar

21   construction projects you have handled as the bookkeeper for

22   Marks Construction?

23   A    Very few, if any.

24      I didn't actually do the invoicing and say what I might

**Exhibit 2**

**Exhibit 2**

1    have invoiced the project but it was from Richard Straight

2    who did the invoicing.  I just merely plugged in the numbers

3    in our system.

4    Q    Okay.  You had a computer program?

5    A    Yes.

6    Q    And who would you receive the charges for a particular

7    project from?

8         Who provided you those?

9         I'm going to ask you question by question just to let

10   you know.

11        Who provided you the amounts to be charged to a

12   particular project?

13   A    Richard.

14   Q    Okay.  And he would give you a piece of paper?

15   A    Yes.

16   Q    And you would take those and there were boxes on the

17   computer screen for you to enter information into?

18   A    Yes, our accounts receivable package which is very

19   small.

20   Q    Did you do anything other than take the information that

21   Mr. Straight provided to you and then put it into the

22   computer program?

23   A    No.

24   Q    And how did you learn -- I think you testified you got

**Exhibit 2**

**Exhibit 2**

1   that program sometime in the '80s?

2   A   Yes.

3   Q   And how did you learn how to use that program?

4   A   Well, our daughter helped us -- helped me with it

5   because she had a little more knowledge.

6      It was already on the computer.  It was installed on the

7   program, on the computer, because I didn't know how to

8   install it.

9   Q   And how old was your daughter back in the 1980s?

10   A   Probably her last year in high school.

11   Q   Seventeen or eighteen years old?

12   A   Correct.

13   Q   Mr. Callcott asked you some questions about what your

14   responsibility was as president of Marks Construction with

15   regard to the plan.

16      Do you remember that?

17   A   Yes.

18   Q   Did you attempt to view the activity in the plan after

19   Ms. Hughes took over based on your testimony from her

20   representations?

21      MR. CALLCOTT:  Objection.

22      Asked and answered.

23      THE WITNESS:  I'm not sure if I fully understand

24   what you are referring to.

**Exhibit 2**

**Exhibit 2**

1   BY MR. ROMANO:

2   Q    Sure, that's fine.  I'm the same way he is, if you don't

3   understand my question, you ask me to rephrase it.

4       Did you at some point try to see how the plan was doing

5   after Ms. Hughes took it over?

6       MR. CALLCOTT:  Objection.

7       Asked and answered.

8       THE WITNESS:  Yes, I tried to get online but it

9   wasn't possible.

10  BY MR. ROMANO:

11  Q    Okay.  When you tried to get online and couldn't, what

12  did you do?

13  A    I called or there had to be communication in some form

14  between myself and Sharon trying to find out how we could get

15  on.

16  Q    In those conversations did Ms. Hughes ever mention a

17  voice response unit?

18      MR. CALLCOTT:  Objection.

19      Asked and answered.

20      THE WITNESS:  No, sir.

21  BY MR. ROMANO:

22  Q    Okay.  Do you remember was it more than one time that

23  you communicated with Ms. Hughes about you not being able to

24  get online with the plan?

**Exhibit 2**

**Exhibit 2**

1        MR. CALLCOTT:  Objection.

2     Asked and answered.

3        THE WITNESS:  Yes, I believe there was, but I can't

4   give you an exact number.

5   BY MR. ROMANO:

6   Q    Okay.  I'm going to mark as Deposition Exhibit Number

7   26, I believe, a one page document Bates stamped by Plaintiff

8   737.  It bears a fax banner at the top 8/29/03 from HNB

9   Privacy Financial GRPS which I assume is groups.  I'm going

10   to ask you to take a look at this.

11      (Deposition Exhibit No. 26 marked for the purpose of

12   identification.)

13   BY MR. ROMANO:

14   Q    Do you recognize this document?

15   A    Yes, I have seen that.

16   Q    Did you receive this document at Marks Construction?

17   A    Yes, because we couldn't access our account, so I called

18   Sharon as to how we could get on, but I don't think it was up

19   and running.

20   Q    I understand.

21      The instructions that you seen in handwritten form, who

22   do you believe those came from?

23   A    I believe they came from Sharon Hughes.

24   Q    And do you remember attempting trying to get on the

**Exhibit 2**

**Exhibit 2**

1   Internet to view the activity in the investments of the Marks

2   Construction Company plan prior to receiving these

3   instructions?

4   A   Yes.  That's when I couldn't get on.

5   Q   And is the date 8/29/03 to the best of your knowledge

6   the date that this document was faxed to you?

7   A   That's to the best of my knowledge.

8   Q   And when you tried to get on -- Well, let me rephrase

9   that.

10      Did you use these instructions to try to get online?

11   A   Yes, sir.

12   Q   And were you successful?

13   A   No, sir.

14   Q   And did Ms. Hughes at anytime when you had

15   communications with her that initiated her faxing these

16   instructions to you -- did she ever tell you at anytime that

17   you couldn't get on because the bank hadn't finished doing

18   what it needed to do to permit you to access the account

19   online?

20      MR. CALLCOTT:  Objection to form.

21      THE WITNESS:  No, sir.

22   BY MR. ROMANO:

23   Q   Okay.  When you couldn't get online using these

24   instructions, what did you do?

**Exhibit 2**

**Exhibit 2**

1   A   Well, I think I telephoned her again to see what we

2   could do.

3   Q   And did you continue to try to access the account and

4   get online after you received these instructions?

5   A   Several times, yes.

6        MR. CALLCOTT:  Objection.

7      Asked and answered.

8   BY MR. ROMANO:

9   Q   And were you ever able to get online per these

10   instructions or per your communications with Ms. Hughes prior

11   to the date she came up and sat down with you to make the

12   investment selections we see on Deposition Exhibits 4 and 5?

13   A   No, sir.

14   Q   To the best of your recollection was January 21, 2006,

15   the first time you saw the plan on line?

16        MR. CALLCOTT:  Objection to form.

17      You meant 2004.

18        THE WITNESS:  2004.

19        MR. ROMANO:  I'm sorry, thank you.

20   BY MR. ROMANO:

21   Q   Prior to the date reflected on Deposition Exhibits 4 and

22   5 which is January 21, 2004, do you ever remember ever being

23   able to get online prior to that date?

24   A   No, sir.

**Exhibit 2**

**Exhibit 2**

1    Q    Do you remember receiving any account statements during

2    this time period between the August 29, 2003, fax of

3    instructions to utilize the Internet and the time Ms. Hughes

4    came to the office on January 21, 2004?

5    A    No, sir.

6            MR. CALLCOTT:  Objection to form.

7    BY MR. ROMANO:

8    Q    When you signed all of the plan documents that came to

9    you from Ms. Hughes with the little sign tabs, did you keep a

10    copy of those after you signed them and before Huntington

11    Bank signed them?

12    A    No, sir, not to my knowledge.

13    Q    Did Ms. Hughes tell you to keep a copy?

14    A    No, sir, if it wasn't in the instructions.

15    Q    Do you remember when you received the plan documents

16    back signed by Sharon Hughes on behalf of Huntington National

17    Bank?

18    A    No, I don't.

19    Q    Mr. Callcott showed you a letter dated April 30, 2003,

20    Deposition Exhibit Number 19.

21        Do you have any recollection or does this refresh your

22    recollection as to when you may have received the plan

23    documents one way or the other?

24    A    No.  I believe it was quite sometime after.

**Exhibit 2**

**Exhibit 2**

1   Q    After you had signed them?

2   A    After I had signed them.

3        MR. CALLCOTT:  Objection.

4     Asked and answered.

5        THE WITNESS:  What dates I don't know.

6   BY MR. ROMANO:

7   Q    Do you remember if they came with this letter Deposition

8   Exhibit Number 19?

9        MR. CALLCOTT:  Objection.

10      Asked and answered.

11       THE WITNESS:  I would assume that yes they did.

12   BY MR. ROMANO:

13   Q    I'm not asking you that.

14      Do you know one way or another?

15       MR. CALLCOTT:  Please let your witness answer

16   before you interrupt her.

17       MR. ROMANO:  Thank you, Mr. Callcott, for your

18   instruction.

19       MR. CALLCOTT:  Well, I'm going to instruct you not

20   to interfere with the witness's testimony which is what you

21   are doing.

22       MR. ROMANO:  Sir, I don't think you can instruct

23   me.  I appreciate your objection.

24   BY MR. ROMANO:

**Exhibit 2**

**Exhibit 2**

1   Q   But I'm sorry if I interrupted you, Mrs. Marks.  You go

2   ahead.  Let me ask you the question again.

3       Do you know whether you received the plan documents

4   signed by Huntington National Bank with the April 30, 2003,

5   letter which is Deposition Exhibit Number 19?

6       MR. CALLCOTT:  Objection to form.

7       Asked and answered.

8       THE WITNESS:  I would say yes.

9   BY MR. ROMANO:

10  Q   Do you have a specific recollection or was that your

11  assumption sitting here?

12      MR. CALLCOTT:  Objection.

13      Asked and answered.

14      THE WITNESS:  Well, the exact date I don't

15  remember, but I know it was quite awhile after we received or

16  signed the plan or whatever it was.

17  BY MR. ROMANO:

18  Q   Okay, and here's my question.

19      Do you have a recollection of receiving the signed plan

20  documents from Huntington Bank with the April 30, 2003,

21  letter?

22      MR. CALLCOTT:  Objection.

23      Asked and answered.

24      THE WITNESS:  No, I don't remember.

**Exhibit 2**

**Exhibit 2**

1   BY MR. ROMANO:

2   Q   Okay.

3   A   I don't remember.

4   Q   And I thought so.

5      Okay.  Back to the loans taken out by you and Jim Marks

6   in April, and Davis, Angela Davis, excuse me, do you -- did

7   anybody from Huntington National Bank ever notify you that

8   any loan payment was delinquent?

9   A   No, sir.

10   Q   Did anybody ever advise you that the loans were in

11   default prior to your receipt of the Form 1099s?

12   A   No, sir.

13   Q   Did you assume that the loans would be paid out of your

14   retirement account --

15      MR. CALLCOTT:  Object to form.

16   BY MR. ROMANO:

17   Q   -- if due?

18   A   Yes.

19   Q   Were you able to get back on the Internet and look at

20   the accounts investments after the January, 2004, visit by

21   Ms. Hughes when she came up -- let me show you Deposition

22   Exhibits 4 and 5 -- when she came up and had you select those

23   funds?

24   A   As best as I can remember, yes, but at first we had

**Exhibit 2**

**Exhibit 2**

1   trouble with the pin number and I don't know what happened,

2   but they corrected it eventually.

3   Q   This was after her visit in January of '04?

4   A   Yes.

5   Q   Now, let me ask you.  Did you know anything about those

6   funds that are reflected on Deposition Exhibits 4 and 5 prior

7   to Ms. Hughes's visit?

8       MR. CALLCOTT:  Objection.

9     Asked and answered.

10      THE WITNESS:  No, sir, and I told her when we

11   decided -- when she suggested that we select these that I was

12   going strictly by what she suggested because I knew nothing

13   about investments.  I don't even know what these funds are.

14   BY MR. ROMANO:

15   Q   Okay.  Who decided what percentage would be given to

16   each fund?

17      MR. CALLCOTT:  Objection.

18     Asked and answered.

19      THE WITNESS:  Sharon said that this would be good,

20   take ten percent of this one as she drew them up because Jim

21   and I were conservative from the little test that she had

22   given us.

23   BY MR. ROMANO:

24   Q   How long did this exercise take of the creation of

**Exhibit 2**

**Exhibit 2**

1    Deposition Exhibits 4 and 5 and her getting on the Internet

2    to make these selections?

3    A    I would say not more than a half hour.

4          MR. ROMANO:  Okay.  I have nothing further right

5    now, Mr. Callcott.

6                      REEXAMINATION

7    BY MR. CALLCOTT:

8    Q    With respect to Exhibit 19 which he showed you --

9          MR. ROMANO:  Which one is it?

10          MR. CALLCOTT:  I believe it is a letter dated April

11    of 2003.

12          MR. ROMANO:  Let me see.

13          Oh, there it is.

14    BY MR. CALLCOTT:

15    Q    You said you didn't recollect regarding the receipt of

16    those documents.

17          Is it true that you simply don't remember one way or the

18    other whether they were with that document or whether they

19    were at some other time?

20          MR. ROMANO:  I'm going to object.

21          Misconstrues her testimony.

22    BY MR. CALLCOTT:

23    Q    I'm saying, as you look at that document, isn't it true

24    that you don't recollect one way or the other whether the

**Exhibit 2**

**Exhibit 2**

1   documents were received with that letter or whether they were

2   received at a different time?

3        MR. ROMANO:  Can you define which documents you

4   mean?

5   BY MR. CALLCOTT:

6   Q   Do you understand my question?

7   A   To a point.

8   Q   Okay.

9   A   And I think I said before that this letter was received

10   with the booklets at this particular date because it was

11   later than when we signed where she had sent the book for me

12   to put her signature, my signature.

13   Q   Now, you have made a claim that the bank had certain

14   responsibilities after April 1st of 2006 regarding the

15   investments.  You stated that it was the bank's

16   responsibility to do that.

17        Are you aware of any document that delegates that duty

18   to the bank?

19   A   No, I'm not aware of any document.

20        There again, we put our complete trust in Sharon and

21   Huntington Bank.

22   Q   Now, with respect to a document Bates Number 568 -- it

23   is Exhibit 24 -- I asked you questions about this document

24   and got one set of answers and then your lawyer asked you a

**Exhibit 2**

**Exhibit 2**

1    set of questions and got a different set of answers.

2         MR. ROMANO:  I'm going to object to that but go

3    ahead.

4         MR. CALLCOTT:  Well, the transcript will bear us

5    out one way or the other.

6         MR. ROMANO:  Right, it will speak for itself.

7    BY MR. CALLCOTT:

8    Q    Do you have a firm recollection one way or the other

9    about how you received that document or who you sent it to?

10   A    No.  As I said, I don't have a firm recollection but,

11   if it were with the other letter, it would have been from

12   them.

13   Q    But you simply don't know for sure one way or the

14   other?

15   A    I would say no.

16   Q    Okay.  And if you signed that letter, do you think you

17   sent it out?

18   A    That I can't answer.

19   Q    Would it have been your normal and customary practice to

20   send it out?

21        MR. ROMANO:  I object to the form as to what is

22   normal and customary.

23        THE WITNESS:  Again as I say, if I was advised by

24   Sharon, I would have done it.

**Exhibit 2**

**Exhibit 2**

85

1   BY MR. CALLCOTT:

2   Q   Let me ask it to you this way.

3       Do you have any specific reason to believe that you did

4   not send that out and I guess we are talking specifically

5   about Exhibit 24?

6           MR. ROMANO:  Objection to form.

7           THE WITNESS:  No, I have no reason to believe it

8   wasn't sent.  I absolutely do not know.

9   BY MR. CALLCOTT:

10  Q   But you don't have any reason to think that you didn't

11  send it out?

12          MR. ROMANO:  To who?

13          MR. CALLCOTT:  To who it is addressed to.

14          THE WITNESS:  I can't honestly answer that, who it

15  was sent to.

16  BY MR. CALLCOTT:

17  Q   I understand, ma'am.

18      I'm asking is there any specific reason that leads you

19  to believe that that letter was not sent out by you?

20          MR. ROMANO:  To the addressee?

21          MR. CALLCOTT:  To the addressee.

22          THE WITNESS:  No.

23  BY MR. CALLCOTT:

24  Q   Now, you made some comments about trying to check

**Exhibit 2**

**Exhibit 2**

1   online.

2       Between April 1st of '03 and say this August 29, '03,

3   facimili which your counsel has appended as Exhibit 26, do

4   you have any specific recollection as to how many times you

5   had tried to check online for these accounts?

6           MR. ROMANO:  Prior to that date?

7           MR. CALLCOTT:  Prior to this date.

8           THE WITNESS:  No, sir, I wouldn't have any idea.

9   I would say more than three or four but I don't have a record

10  of it, of how many.

11  BY MR. CALLCOTT:

12  Q   Do you have a firm recollection of trying as many as

13  three or four times?

14  A   Yes, I would say so.

15  Q   As many as ten times?

16  A   No, I don't think it would be quite that many.

17  Q   After this date 8/29/03 until January of '04, how many

18  times do you claim to have tried to get online between those

19  two dates?

20  A   I would say about the same amount.

21  Q   Now, previously there has been some testimony regarding

22  whether or not you received any statements from Huntington

23  and I want to make sure I understand your testimony.

24      Are you saying that you simply don't recollect one way

**Exhibit 2**

**Exhibit 2**

1   or the other whether you received statements from Huntington

2   about your account or are you stating affirmatively that you

3   never received statements from Huntington during the time

4   period of April 1, '03, until January of '04, or from anyone

5   related to these accounts?

6   A   I never saw any, so I would assume that we didn't get

7   any.

8        MR. CALLCOTT:  Okay, all right.  Let's take a short

9   break and we will be right back.

10       MR. ROMANO:  I have a couple of questions for

11   Mrs. Marks.

12       MR. CALLCOTT:  Let's take a break.  We will be

13   right back.

14   (Recess taken in proceedings at 12:31 p.m.)

15            R-E-C-E-S-S

16   (Proceedings reconvened at 12:37 p.m. as follows:)

17       MR. CALLCOTT:  Back on the record.

18   BY MR. CALLCOTT:

19   Q   Ms. Marks, let me ask you this.

20       Would Marks Construction have kept the plan in place --

21   If the things that you and Mr. Marks have indicated that

22   Sharon told you that those things had turned out in your

23   estimation to be true, would you have left things the way

24   they were --

**Exhibit 2**

**Exhibit 2**

1        MR. ROMANO:  Objection to form.

2    BY MR. CALLCOTT:

3    Q    -- and kept the plan in place?

4    A    No sir, that would be a guess only.  I don't know.

5    Q    Well, I mean, if the plan had earned higher returns and

6    was less expensive to administratively maintain, would you

7    have anticipated keeping it in place?

8    A    Yes, we probably would have kept it in place because we

9    didn't realize that it had lost money.

10   Q    No, but I'm saying that is if the same --

11   A    This --

12        MR. ROMANO:  Let him ask the question.

13   BY MR. CALLCOTT:

14   Q    If Sharon and Huntington had done all of the things that

15   you claim they said they would do, would you have kept the

16   plan in place?

17   A    Well, that wouldn't have been all of my decision.  It

18   would have been up to Jim but I would say if they continued

19   to make money, yes.

20        MR. CALLCOTT:  Okay.  Pass it back.

21    (Discussion off the record.)

22             REEXAMINATION

23   BY MR. ROMANO:

24   Q    I'm not sure I understood his question but I got to ask

**Exhibit 2**

**Exhibit 2**

89

1   again.

2      If the representations that Sharon Hughes made when she

3   came to your office in 2002 that she was going to make more

4   money, personally handle the plan, make sure all of the

5   investments were good, lower the fees, if Huntington Banks

6   had done all of those things, would the plan still be at

7   Huntington Banks?

8        MR. CALLCOTT:  Objection.

9      Asked and answered.

10       THE WITNESS:  I would say yes.

11   BY MR. ROMANO:

12   Q   Okay.  When you said things, it confused me.  I mean,

13   I wanted to know what things you were talking about.

14      Mr. Callcott asked you if you had received any

15   statements.  I believe Mr. Marks said something to you during

16   the break.

17      Do you have any recollection of receiving any statements

18   at all from the time Ms. Hughes visited you until January of

19   2004?

20   A   I didn't remember but they said, yes, we did, but I'm

21   not sure that I ever even looked at it if we did receive it.

22   Q   When you receive a statement regarding the plan, what do

23   you normally -- even today what do you normally look at?

24   A   The bottom --

**Exhibit 2**

**Exhibit 2**

1       MR. CALLCOTT:  Objection to form.

2     Go ahead.

3       THE WITNESS:  The bottom line to see how much it is

4   because I don't understand all of it.  I have no idea.  I

5   can't read it, read a financial statement.

6   BY MR. ROMANO:

7   Q    And when you started trying to get online to view the

8   plan after Ms. Hughes took it over, was there any urgency or

9   concern that you were trying to satisfy or were you just

10   trying to look at it online?

11   A    Just trying to look at it.

12   Q    Why weren't you worried about -- well, let me ask you

13   this.  Well, strike that.

14     Did you have any concern when you first tried to get

15   online that perhaps the assets had not been invested?

16       MR. CALLCOTT:  Objection to form.

17       THE WITNESS:  No.

18   BY MR. ROMANO:

19   Q    Okay.  Did you have any concern when Ms. Hughes came in

20   on January 21st, 2004, and had you fill out these forms with

21   some urgency that the plan assets had not been invested?

22   A    No.

23       MR. ROMANO:  I don't have anything further.

24     Read and sign.

**Exhibit 2**

**Exhibit 2**

1        MR. CALLCOTT:  Yes, ma'am -- yes, sir.

2        You understand that you have the option to read and sign

3    and we make that request.  Your counsel said that is what you

4    will do.

5        MR. ROMANO:  Yes.

6        (Deposition adjourned at 12:58 p.m.)

7                    *  *  *

8            A-D-J-O-U-R-N-M-E-N-T

9                    *  *  *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**Exhibit 2**

**Exhibit 2**

1       C E R T I F I C A T E

2

3   STATE OF WEST VIRGINIA)   SS:

4

      I, Rosalie B. Eanone, Registered Merit Reporter,
5  Notary Public in and for the State of West Virginia, do
   hereby certify that the within witness was by me first duly
6  sworn to tell the truth, the whole truth, and nothing but the
   truth; that I did report said deposition in stenotype; and
7  that the foregoing pages are a true and correct transcription
   to the best of my ability of my said stenotype notes of said
8  deposition.

9

      I further certify that the above deposition was
10  taken at the time and place hereinabove set forth and that
   the taking of said deposition was commenced and completed as
11  hereinabove set out.

12

      I further certify that I am not attorney or counsel
13  of any of the parties, nor am I a relative or employee of any
   attorney or counsel or party connected with the action, nor
14  am I financially interested in the action.

15

      IN WITNESS WHEREOF, I have hereunto set my hand this
16  11th day of October, 2006.

17

18

19

20         ROSALIE B. EANONE, RMR, NOTARY PUBLIC

21

22

23

24

**Exhibit 2**

**Exhibit 2**

1     IN THE UNITED STATES DISTRICT COURT FOR THE
       NORTHERN DISTRICT OF WEST VIRGINIA
2         CLARKSBURG
       -----
3

4  MARKS CONSTRUCTION CO., INC., et al,

5     Plaintiffs
  VS          CIVIL ACTION NO. 1:05-CV-73
6        (Judge Frederick P. Stamp, Jr.)
  THE HUNTINGTON NATIONAL BANK, et al,
7
    Defendants
8
      ------
9

10         CERTIFICATE

11    I, Karen E. Marks, do hereby certify that
  I have read the foregoing transcript of my deposition
12  and certify that it is a true and correct copy of my
  testimony, except for additions, corrections or changes,
13  if any, in form or substance as set forth by me on the
  attached Deposition Correction Sheet.
14

15

16
      Deponent
17

18

19

20

21

22  Notary Public

23
  (date)
24

**Exhibit 2**

**Exhibit 2**

1          CORRECTION SHEET
    DO NOT WRITE ON TRANSCRIPT   -   ENTER CHANGES BELOW
2
    DEPONENT:  KAREN E. MARKS
3
    PAGE LINE  CHANGE FROM    TO    REASON
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   Signature of Deponent          Date

**Exhibit 2**

**Exhibit 2**